IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| ANITA RUSSELL, | ) | |
| Personal Representative for the Estate | ) | |
| of Daniel Russell, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:11cv75 |
| | ) | |
| DENNEY WRIGHT and | ) | |
| | ) | |
| TASER INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DENNEY WRIGHT'S
## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW defendant Denney Wright, by counsel, and files this memorandum in support of his motion for summary judgment.

## STATEMENT OF THE CASE

On or about October 19, 2011, plaintiff, as administrator of the Estate of Daniel Russell filed a lawsuit against defendants Deputy Sheriff Denney Wright ("Wright" or "Deputy Wright") of the Appomattox County Sheriff's Office, Appomattox County, the Commonwealth of Virginia and TASER International, Inc. ("TASER") in the Circuit Court for Albemarle County. The Commonwealth of Virginia was nonsuited on November 30, 2011. On that same day, the case was removed to this Court. On or about December 22, 2011, plaintiff moved to file an amended complaint. On February 3, 2012, plaintiff filed a motion to amend her previous motion for leave to file an amended complaint. This Court granted the motion to file the second amended complaint on March 13, 2012, and that complaint named only Wright and TASER as

defendants. The claims made against Deputy Denney Wright are: 1) a § 1983 claim for excessive force in violation of the Fourth Amendment; 2) gross negligence for shooting Daniel Russell (hereinafter "Russell" or "decedent") with an electronic control device (ECD) manufactured by TASER without provocation or justification; and 3) assault and battery for intentionally shooting decedent with an ECD without provocation and causing him to go into a fatal coma. From Wright, plaintiff seeks compensatory and seeks punitive damages for using deadly force without justification or provocation. TASER was sued for breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, breach of duty to warn and negligence. From TASER, plaintiff seeks compensatory and punitive damages.

Both defendants deny that they are liable to plaintiff and have moved for summary judgment.

<u>STATEMENT OF FACTS</u>

As they must for purposes of this memorandum, the facts are presented in a light most favorable to the plaintiff. The pertinent facts in this case are largely undisputed and much of the incident was recorded by dispatch, in car cameras and the Taser camera.

<u>Incident</u>

Late on October 30, 2010, defendant Appomattox County Sheriff's Deputy Denney Wright was speaking with Deputy John Mattox in the Appomattox High School parking lot.[1] (W 114; W Ex 5.) Deputy Mattox and then Sergeant Christopher Samms were dispatched to a call at 7724 Red House Lane, Appomattox County, in response to a 911 call at approximately 11:41 p.m. (W Ex 5; A Decl ¶3, 911 Call 2) made by Andrew Russell (then 16) for rescue to come to

---

[1] See exhibit list attached hereto as the last page of this memorandum.

check on his 9 year old brother (Rhett) who had been kicked in the ribs by his father, decedent Daniel Russell (then 52) (A Decl ¶3, 911 Call 1).  Andrew reported that it "looks bad".  (A Decl ¶3, 911 Call 1.)  Since Deputy Wright was with Maddox and it was on his way home anyway, Wright radioed that he would also respond and he followed Mattox.  (W 115; W Ex 5; A Decl ¶3, 911 Call 2.)  Both were in their marked vehicles.  They proceeded to the residence and were told that the man was leaving the house in his Chevrolet vehicle with "farm use" tags and that he had been drinking.  (A Decl ¶3, 911 Call 2 and 4.)  Andrew reported that he could see the officers' vehicles, but that his father did not stop for them.[2]  (A Decl ¶3, 911 Call 1.)  Russell pulled out of the driveway as the officers approached, so Mattox and Wright turned around in the driveway to follow him and activated their lights and sirens (W Ex 5 and 7; M 56.)[3]  Russell did not slow down and continued at a high rate of speed causing Mattox to call it into dispatch as a pursuit and noted that they were going about 60 miles per hour.  (W Ex 5; M 58; M Decl ¶4; A Decl ¶3, 911 Call 5.)  Mattox had to go faster than 60 miles per hour to catch up to Russell.  (M 58.)  Russell passed numerous driveways and areas where he could have pulled off the road safely.  (W Ex 7; W Decl ¶3; M Decl ¶3.)  Finally, after about .6 or .7 miles (M 59), Russell applied the brakes, turned on his blinker, and turned left on Promise Land Road (M 89) and pulled off the road into a gravel parking area (W Ex 5 and 7.)

Maddox pulled in immediately after Russell.  (W Ex 5 and 7.)  Russell got out of his truck very quickly and started moving toward Mattox.  (M 59; W Ex 5 and 7.)  It was unusual for a driver to do so in Appomattox County.  (W Decl ¶6; M Decl ¶4.)  Because of Russell's

---

[2] Dispatch asked Andrew if his father had weapons and Andrew reported that he did not, but dispatch did not convey that information to the officers.  (A Decl ¶3, Call 1, 2 and 4.)

[3] The in-car cameras in both vehicles were also activated.  The video portion begins first with an initial delay for the sound.

aggressive actions, Mattox pulled his service weapon and did not have time to turn his siren off. (M 16; W Ex 5.) Russell was yelling something at the beginning, but Mattox could not hear what he was yelling because of the siren. (M 16; W Ex 5.) Maddox repeatedly told Russell to get down – get down on the ground. (M91-92; M Decl ¶7; W Ex 5 and 7.) Mattox used an overly loud voice to make sure Russell could hear him and he believes Russell could hear him. (M 62; M Decl ¶7.) Wright turned off his siren, pulled his Taser and approached. (W 147; W Ex 7.) He could hear Mattox's commands to Russell to get down on the ground. (W Ex 5; W Decl ¶5.) Both officers were concerned that they could not see whether Russell was armed or not. (W 160; W Decl ¶5; M 67-68; M Decl ¶7.) Russell was wearing a t-shirt with a button up shirt open over the t-shirt. (W 160; W Ex 7.) The officers could not see his waistband to see if he might be armed. (W 160; W Decl ¶5; M 68; M Decl ¶7.) Mattox, who teaches defense tactics, is not going to approach someone unless he is able to see everything he can before doing so – especially the waistband and small of the back. (M 68-69; M Decl ¶7.) This was not possible with Russell.

Russell made no move to comply with the commands to get down – get down on the ground. (W 157; W Ex 7; W Decl ¶5; M 76-77; M Decl ¶7.) He placed his hands in the air at times, but kept moving them up and down. (W Ex 7.) Both officers then heard Russell say "Go ahead and shoot me." (W 123; W Ex 5 and 7; W Decl ¶5; M 71; M Decl ¶7.) This statement concerned both of the officers. Mattox had never confronted someone that made such an odd statement. (M 72; M Decl ¶7.) It was extremely worrisome to Mattox as most people know that a loaded gun can take their life. (M 72.) Wright took the statement as a threat and knew that Russell would not obey their commands. (W Decl ¶5.) He thought he might be armed and might try something. (W Decl ¶5.) If Russell did not care about his own life, he certainly would

not care about the life of the officers. Moreover, Russell was clearly indicating that he was not going to do what they were telling him to do. (W 157, 193-94; W Ex 5 and 7; W Decl ¶5; M 75.) Mattox told Wright to "tase him" as Mattox took steps back from Russell. (W 125; W Ex 5 and 7; W Decl ¶5.) Wright did not initially use the Taser. Instead, more commands were given to get down on the ground. (W Ex 5 and 7.) Then Russell took another step towards the officers and was getting ready to take another when Wright deployed the Taser. (W 157-59; W Ex 5 and 7; W Decl ¶5.)[4] Wright made an independent decision to use the Taser on Russell, but knew that Mattox believed the Taser was appropriate for the situation. (W126; W Decl ¶5.) Russell crossed his arms and fell backwards. (W Ex 5 and 7.) Wright used only a single five second Taser cycle. (W 160.)

The deputies turned Daniel Russell over and cuffed him with some difficulty as he would not release his arm and then performed a quick pat down search and retrieved Russell's identification. (W Ex 5.) The deputies were joined by Sgt. Samms who arrived on the scene when Russell was still standing, but he was on the telephone when he arrived. (W Ex 5 and 7; S 20-21.) Mattox and Wright were not aware that Samms had arrived on the scene until he approached them after Russell had been handcuffed. (W Decl ¶6; M Decl ¶8.) The officers report that Russell was still moving and breathing at this point. (W Ex 5; M 97-99; S 31, 34.) Mattox called for rescue since Russell had been tased even though he did not notice anything wrong with Russell at that point – he would want anyone that had been tased to be seen by rescue personnel. (W Ex 5; M Decl ¶9; A Decl ¶3, 911 Call 12.) They propped Russell up against Sgt. Samms' legs and subsequently noticed that something was wrong. (W Ex 5.). They started saying, "hey buddy, hey buddy," and they smelled a strong odor of alcohol. (W Ex 5 and

---

[4] The Taser also has a camera that is activated when the Taser is deployed.

7; S 33-34, 40-41.)  A sternum rub was administered and the AED was retrieved.  (W Ex 5 and 7.)  The volunteer rescue squad that was headed to the house for Russell's son was then diverted to the Taser scene at the request of Sgt. Samms.  (W 174-75; A Decl ¶3, 911 Call 15.)  Deputy Wright was instructed to go to the house and interview Russell's son, and he left the scene.  (W 130; W Ex 5.)

The AED instructed Mattox and Samms to administer a shock and then CPR began and continued until rescue arrived.  (W Ex 5 and 7; M 79.)  Russell went into cardiac arrest at some point.  His heart was restarted by rescue workers, and he was taken to Lynchburg General Hospital.  (W Ex 5.)  At the hospital, Russell had a 0.17 blood alcohol level and tested positively for marijuana.  (H 93, 103.)  He had a history of two prior heart attacks, including a stent, and a history of cocaine and heroin use.  (C 18-19; H 95.)  Russell suffered anoxic brain injury and lived in a semi-vegetative state until he suffered another heart attack seven months later and died. (Whaley 24-25.)

If Russell had recovered, he would have been charged with obstruction, eluding, domestic assault, DUI, possession of marijuana, and improper use of farm use tags.  (M 115.)

Analysis of Aligned Videos

Video analyst expert Grant Fredericks aligned and synchronized the videos so the incident could be seen from different perspectives, and the videos can be viewed frame by frame. (F 28; F Ex 120.)  Fredericks used the time on the Taser camera, but does not know what the actual time was.  (F 62.)  The car videos recorded 30 frames per second and play back at 30 frames per second.  (F 32.) The Taser camera recorded 10 frames per second, but plays back at 30 frames per second, so each image is sustained three times longer on playback.  (F 32-33.) The aligned video can be played on Avid Media Composer or Quicktime Player.  (F34, 56-57.)

To view the aligned video frame by frame, pause the video and then use the arrow keys to the right to forward and to the left to go backward. The time on the aligned video references hours, minutes, seconds and images, for example 03:04:58;08 shows three hours, four minutes, 58 seconds, and frame 8, but does not show the actual time. (F 62.)

Fredericks report provides detailed information that can be seen on the aligned video and the following is from his report and deposition transcript where indicated. At 03:05:00:03, Deputy Mattox emerges from his vehicle, and immediately yells loudly at Mr. Russell, "Get down." Instead, Mr. Russell advances toward the officers. Deputy Mattox is holding his firearm in his right hand, and is pointing it toward Mr. Russell, who continues to advance. Mr. Russell takes eight steps toward the officers. If one counts the first foot on the ground when he exits the vehicle and count his weight shifts, then there may be eleven motions forward with the feet. (F 76-77.) As he moves forward, he moves out of the field of view of Deputy Mattox' in-car video system. As Mr. Russell approaches the officers, Deputy Mattox yells loudly at Mr. Russell, 'Get down' five (5) times, 'Do it' once (1) and 'Get down on the ground' once (1) between 03:05:00:03 and 03:05:09:00; a total of nine seconds. At this time, Mr. Russell raises his arms. Deputy Mattox steps backward, and away from Mr. Russell. As he steps backward, he turns his head toward Deputy Wright and says, 'Tase him'. Deputy Mattox repeats, 'Tase him', as he continues to step backward, with his firearm still pointed toward Mr. Russell. Deputy Wright moves forward, toward Mr. Russell. At 03:05:10:26, Mr. Russell slowly begins to move toward Deputy Mattox, who is retreating. Deputy Mattox again yells loudly to Mr. Russell, 'Get down' and 'Get on the ground'. At 03:05:13:03, Mr. Russell asks, 'Why don't you just Tase me'? At 03:05:13:23, as Mr. Russell moves forward, Deputy Mattox repeats, 'Tase him. Tase him'. At 03:05:14:17, Mr. Russell is moving toward the officers. As he takes his next step forward,

Deputy Wright fires the X26 ECD at Mr. Russell.  Mr. Russell reacts at 03:05:14:24 by stiffening up, and falling backward.  The TASER Cam recording ends at 03:06:17:21.  Deputy Mattox returns to his police vehicle to turn off the siren.  At 03:06:25:24, Deputy Mattox broadcasts, 'One in custody'.

Between 03:06: 36:11 and 03:07:25:07 (almost forty-eight seconds), Mr. Russell can be heard  making guttural breathing sounds.  At 03:06:52:03, while Mr. Russell can be heard making breathing sounds, Deputy Mattox broadcasts a request for a medical unit to come to his location, in order to examine Mr. Russell. The Deputy advises that the Taser was used.  Gutteral expulsions of breath are heard periodically until two minutes and ten seconds after deployment of the Taser.  (F 49-50.)  At 03:07:34:07, Deputy Samms is seen entering the field of view of Deputy Mattox' in car video system. Deputy Samms approaches the area where Mr. Russell is on the ground.  Wright's in-car video stops recording at 03:11:22:23.  (F Ex 118 and 120.)

Wright Background

Wright began employment with the Appomattox County Sheriff in 2005 at the jail.  He did not carry a Taser at the jail.  (W 15.)  In 2009, he became a road deputy and was trained at the criminal justice academy.  (W 34.)  The Sheriff's use of force policy allowed for Taser use in response to passive resistance where a lesser means of force has been attempted and failed and the officer is attempting to make a custodial arrest.  (W Ex. 10, p. 2-6.6.)  The policy places Tasers, non-lethal force, on the same level as OC spray.  (W Ex. 10, p. 2-6.6.)

The policy lists the preferred target area as center mass of the body (W Ex 10, p. 2-6.6), and Wright was trained to target center mass – center of the upper torso.  (W 83-84.)  Before Wright was trained on use of a Taser, Wright attended a staff meeting in February 2010 (B 85) wherein a discussion was held that TASER was recommending, if possible, that the preferred

target area be changed to lower center mass to avoid controversy about whether or not the ECD could have caused a cardiac event.  (W90-92.)  He had no understanding from this meeting that the Taser could cause cardiac arrest.  (W 87.)  Wright was later trained to use the Taser in April 2010, six months before this incident by Deputy Burton.  Wright was trained using an old version of the Taser training DVD – Version 14.  (B 92-93.)  The current version in April 2010 was version 16.  (B 18; Staples Ex 19)  Version 14 taught that center mass was the preferred target**.**  (W Ex 12.)  Wright had never deployed a Taser in the field prior to this incident, and he deployed the Taser at Russell's center mass (right of sternum at breast level) for the top probe as he was trained to do.  (W 49, 223.)[5]   The Sheriff's policy at the time of this incident still said to target center mass.  (W Ex 10.)  As plaintiff's expert Dr. Zipes testified, while there were suggestions, there was no peer reviewed study prior to April 30, 2012, that ever stated or concluded that a Taser causes cardiac arrest.  (Z 107-10.)  Indeed, the Police Executive Research Forum / National Institute of Justice guidelines even as of 2011 do not include a recommendation to avoid the chest area or to avoid center mass.  (Alp 88-90; Alp Ex 155.)

<u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In establishing the parameters for an award of summary judgment, the Supreme Court has stated that:

> The judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of the plaintiff's

---

[5] Russell's sister claims the upper probe mark was left of sternum at breast level.  (LW 98.) There is no mention in the medical records of probe locations or probe marks.

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find a preponderance of the evidence that the plaintiff is entitled to a verdict.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). See also Celotex Corp. v. Catrette, 477 U.S. 317 (1986).

Mere general allegations will not prevent an award of summary judgment. Johnson v. McKee Baking Co., 398 F. Supp. 201, 206 (W.D. Va. 1975), aff'd, 532 F.2d 750 (4th Cir. 1976). Likewise, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Allegations that are simply conclusory do not state a constitutional claim. Lovern v. Cox, 374 F. Supp. 32, 34 (W.D. Va. 1974). Additionally, the non-moving party cannot manufacture a genuine issue of material fact through mere speculation, or by simply building one inference upon another. Beale v. Hardy, 769 F.2d 213 (4th Cir. 1985). A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.1991).

<u>ARGUMENT AND AUTHORITIES</u>

I. DEPUTY DENNEY WRIGHT USED REASONABLE FORCE IN USING THE TASER TO EFFECT AN ARREST OF DANIEL RUSSELL AND DID NOT VIOLATE THE FOURTH AMENDMENT.

All excessive force claims in the course of an arrest are analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The Fourth Amendment states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

Necessarily, the right to arrest carries with it the right to use force to effect the arrest. Graham, 490 U.S. at 396. Courts are to carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Since the reasonableness test is "not capable of precise definition or mechanical application," the totality of the circumstances must be evaluated. Id. (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)). The Fourth Circuit Court of Appeals has noted that "[a]pplication of the standard is highly fact dependent…." Wilson v. Flynn, 429 F.3d 465, 468 (4th Cir. 2005). Examination of all facts and circumstances includes the severity of the crime, whether the suspect poses an immediate threat to safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Id. Importantly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The courts' balancing of interests must also take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

In this case, Deputy Wright used a Taser to effect the arrest of Russell. Electronic control devices (ECDs), also known as conducted energy devices (CEDs) or tasers have proven to be effective devices for law enforcement agencies, and ECDs carry "a significantly lower risk of injury than physical force." Hagans v. Franklin County Sheriff's Office, 695 F.3d 505, 510 (6th Cir. 2012) (quoting John H. Laub, Director, Nat'l Inst. of Justice, *Study of Deaths Following Electro Muscular Disruption* 31 (2011); see also Mattos v. Agarano, 661 F.3d 433, 464 (9th Cir. 2011) (*en banc*) (Kozinski, J., concurring in part and dissenting in part)). The vast majority of

individuals subjected to a taser – 99.7% - suffer no injury or only a mild injury.  Id.  Plaintiff's

use of force expert, Geoffrey Alpert, notes in July 2010, in A Multi-Method Evaluation of Police

Use of Force Outcomes:  Final Report to the National Institute of Justice, that "the empirical

evidence suggests that getting close to suspects to use hands-on tactics increases the likelihood of

officers sustaining injuries."  (Alp Ex 149.)  Across 12 agencies, in more than 24,000 use of

force cases, the odds of a suspect being injured decreased by 60 percent when CEDs were used.

(Alp Ex. 149.)  The report also suggests that agencies need to consider alternatives to officers'

use of hands-on tactics if they want to reduce injuries.  (Alp Ex 149.)

The United States Supreme Court has not yet addressed the issue of ECDs and the use of

force, and the Fourth Circuit Court of Appeals has not addressed the use of a taser in a use of

force case similar to the case presented in Russell.  Indeed, the Fourth Circuit only specifically

addressed the use of an ECD in one Fourteenth Amendment case.  In Orem v. Rephann, 523 F.3d

442 (4th Cir. 2008),[6] the Court considered the use of a taser under the Fourteenth Amendment

due process clause since the person was already in custody and was being transported to jail.  In

a case very different than the one at hand, a handcuffed and hobbled arrestee was being

transported to jail when she yelled, cursed, banged her head repeatedly against the car window,

and jumped around in the back seat causing the car to rock and loosening the hobbling device.

Orem, 523 F.3d at 444.  The deputy driving the vehicle pulled over but did not request

assistance.  Id.  The driver tightened the hobbling device.  Id.  A deputy that had been following

in his car stopped and engaged in a verbal exchange with the arrestee.  He used the taser against

the arrestee twice in stun mode and then instructed her to respect the officers.  Id. at 445.  The

Court denied defendant's motion for summary judgment finding that the force used, in a light

---

[6] The district court and parties had engaged in a Fourth Amendment analysis, but also denied
summary judgment.

most favorable to the arrestee, was wanton, sadistic, and was not used in a good faith effort to restore discipline.  Id. at 447.  In addressing qualified immunity, the Court stated that the transporting officer and another officer on the scene, whom the court presumed to be reasonable officers, did not find it necessary to use a taser.  Id. at 448.  Since the taser was used to punish the arrestee, qualified immunity was not available on summary judgment.  Id. at 449.

The Fourth Circuit discussed the use of ECDs in Henry v. Purnell, 652 F.3d 524 (4th Cir. 2011) (en banc), cert. denied, __ U.S. __, 132 S. Ct. 781 (2011),[7] but that case actually involved the use of a Glock .40 caliber handgun that the officer mistook for his Taser M26.  Purnell, 652 F.3d at 528.  Henry failed to pay child support or report to jail so an arrest warrant was issued.  Purnell eventually located Henry in a vehicle with others.  Henry exited the vehicle and went towards the back of it with the officer, but then jogged or ran toward his trailer home.  Purnell unholstered his Glock thinking it was his Taser, gave no command to stop, gave no verbal warning and shot Henry in the elbow.  Id.  The Court, applied the standard for use of deadly force and noted that "[a] police officer who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others' violates that suspect's Fourth Amendment rights."  Id. at 531-32 (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)).  Purnell's mistaken belief did not change the standard.  Under the

---

[7] The case went to the Fourth Circuit several times.  First the district court denied summary judgment as credibility was in issue with regard to drawing the wrong weapon.  The Fourth Circuit determined it had no jurisdiction over the first appeal.  (Purnell I).  After an amended complaint, a second summary judgment motion was filed arguing that the fourth amendment did not apply as he did not intend to seize Henry and he was entitled to qualified immunity.  The district court denied this motion and another appeal followed.  The Fourth Circuit affirmed in part determining that a seizure occurred and vacated and remanded the matter for evaluation under the Fourth Amendment standard and additional evidence.  (Purnell II – 2007).  A third motion for summary judgment followed.  The district court granted the motion finding that it was reasonable for Purnell to believe the weapon he fired was the Taser.  The Fourth Circuit affirmed the district court in a divided panel decision (9/24/2010), and then rehearing en banc was granted.

qualified immunity analysis, the Court found that Henry could show that a reasonable officer would have realized that he had his Glock and not his Taser and it would have been clear that "shooting a fleeing, non-threatening misdemeanant with a firearm was unlawful." Id. at 534.

The concurring and dissenting opinions make it clear that the case did not concern "whether the intentional use of the Taser by Deputy Purnell under the circumstances would have comported with the Fourth Amendment." Id. at 537 (Davis, J., concurring), and at 542 (Shedd, J., dissenting). Both opinions then discuss the hypothetical situation. The concurring opinion points out the factual differences between the Purnell case and the case of McKenney v. Harrison, 635 F.3d 354, 357 (8th Cir. 2011), wherein Barnes, a man wanted under three misdemeanor arrest warrants regarding child support and who on a previous occasion fled by vehicle from the police, made a movement toward an open window in his bedroom while officers allowed him to dress. Purnell, 652 F.3d at 538 (Davis, J., concurring). Barnes was warned not to do anything stupid and was informed that he did not want to be tased. He was tased when he went towards the window, fell from the window and died four days later from head trauma. McKenney, 635 F.3d at 357-58. In affirming summary judgment, the Eighth Circuit stated that level of force was not unreasonable, the officer made a split second decision, used only a single taser shock, and that the "alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest." Id. at 360.

The Purnell concurring opinion includes a quote from the McKenney concurrence about the fact that "the law is still evolving" with regard to use of Tasers as illustrated by the cases that grant qualified immunity. Purnell, 652 F.3d at 540 (Davis, J., concurring). The McKenney concurrence also noted that "[l]ocal law enforcement policies also reflect differing views of where the taser fits on the 'force continuum.' Some allow taser use only as an alternative to

deadly force, while others call for taser use whenever any force is justified." McKenney, 635 F.3d at 361-62 (Murphy, J., concurring) (quoting U.S. Gov't Accountability Office, GAO-05-464 Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies 9 – 10 (2005)). One of the Purnell dissenting opinions notes the similarity of the facts between Purnell and McKenney as Henry too had shown his intent to avoid arrest the day before his arrest and then fled. Both dissenting opinions stress the need to allow for honest mistakes by officers. Purnell, 652 F.3d at 549, n8 (Shedd, J., dissenting).

Judge Kiser authored a decision in June 2011 in a case involving a taser where a woman appeared at the scene of her nephew's arrest. Thompson v. City of Danville, 2011 WL 2174536 (W.D. Va. 2011). She interfered and was arrested and handcuffed. After being handcuffed, she kicked backwards hitting the officer's knee and struggled after being placed on the ground. Id. at *2. She was tased in the drive stun mode. Id. When the officer attempted to place her in the patrol car, she would not enter the car and was drive stunned again. Id. She argued that she tried to get in the car, but her arm hit the top of the entrance. In granting summary judgment to defendant on the excessive force claim, the Court noted the Orem decision, decided under the Fourteenth Amendment, and cited to two Fourth Amendment taser cases from the Eleventh Circuit. Id. at *8; see Floyd v. Corder, 2011 WL 1834249 *1 (11th Cir. 2011); Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).

In Floyd v. Corder, 2011 WL 1834249 *1 (11th Cir. 2011), the trial court found that the officer was entitled to qualified immunity because it was clearly established in October 2007 "that a taser could be employed on a noncompliant suspect where the crime alleged was minor, and even where no violence had occurred." The Eleventh Circuit affirmed, but found that the suspect was thought to have struck his nephew and was yelling at his nephew at school. He

refused to cooperate with the deputy and made a move towards his nephew.  The deputy tased him three times.  Id.  The appellate court reasoned that even if the force was excessive, the deputy was entitled to qualified immunity.  Id. at *2.

In Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), wherein a tractor trailer truck driver was pulled over for a faulty taillight.  He refused to retrieve documents from the cab of his truck despite being asked five times by the officer.  Draper, 369 F.3d at 1278.  He was belligerent and yelling.  Id.  When the driver did not retrieve the documents upon the fifth request, the officer deployed the taser once to the driver's chest.  Id. The court noted that a verbal command to arrest with a physical handcuffing "may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt."  Id.  "Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used – a single use of the taser gun causing a one-time shocking – was reasonably proportionate to the need for force and did not inflict any serious injury."  Id.

In two recent Ninth Circuit Court of Appeals taser cases that were consolidated for en banc consideration, Mattos v. Agarano, 661, F.3d 433 (9th Cir. 2011), cert. denied, __ U.S. __, 132 S. Ct. 2681-82 (2012), the court found a factual issue as to use of excessive force, but granted summary judgment because of qualified immunity.  Notably, the panel decisions that were issued in 2010, before the incident at hand, found that there was no violation of the Fourth Amendment and granted qualified immunity.  Brooks v. City of Seattle, 599 F.3d 1018 (9th Cir. 2010); Mattos v. Agarano, 590 F.3d 1082 (9th Cir. 2010).  In one of the cases, the officer tased a woman he knew to be pregnant three times in drive stun mode when she refused to sign a traffic citation for speeding and would not leave her car.  Brooks, 599 F.3d at 1030-31.  In the other case, a wife who was allegedly the victim of domestic abuse did not immediately move when her

husband was going to be arrested and put her arm out to stop the officer from smashing her chest as he pushed by, was tased in dart mode without warning. <u>Mattos</u>, 590 F.3d at 1086.

In the case at bar, Wright was presented with a man that was accused of just having committed a very serious, violent act – kicking his own 9 year old son in the ribs such that his other son called 911. Wright knew Russell had been drinking. He knew that Russell had not complied with pulling his vehicle over when confronted with lights and sirens, and that Russell had initially fled despite the officers' active lights and sirens for over half a mile and despite having available places to pull over. He knew that Russell exited his vehicle aggressively and advanced towards the officers before the officers had time to exit their own vehicles. He knew this to be an unusual situation in Appomattox County. He knew that Russell repeatedly failed to make any attempt to get down on the ground despite repeated loud commands to do so that even Wright could hear over the siren. He could not see Russell's waist to observe whether or not he was armed. He knew that Mattox, a defensive tactics instructor, thought that a Taser was the appropriate device to use. He displayed the Taser so that Russell could easily see it and sited the laser on Russell's chest. He knew Russell said to go ahead and shoot him, which Wright took as a threat. After siting the laser, more commands were given to Russell, with which he failed to comply. Finally, he knew that Russell was again advancing towards him before he deployed the Taser. (W Decl ¶5.)

In examining the <u>Graham</u> factors, the first factor being the severity of the crime, Russell was alleged to have kicked his 9 year old son in the ribs. He then eluded law enforcement officers before pulling over. Both of these actions are criminal activities and are serious. In <u>Wilson v. Flynn</u>, 429 F.3d 465, 468 (4th Cir. 2005), the Fourth Circuit balanced the severity of the crime factor against the plaintiff when he showed an intent to hurt his wife if she did not

obey him.  In this case, Wright was told that he had kicked his young son in the ribs.  He then committed a second serious crime of eluding law enforcement, which crime Wright personally observed.

With regard to the second factor, whether Russell posed an immediate threat to the officers or others, the balance again weighs in favor of the officers.  Wright and Maddox knew Russell had been drinking, and they observed his unusual and aggressive exit from the truck as well as his continued refusal to obey verbal commands.   They could not see his waistband to see whether he was armed.  He then told them to go ahead and shoot him which caused them both great concern.  Despite his knowledge that Mattox's service weapon was drawn on him and Wright's Taser aimed at him, he continued to disobey commands and advanced towards the officers.  These actions were threatening, and Wright could reasonably believe that Russell posed a threat to the officers' safety.  These facts are again similar to Wilson where the husband was drinking and reportedly tearing up the house.  The officers also observed him disabling his wife's car and telling her she was not going anywhere with the children.  The Court found the husband's actions to be threatening to all persons present.  Wilson, 429 F.3d at 468.

The final factor, whether he was actively resisting arrest or attempting to evade arrest by flight, also favors Wright.  Russell had shown his desire and intent to evade arrest by initially fleeing in his vehicle and failing to pull over.  He continually disobeyed commands and clearly indicated that he had no intention of complying with the officers when he told them to just shoot him – or just tase him – and advanced.  Those are not the words of a suspect that is going to comply.  In Wilson, the husband disobeyed orders of the officers, would not comply despite his daughter's pleas, and physically resisted when officers attempted to handcuff him.  The Wilson Court noted that "the force used by the officers was that force which was necessary to effect the

arrest of an aggressive individual in a rapidly changing environment" and that the officers used

no force after he was restrained in handcuffs. Id. at 469. The Court in Wilson found no

constitutional violation even though plaintiff was admittedly punched in the face, suffered a

nasal fracture, and was maced. He also alleged that he was kicked in the face and ribs, shoved

and stomped. Id. at 467. While a taser was not used against the plaintiff in Wilson, it is likely in

this case that if Wright had not used the Taser that the situation "may well have, or would likely

have, escalated a tense and difficult situation into a serious physical struggle…." Thompson,

2011 WL at *8 (quoting Draper, 369 F.3d at 1278).

If it is not excessive and not outside the range of reasonable conduct to use a taser on a

man three times who sits in the road, sobs and refuses to move after being arrested and

handcuffed for a traffic violation, Buckley v. Haddock, 292 Fed. Appx. 791, *2-3 (11th Cir.

2008), it is certainly not a constitutional violation to deploy a taser in the situation confronting

Deputies Wright and Maddox.

> III. EVEN IF THIS COURT WERE TO FIND THE USE OF FORCE
> UNLAWFUL, DEPUTY WRIGHT IS ENTITLED TO QUALIFIED
> IMMUNITY BARRING PLAINTIFF'S CLAIM.

Government officials "performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). A defendant who is an official or employee of a municipal

corporation or a public body, performing a discretionary function, is entitled to qualified

immunity protecting him from liability for damages, if his actions were objectively reasonable.

Anderson v. Creighton, 483 U.S. 635, 639 (1987); Malley v. Briggs, 475 U.S. 335, 341 (1986);

Sevigny v. Dicksey, 846 F.2d 953, 956 (4th Cir. 1988). To determine qualified immunity, the

Court should decide whether the facts, in a light most favorable to plaintiff, show a constitutional violation. This section of the analysis is found in section I of the Argument. If they do, then the Court determines whether the right was clearly established at the time. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Court has discretion to determine the second factor without reaching a decision on the first factor. Id. at 242.

A law enforcement officer is not expected to know all of the legal limits of "well-known" constitutional rights; the officer can claim immunity if a reasonably well-trained officer would not have known that his conduct violated the plaintiff's constitutional rights. Anderson, 483 U.S. at 638-39. Thus, if under the circumstances, an officer performing a discretionary function reasonably could have believed that his actions were reasonable, then the officer is protected by qualified immunity. Indeed, as stated by the United States Supreme Court in Malley, if officers of reasonable competence could disagree on whether the action was reasonable, immunity should be granted. Malley, 475 U.S. at 341; Springman v. Williams, 122 F. 3d 211, 214 (4th Cir. 1997). Under this standard, all but the "plainly incompetent or those who knowingly violated the law" are protected. Malley, 475 U.S. at 341.

The reasonableness of the defendant's belief is judged from an objective standard in light of the clearly established law at the time of the defendant's exercise of discretion. Anderson, 483 U.S. at 639. The inquiry of the Court under such circumstances "must be filtered through the lens of the [defendant's] perceptions" at the time of the exercise of discretion. Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). This prevents judging the reasonableness of the defendant's actions "with the benefit of 20/20 hindsight" and "limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the [defendant] reasonably perceived." See Gooden v. Howard County, Maryland, 954

F.2d 960, 965-66 (4th Cir. 1992) (en banc).  It is important to resolve the issue of qualified immunity at the summary judgment stage as qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)); Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

Under the existing case law, cited in this memorandum, a reasonable officer in Deputy Wright's position would believe that his actions were constitutional.  The case law at the time of this incident, which must be examined "at the appropriate level of specificity," Norwood v. Bain, 166 F. 3d 243, 252 (4th Cir. 1999), cert. denied, 527 U.S. 1005 (1999), shows that Deputy Wright would understand that the law was not clearly established and that judges had differed on their interpretations as to whether tasers constituted reasonable force in cases involving far less violent and far less threatening situations.  As a reasonable officer, he knew that the United States Supreme Court had not addressed the issue of tasers and use of force, that the Fourth Circuit Court of Appeals had not addressed a situation similar to the one he faced, and the no case law could be found from the Supreme Court of Virginia.  He also knew that courts will not engage in "unreasonable second guessing of an officer's assessment of circumstances," Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002).  He also knew that another reasonable officer on the scene, Mattox, thought it appropriate to use the taser on Russell.

Qualified immunity protects officers where the case law would not inform them that their actions violated the constitution.  As the Sixth Circuit said only months ago, "The taser remains a relatively new technology, and courts and law enforcement agencies still grapple with the risks and benefits of the device."  Hagans, 695 F.3d at 510.  Plaintiff's own expert also noted in a 2010 Police Quarterly article that there is no consensus among law enforcement agencies as to

where to place Tasers on the use of force continuum.  The report noted that half of police

agencies allow for use of OC spray to overcome passive resistance and another 20 – 30 percent

allow use of a CED in the same circumstances.  (Alp 19, 24-25; Alp Ex 151.)

Here, it cannot be said as a matter of law that reasonable officers in Deputy Wright's

position would have known that any of his conduct violated the Fourth Amendment.  Since

Deputy Wright cannot be held liable for what would amount to "bad guesses in gray areas," he is

entitled to qualified immunity.  Conley v. Town of Elkton, 381 F. Supp. 2d 514, 524 (W.D. Va.

2005) (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

III.    A FINDING IN FAVOR OF DEPUTY WRIGHT ON THE FEDERAL
        CLAIM THEN REQUIRES DISMISSAL OF THE STATE LAW
        CLAIMS.

If this Court determines that the use of force was objectively reasonable, the state claims

should be dismissed as well.  The actions cannot be grossly negligent or constitute assault and

battery if lawful authority existed and the actions were objectively reasonable.  Thompson at 9

(citing Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), and Milstead v. Kibler, 243

F.3d 157 (4th Cir. 2001) (abrogated in part on other grounds)).

Furthermore, Virginia has the same qualified immunity initially established by the United

States Supreme Court in Pierson v. Ray, 386 U.S. 547, 555 (1967).  DeChene v. Smallwood, 226

Va. 475, 479, 311 S.E.2d 749, 751 (1984).  That is, when a law enforcement officer acts in good

faith and has a reasonable belief in the validity of his actions, then he cannot be held liable for

those actions.  What the court described in DeChene as good faith immunity became the term

"qualified immunity" mentioned in Jordan v. Shands, 255 Va. 492, 499, 500 S.E.2d 215, 219

(1998).  The concept of qualified immunity has evolved over the years.  What used to consist of

an objective and subjective test has become the objective qualified immunity test set out above in the federal cases.

Finally, Deputy Wright adopts the contributory negligence argument made by TASER International, Inc., with its permission, and incorporates that argument by reference.

IV.     PLAINTIFF'S PUNITIVE DAMAGES CLAIM SHOULD BE DISMISSED AS A MATTER OF LAW.

A jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Smith v. Wade, 461 U.S. 30, 56 (1983).  The Fourth Circuit has instructed that punitive damages are "an extraordinary remedy … designed to punish and deter particularly egregious conduct."  Front Royal v. Town of Front Royal, 749 F. Supp. 1439 (W.D. Va. 1990).

There is no evidence that Deputy Wright had any evil motive or intent or was reckless or callously indifferent to plaintiff's rights.  There is certainly no indication that Wright knew about Russell's heart conditions.  He was called to the scene initially by Russell's own son who reported violent behavior by his father against his nine year old brother.  Deputy Wright was protecting and serving his community.

<u>CONCLUSION</u>

For the reasons stated herein, defendant Deputy Denney Wright respectfully requests that his motion for summary judgment be granted and that this case be dismissed with prejudice.

Respectfully Submitted,
DENNEY WRIGHT

By: */s/* Elizabeth K. Dillon
Of Counsel

Elizabeth K. Dillon (VSB# 25989)
GUYNN, MEMMER & DILLON, P.C.
415 S. College Ave.
Salem, Virginia 24153
Telephone: (540) 387-2320
Facsimile: (540) 389-2350
elizabeth.dillon@gmdlawfirm.com
Counsel for Defendant Deputy Denney Wright

## CERTIFICATE OF SERVICE

I hereby certify that I have this 14th day of November, 2012, electronically filed the foregoing Defendant Denney Wright's Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Peter A. Miller, Esq.
The Miller Firm, LLC
108 Railroad Avenue
Orange, Virginia 22960
Email: pmiller@millerfirmllc.com
*Counsel for Plaintiff*

Jeremy E. Carroll, Esq.
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P.O. Box 2887
Roanoke, Virginia 24001-2887
Email: jcarroll@gfdg.com

Isaiah Fields, Esq.
TASER International, Inc.
17800 N. 85th Street
Scottsdale, AZ 85255
Email: isaiah@TASER.com
*Counsel for TASER International, Inc.*

/s/ Elizabeth K. Dillon

{00012342.DOC }

<u>EXHIBIT LIST</u>

Exhibit A – Denney Wright Deposition Transcript Excerpts             W __

Exhibit B – Denney Wright Deposition Exhibits             W Ex __
         Exhibit 5 – Incident Report
         Exhibit 7 – Mattox in-car video, Wright in-car
                Video and Taser Cam video
                (under seal on DVD submitted by mail)
         Exhibit 10 –Appomattox County Sheriff's Office General Order
           – Use of Force (under seal submitted by mail)
         Exhibit 12 - Taser x26 User Certification Test

Exhibit C – Denney Wright Declaration             W Decl ¶ __

Exhibit D – John Mattox Deposition Transcript Excerpts             M __

Exhibit E – John Mattox Declaration             M Decl ¶ __

Exhibit F – Jeremy Hardison, M.D. Deposition Transcript Excerpts             H ___

Exhibit G – Daniel Carey, M.D. Deposition Transcript Excerpts             C ___

Exhibit H – Kevin Whaley, M.D. Deposition Transcript Excerpts             Whaley ___

Exhibit I – Oscar Wilson Staples Deposition Exhibits             Staples Ex ___
         Exhibit 19 –Appomattox County Sheriff's Office
           Detailed Report

Exhibit J – Grant Fredericks Deposition Transcript Excerpts             F ____

Exhibit K – Grant Fredericks Deposition Exhibits             F Ex ___
         Exhibit 118 – Report of Grant Fredericks
           (under seal submitted by mail)
         Exhibit 120 – DVD Provided by Grant Fredericks
           (under seal on DVD submitted by mail)

Exhibit L – Sean Burton Deposition Exhibit Transcript Excerpts             B ___

Exhibit M – Christopher Samms Deposition Transcript Excerpts             S ____

Exhibit N – Douglas P. Zipes, MD Deposition Transcript Excerpts             Z ____

Exhibit O – Elizabeth Ashby Declaration with E911 calls under seal             A Decl ¶ __

Exhibit P – Geoffrey P. Alpert, PhD Deposition Transcript Excerpts             Alp ___

Exhibit Q – Geoffrey P. Alpert PhD Deposition Exhibits                    Alp Ex ___
          Exhibit 149 Excerpts – A Multi-Method Evaluation of
                       Police Use of Force Outcomes: Final
                       Report of the National Institute of Justice
          Exhibit 151 – Police Quarterly - Policy and Training Recommendations
                       Related to Police Use of CEDs: Overview
                       of Findings From a Comprehensive National
                       Study
          Exhibit 155 -  2011 Electronic Control Weapons
                       Guidelines

Exhibit R – Lisa Whidbee Deposition Transcript Excerpts                    LW ___