UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| ANITA RUSSELL, Personal Representative for the Estate of Daniel Russell, | ) ) ) ) | |
| Plaintiff, | ) | Civil Action No. 3:11-cv-00075-GEC |
| v. | ) ) | **MEMORANDUM IN SUPPORT** |
| DENNEY WRIGHT, et al., | ) ) | **OF MOTION FOR SUMMARY** **JUDGMENT BY TASER** |
| Defendants. | ) ) | **INTERNATIONAL, INC.** |

COMES NOW, defendant, TASER International, Inc. ("TASER"), by counsel, and files this memorandum in support of its motion for summary judgment. For the reasons stated herein, TASER is entitled to judgment as a matter of law on multiple independent bases.

**INTRODUCTION AND EXECUTIVE SUMMARY**

Distilled to its core, Ms. Anita Russell ("Plaintiff"), personal representative for the Estate of Daniel Russell ("Russell"), alleges that the TASER® X26™ Electronic Control Device ("ECD" or "X26"), used by Appomattox County Sheriff's Office ("ACSO") Deputy Denney Wright ("Dep. Wright") on Russell on October 30, 2010, was defective because TASER did not adequately warn that an electrical discharge from the ECD to Russell's chest could allegedly deliver sufficient electrical charge to Russell's heart to induce ventricular fibrillation ("VF") and cardiac arrest. Plaintiff brings her products liability action against TASER based on theories of negligence and breach of implied warranties. Specifically, she alleges negligent failure to warn [Counts VI and IX of Second Amended Complaint [Dkt. 35] ("Complaint")] and breaches of the implied warranties of fitness and merchantability [Counts IV and V]. She also seeks

1

punitive damages based on alleged wanton misrepresentations and failure to provide warnings and training [Count VII].[1] Plaintiff cannot sustain her burden on any of these claims.

First, Plaintiffs' negligence claims are barred by Russell's contributory negligence and assumption of the risk where Russell got drunk, assaulted his nine year old son, fled his home after 911 was called, led deputies on a short pursuit, refused to obey commands of ACSO deputies to get on the ground, and finally invited Dep. Wright's use of force by saying **"Why don't you just taser me"** while stepping toward deputies who had weapons trained on him.

Second, Plaintiff's negligent warnings claims fail where TASER warned extensively about possible cardiac risks associated with the ECD and that officers should avoid targeting the chest before the October 30, 2010 incident, but ACSO never trained Dep. Wright on those risks and warnings. Instead, ACSO trained Dep. Wright with outdated, obsolete TASER training materials, which did not contain current risks and warnings. Because Dep. Wright never actually read TASER's relevant risks, warnings, and instructions, any alleged inadequacy in those materials cannot be a proximate cause of Russell's injury.

Plaintiff's negligent warnings claims also fail where Plaintiff cannot establish that TASER had a duty to warn given that her experts have testified that the alleged risk of an ECD inducing VF in humans is remote, that it cannot be calculated, and that such a risk only first appeared in published, peer reviewed literature more than a year *after* the Russell incident.

Further, Plaintiff's negligent warnings claims fail because she has no qualified warnings expert. ECD product warnings and training materials for professional law enforcement officers is complex subject matter that falls outside the scope of lay jurors' common understanding. Kenneth R. Laughery, Ph.D. ("Laughery") has no experience in law enforcement; no

---

[1] Despite alleging negligent design and manufacturing, Plaintiff has adduced no evidence to support these allegations. Plaintiff's claims ultimately rest on allegations of a failure to warn.

understanding of the cardiac risk associated with ECD exposure; and no understanding of the content of the warnings or training materials that were actually provided to Dep. Wright or were in effect on October 30, 2010. Without a qualified expert, Plaintiff cannot sustain her claim.

Next, even a cursory review of TASER's warnings in effect at the time of incident establish that they adequately address the remote and incalculable risk of ECD induced VF leading to cardiac arrest, and are adequate as a matter of law.

Plaintiff's breach of the implied warranty claims also fail because TASER properly disclaimed any and all implied warranties and excluded consequential damages.

Finally, Plaintiff's claim for punitive damages fails because there exists no evidence of any willful or wanton misconduct by TASER.

## STATEMENT OF FACTS

### I.    The Incident.

On October 30, 2010, Russell and Plaintiff went out for a night of dinner, dancing and drinking. [ExA(Plaintiff Depo)pp.78-82]. Russell was 52 years old with a history of crack cocaine, marijuana, alcohol, and tobacco abuse. [*Id.*pp.52,152-154,156]. He also suffered from severe cardiac dysfunction which had caused him to experience heart attacks in June of 2008 and August of 2009, and was under doctors' orders to stop using drugs and alcohol which increased his risk of sudden cardiac arrest.[2] [*Id.*pp.42-43,45; ExB(Zipes Depo)p.317]. Russell's

---

[2] Russell's cardiac condition included both coronary artery atherosclerotic disease with blocked vessels and cardiac dysfunction with a low ejection fraction. A cardiac catheterization of Russell in June 2010 revealed that most of Russell's major blood vessels that provide blood flow, oxygen and nutrients to the heart muscle were either completely blocked or severely blocked. In August of 2009 it was determined that he had an ejection fraction of 30%, meaning that the contractions of his heart were so weak that if they did not improve by November of 2010 he was a candidate for an implantable defibrillator. [ExJ(Vilke Report)pp.9-17].

heart was so compromised that Plaintiff's own expert, Douglas Zipes, M.D. ("Zipes"), testified that basketball, wrestling or a hard sprint put Russell at risk for cardiac arrest. [ExBpp.167-169].

Russell and the Plaintiff returned home to their children, Andrew Russell (age 16) and Rhett Russell (age 9), sometime after 10:00 p.m. [ExAp.82]. Russell proceeded to get in an argument with his youngest son, which culminated with Russell kicking him in the ribs with his cowboy-booted foot. [ExC(Andrew Depo)p.67; ExD(Rhett Depo)pp.8-9]. Rhett "made, like, a horrible noise" and fell to the floor. [ExCpp.49-52]. Andrew called 911 and reported the assault, something he had done on at least five prior occasions when his father had caused a domestic disturbance. [ExApp.86-87;ExCpp.21,68].

Deputy John Mattox ("Dep. Mattox") and Dep. Wright were dispatched to the Russell house for what was reported as a domestic violence call. [ExE(Wright Depo)pp.115-117]. As they were pulling up in separate marked sheriff's vehicles, Russell was fleeing the scene in his pickup truck. [ExF(Mattox Depo)pp.55-58;ExG[3]-2(Synced Videos)[4]]. Dep. Mattox activated his blue lights, but Russell pulled onto the road and headed in the opposite direction of the deputies. [*Id.*]. The deputies turned around and chased Russell, reaching speeds of approximately 60 m.p.h., in a pursuit that lasted nearly a minute. [*Id.*].

As seen on the dash cam videos, Russell pulled into a dirt lot, quickly exited his truck and walked toward the officers. [ExFpp.59,90-91;ExG-2]. Dep. Mattox exited his car, with his firearm drawn and pointed at Russell, and yelled for him to "Get down". [ExFpp.62,67,93;ExG-2]. Dep. Wright likewise exited his car, drew his X26 ECD and began "painting" Russell's chest

---

[3] Pursuant to the Court's protective order, ExG is being filed under seal in its entirety.

[4] The "Synced Videos" consist of three separate synchronized videos. The videos are the in-car dash camera from Dep. Mattox's car, the in-car dash camera from Dep. Wright's car, and the camera attached to the TASER X26 ECD. The video is over 46 minutes in running time, but the parts relevant to this motion are contained in the first 5 minutes.

with the ECD's LASER targeting system.[5] [ExG-2]. Russell did not obey, but instead continued to move toward the deputies. [*Id.*]. Dep. Mattox stepped back, his firearm still trained on Russell, and told Dep. Wright to "Taser him". [ExEp.125;ExFp.65;ExG-2]. Dep. Mattox then again yelled at Russell to "Get down" and "Get on the ground". [Ex.G-2]. Russell did not get on the ground, but instead said, **"Why don't you just taser me"**. [*Id.*;ExG(Fredericks Declaration)¶6;ExG-3(TASER Cam Audio)].[6] As Russell began to take his next step forward, Dep. Wright deployed the X26 ECD at him. [ExG-2;ExEpp.122-123,157].

Upon deployment of the ECD Russell stiffened and fell backwards to the ground. [ExG-2]. After a single ECD cycle of five seconds he began moving his hands and feet. [*Id.*]. Dep. Mattox and Dep. Wright went "hands on" and rolled Russell to his stomach and handcuffed his arms. [*Id.*]. Russell subsequently went into cardiac arrest. He was resuscitated by emergency medical services personnel and transported to an emergency room in Lynchburg. Toxicology taken at the emergency room established that Russell had a BAC of 0.17 and had marijuana metabolites in his system. [ExBpp175-176]. Unfortunately, Russell suffered anoxic brain injury and spent approximately seven months in hospital and nursing home care before passing away from a heart attack on June 1, 2011. [ExH(Whaley Depo)pp.6,12,18-21,25,27].

No physical autopsy was performed on Russell's body, however Virginia Department of Health Assistant Chief Medical Examiner Kevin D. Whaley, M.D., ("Whaley") performed a retrospective records review and determined the cause of death to be "acute myocardial infarction due to hypertensive and atherosclerotic cardiovascular disease." [*Id.*]. Whaley

---

[5] "Painting" refers to the practice of applying the ECD's LASER targeting light system on a subject as a warning to try and gain their volitional compliance.

[6] Exhibit G-3 is an unenhanced audio clip created from the TASER Cam video of the Russell incident. Some of the sound quality is lost on standard computer speakers. Accordingly, counsel respectfully recommends listening to the clip through headphones and on a "loop" as the voices become more distinct through repeated listening.

testified that the stress of the situation was too much for Russell's diseased heart, which had been made even more unstable by Russell's alcohol consumption the night of the incident. [*Id.*].

## II.     TASER and the X26 ECD.

TASER was founded by brothers Rick Smith and Tom Smith after Rick's loss of two high school friends to a firearm. [ExI(Smith Declaration)¶3. TASER's strategic objective is to protect life by providing solutions to violent confrontations. [*Id.*¶4]. To that end, in part, TASER designs, assembles, and markets ECDs that enable law enforcement officers to protect themselves and others while *minimizing* the risk of serious injury or death.[7] [*Id*]. In 2003, TASER introduced the low-power X26 ECD, which is designed in probe-deployment mode to incapacitate an individual from a safer distance than most other force options while minimizing risks of death or permanent injury. [*Id.*¶5]. The X26 ECD works by transmitting stimuli through brief, low-charge, short duration electrical pulses that block the command center of the body at the motor-neuron level causing the target to become temporarily incapacitated. [*Id.*].

The X26 ECD may be primarily applied in two ways: a probe deployment, where two small probes fire via compressed nitrogen, with electrical impulses transmitted into the target through very thin insulated trailing wires; or drive-stun mode, in which the ECD is physically pressed against the target. [*Id.*¶6]. The X26 ECD was designed with an automatic 5-second shutoff. Specifically, when the trigger is pressed and released it activates a standard 5-second cycle. [*Id.*¶7]. The X26 ECD has data download capabilities that record the date, time, duration, and other factors for each trigger pull (discharge). [*Id.*¶9].[8]

---

[7] TASER also designs and sells on-officer camera devices in furtherance of its strategic objectives to protect life with the highest-level of force option accountability. [ExI¶¶3&4].
[8] Russell received a single 5-second exposure on October 30, 2010. [ExEp.160].

**III.    TASER's ECD Product Training Materials and Warnings.**

To aid law enforcement agencies, TASER started an instructor training course in 1998 in which TASER certifies TASER ECD Master Instructors and Instructors. Master Instructors are eligible to certify both Instructors and "end users." Instructors are only eligible to certify end users. [*Id.*¶¶12-14]. TASER itself very rarely trains end users of its ECD products. [*Id*]. Likewise, most TASER ECD Instructors are not trained directly by TASER. Instead, Instructors typically are trained by Master Instructors who are certified by TASER but who are not TASER employees. [*Id.;*ExK(Burton Depo)p.96].

TASER periodically revises its Product Warnings, Product Manuals, Training Bulletins, and training materials to stay current with the best available medical and scientific literature regarding the physiologic, metabolic, and cardiovascular effects, if any, of ECDs in humans. [ExI¶17]. When TASER releases a new version of its training materials or Product Warnings, TASER explicitly instructs that all prior TASER training materials (including Training Bulletins) are considered obsolete and should not be used. [*Id.*¶19-20]. TASER's training materials and Product Warnings are available to the public via TASER's website, www.TASER.com, and are generally emailed and/or mailed to all certified Instructors. [*Id*]. TASER requires Instructors to visit TASER's website no more than seventy-two (72) hours before conducting a TASER ECD training program to ensure they have the latest training materials, updates, and Product Warnings.[9] [*Id.*¶18].

---

[9] When a new version of TASER's training material is released, certified Instructors are mailed a CD/DVD with the new materials or are emailed a URL where they can download the latest lesson plan revision. [ExI¶18].

In order to qualify as a TASER certified Instructor or end user, an officer's certification course must incorporate _all_ of the materials contained in TASER's training version _in effect at that time of the training_, including the current version of Product Warnings.[10] [_Id._at¶21].

With respect to the training and certification hierarchy as it applies in this case, Dep. Wright is an End User (although _not_ a TASER certified end user) trained by ACSO employee and certified TASER Instructor Deputy Sean Burton ("Dep. Burton"). [ExKp.93]. Dep. Burton was trained and recertified as a TASER Instructor in November of 2008 by Lynchburg Police Department employee and certified TASER Master Instructor Officer Mike Staley, who was trained and certified as a Master Instructor by TASER. [ExI¶28-30]. Sgt. Irvin was also trained and certified as an Instructor by Officer Staley. [_Id._].

Dep. Wright was _not_ a TASER ECD certified end user because ACSO, through Dep. Burton, trained him with outdated, obsolete TASER Product Warnings and training materials. [_Id._¶22]. ACSO also failed to provide Dep. Wright with TASER's updated Product Warnings or training materials, the most recent of which (Version 17 and Product Warnings dated May 1, 2010) went into effect approximately six months prior to the Russell incident. [ExKp.93-94].

## IV.     Materials Provided by TASER to ACSO.

The TASER X26 ECD used on Russell is identified by serial number X00-270066. [ExI¶31]. This ECD was shipped on May 18, 2007, to Southern Police Equipment ("SPE"), a private distributor of law enforcement weapons and equipment in Virginia. [_Id._¶32]. ACSO subsequently purchased the ECDs from SPE. [ExL(Staples Depo)p.31; ExM(Irvin Depo)p.34]. Included in the box with this ECD were TASER's Training DVD Version 13, TASER's Product

---

[10]    TASER Instructor certifications are valid for two years, and recertification requires completion of an additional course. [_Id._¶13]. End user certifications are valid for one year, and recertification requires completion of an annual recertification course. [_Id._¶15].

Warnings dated March 1, 2007, and TASERs 2007 X26 Law Enforcement Operating Manual ("Product Manual"). [ExI¶34]. Also included in the shipment were TASER's sales documents, which contained the following disclaimer of warranties and limitation of remedies:

> **7.      Warranty Exclusions.** THE WARRANTY STATED ABOVE IS THE EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. TASER DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY WARRANTY AGAINST PATENT INFRINGEMENT....
>
> . . .
>
> **9.      Limitation of Remedies.** THE REMEDIES PROVIDED FOR IN THE ABOVE WARRANTY ARE EXPRESSLY IN LIEU OF ANY OTHER LIABILITY TASER MAY HAVE, INCLUDING INCIDENTAL AND CONSEQUENTIAL DAMAGES. . . . IN NO EVENT WILL TASER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE . . . .

[*Id.*¶33]. The Product Manual contained nearly identical disclaimer of warranties and limitation of remedies language. [ExI-3p.27].

Following the purchase of the X26 ECD by ACSO and prior to the Russell incident on October 30, 2010, TASER released its Version 14 training materials on December 1, 2007; its Version 14.2 training materials August 31, 2008 (which was released to remedy a software glitch in the Version 14.0 DVD that was causing some users difficulty); its Version 15 training materials on August 24, 2009; its Version 16 training materials on December 7, 2009; and its Version 17 training materials on May 1, 2010. [*Id.*¶¶36-43]. Likewise, TASER released new Product Warnings on April 28, 2008, September 30, 2009, and May 1, 2010. [*Id.*¶¶36-43]. With each release of revised training materials and Product Warnings all prior training materials

and Product Warnings were superseded and rendered obsolete (with the exception that Version 14 was not superseded until Version 15 was released[11]). [*Id.*¶¶19-20].

ACSO, through its designated employees Dep. Burton and/or Sgt. Irvin, received notice of the release of all of these materials via emailed bulletins *and* were either mailed a CD/DVD with the materials or provided a URL where they could download them from a TASER maintained File Transfer Protocol ("FTP") site or website. [*Id.*¶¶39-49;ExI-1].

## V.    ACSO's ECD Training Program.

As a manufacturer, TASER sells its ECDs to distributors or law enforcement agencies. It provides information, warnings, instructions, recommendations, and training materials to its customers. It has no control over the distribution of ECDs and related materials by a law enforcement agency to its law enforcement officers. [ExI¶¶24,57]. It is the law enforcement agency, not TASER, that trains its officers, ultimately determines the time, duration, content, and requirements for such training, and develops and implements its force policies, procedures, guidance, and orders. [*Id.*]. Sgt. Irvin and Dep. Burton testified that TASER does not establish ACSO use-of-force policies, [ExMp.113;ExKp.92], and Sheriff Oscar Staples confirmed that no warning or bulletin from TASER would supersede ACSO policy. [ExLp.58].

## VI.    ACSO's ECD Training of Dep. Wright with Outdated and Obsolete Materials.

Dep. Wright received ACSO ECD training from Dep. Burton on April 26, 2010. [ExI¶22; ExEp.47;ExKpp.17-18]. No one from TASER was present at his training. [ExI¶22]. Incredibly, Dep. Burton trained Dep. Wright using TASER's *Version 14* training materials, [ExKpp.92-93], which had been superseded by Version 15 on August 24, 2009. [ExI¶¶21,38-39]. Version 15 had been superseded by Version 16 on December 7, 2009. [*Id.*¶¶40-41].

---

[11] Unlike prior whole-number releases of new versions of training material, Version 14.2 did not contain any substantive changes and, therefore, did not render Version 14.0 obsolete. [ExI¶37].

Dep. Burton's use of Version 14 was in direct contravention of the requirements of TASER's Product Warnings and training requirements. [*Id.*¶¶18-22]. <u>Both</u> Sgt. Irvin and Dep. Burton were emailed TASER's "Training Bulletin 14.2-6: Release of Training Version 15.0" on August 24, 2009. [*Id.*¶39;ExI-1]. This bulletin explicitly instructed:

> **With the release of Version 15.0, all prior TASER International training materials and training bulletins are considered obsolete and should not be used.** Please archive all prior versions of the TASER training materials and replace them with Version 15.0.

[ExI-4](emphasis added). Moreover, having himself been trained on Version 14 (and then using Version 14 to train Dep. Wright), Dep. Burton had received and was in possession of the following training slides and instructions regarding TASER's training requirements:



> **Instructor Notes:** Instructors shall copy all of the most current TASER Warnings and hand them out to all course students for their review prior to proceeding with the course. The most current warnings may be located on TASER's website at www.TASER.com.

[ExI-14(Instructor PowerPoint)Slide17:ExI-13(User PowerPoint)atSlide11].

**Training**

Check the TASER Int'l web site 72 hours prior to presenting a TASER class to ensure you are using the most current version of the training DVD and lesson plan and to review all current Training Bulletins.

**Instructor notes**:  If you do not have the latest version of the training CD/DVD, contact TASER International for a copy.

[ExI-14atSlide275].

Additionally, the "Instructor Preparation Checklist" included in Version 14 also stated TASER's requirement that Instructors "always check" within 72 hours before a class:

**INSTRUCTOR PREPARATION CHECKLIST**

Always check the Law Enforcement/Training link at www.TASER.com within 72 hours before your class to ensure you are using the proper lesson plan and to review all Training Bulletins.

[ExI-15]. Version 14 also contained TASER's Product Warnings dated March 1, 2007. These warnings explicitly reiterated TASER's policy that users "[c]omply with current training materials and requirements." [ExI-7]. They further advised that TASER's "most current warnings and instructions are available online at www.TASER.com." [*Id.*]. Dep. Burton trained Dep. Wright using these March 1, 2007 Product Warnings despite the fact that TASER had sent both Dep. Burton and Sgt. Irvin its "Training Bulletin 14.0-03" on April 25, 2008. [ExI¶45;ExKp.80]. This Bulletin explicitly advised of TASER's release of new Product Warnings on April 28, 2008, which superseded all prior warnings and training bulletins:

Title:      Training Bulletin 14.0-03 TASER Law Enforcement Warnings
Department:  Training
Version:     3.0
Release Date:  4/28/2008



Background: TASER International issues warnings regarding the use of our Electronic Control Devices to ensure that end users are aware of risks associated with the use of these devices. As more research is completed and/or more knowledge is obtained, the warnings are updated to ensure that TASER device operators are provided with the most current information. Please go to www.TASER.com to find the new TASER International, Inc. (TASER) law enforcement ADVANCED TASER® M26™ and TASER® X26™ Electronic Control Device (ECD or device) warnings. These device warnings are effective on Monday April 28, 2008, and supersede prior law enforcement warnings and relevant training materials and bulletins, specifically including TASER Training Bulletin 12.0 – 04 (June 28, 2005[1]).

[ExI-8]. TASER's April 28, 2008 Product Warnings were subsequently superseded and rendered obsolete when TASER send Dep. Burton and Sgt. Irvin its "Training Bulletin 15.0: Medical Research Update and Revised Warnings" on September 30, 2009. [ExI¶¶46-47;ExI-9;ExI-10]. This Bulletin announced the following new "Targeting Guide" that lowered the recommended point of aim for frontal shots from center mass to lower-center of mass:



[*Id.*]. Training Bulletin 15.0 also discussed the then current medical science regarding ECD cardiac safety margins as well as TASER's recommendation that users should "**avoid intentionally targeting the chest area with probe applications to increase effectiveness and avoid the remote potential risk of cardiac effect**." [ExI-10p.8]. Notably, TASER's September 30, 2009 Product Warnings also contained language regarding possible cardiac risks not contained in prior version of its Product Warnings or training material. [ExI¶47;ExI-10].

While Dep. Burton and Sgt. Irvin both received Bulletin 15.0 and the September 30, 2009 Product Warnings, Dep. Burton testified that he "didn't read through the entire 15.0 Bulletin, where it dealt with acidosis and sudden cardiac arrest." [ExKp.33,53-54]. Dep. Burton candidly testified that he does not thoroughly read each email he gets from TASER. [*Id.*p.88]. Instead, Dep. Burton relied on a synopsis of Bulletin 15.0 that TASER released on November 6, 2009 for Instructors and agencies to distribute to their ECD certified end users (which Dep. Wright was not) in lieu of the complete Bulletin. [*Id.*pp.53-54,84;ExI¶48;ExI-11].

Dep. Burton testified that he orally "went over" the synopsis at a staff meeting that occurred sometime in February 2010. [ExKpp.84-85]. Dep. Wright was present at this meeting, but at that time had never received any ECD training and was not an ECD certified end user. [ExEp.93]. According to Dep. Burton, the synopsis was also posted on a door at the ACSO and a copy put in the deputies' mailboxes, again at a time before Dep. Wright had received any ECD training. [ExKpp.83,86]. Dep. Wright has no recollection of seeing or reading the synopsis prior to the Russell incident on October 30, 2010. [ExN(Wright Dec.)¶5].

Subsequently, on April 26, 2010, Dep. Burton trained Dep. Wright with TASER's twice obsoleted Version 14 training materials and multiple times obsoleted March 1, 2007 Product Warnings. TASER's September 30, 2009 preferred targeting zones (which include the chest as a "sensitive" body part to be avoided) and new cardiac risk warnings were not included in this training. [ExKpp.11,19,39,74,80,84-85,92-94;ExEpp.87-88]. Instead, Dep. Burton testified that he went over each slide in Version 14 and did not "fray" from Version 14 "at all." [ExKpp.19,80]. Dep. Burton testified that he did this because "I was under the impression, I guess wrongly, that I'm to use what I was certified on to train in." [*Id.*p.71]. Notably, Sgt. Irvin

testified that he knew that only the current version should be used in training and that old versions were to be discarded. [ExMpp.21,44,46,114,117].

In sum, prior to the Russell incident on October 30, 2010, Dep. Wright never received or reviewed TASER's Product Warnings dated September 30, 2009, or May 1, 2010 *or* TASER's Version 16 or Version 17 training programs, *all of which* contained warnings about cardiac risks and the avoidance of targeting the chest. [ExN¶¶3-7;ExKp.94]. In fact, beyond having sat in a staff meeting where Dep. Burton orally "went over" the Bulletin 15.0 synopsis, and his subsequent training on the obsolete Version 14 training materials and March 1, 2007 Product Warnings, Dep. Wright received no other training materials, bulletins, Product Warnings, or information regarding TASER ECDs prior the incident.

## VII.    TASER's Warnings and Training Materials in Effect on October 30, 2010.

TASER's May 1, 2010 Product Warnings and Version 17 training program were in effect on the date of the Russell incident (October 30, 2010). [ExI¶42,49]. Even a cursory review of these materials establishes that they explicitly and extensively warned about possible cardiac risks and that officers should avoid targeting the chest.

As with prior versions of TASER's training materials, TASER's May 1, 2010 Product Warnings and Version 17 user training PowerPoint® contained the following pictorial explicitly stating that TASER ECDs "Can cause injury," that users should "Obey warnings, instructions and all laws," and "Comply with current training materials and requirements":



[ExI-12p1]. Again, as with prior versions, these materials warned users that "[d]isregarding this information could result in death or serious injury"; that users should comply with all existing instructions and laws; and that users should "only use an ECD when legally justifiable":

**IMPORTANT ECD PRODUCT SAFETY AND HEALTH INFORMATION**

⚠ WARNING

These safety warnings are for your protection as well as the safety of others. Disregarding this information could result in death or serious injury.[1]

**Complete Training First.** Significant differences exist between each of the TASER International, Inc. ("TASER") Electronic Control Device ("ECD") models. Do not Use[2] or attempt to Use any ECD model unless you have been trained and certified by a Certified TASER Instructor[3] on that particular model.

**Read and Obey.** Read, study, understand, and follow all instructions, warnings, information, training bulletins and TASER training materials[4] before Using the ADVANCED TASER® M26™ ECD, TASER X3™ ECD, or TASER X26™ ECD. Failure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the User, force recipient, and others.

**Obey Applicable Laws.** Use the ECD only in accordance with applicable federal, state, and local laws and other regulations or legal requirements. Your law enforcement agency's Guidance[5] must also be followed.[6] Any Use of an ECD must be legally justifiable. Resistance to law enforcement interaction incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of death or serious injury.

[*Id.*]. TASER's warnings defined a certified TASER Instructor as someone who "possesses and maintains a current TASER instructor certification for the specific product model they are teaching, demonstrating, or Using and is required to be fully compliant with TASER's most current training requirements and materials," and that "[c]urrent TASER Instructor Training materials may be obtained by contacting TASER's Training Department." [*Id.* at n.3&4].

As with prior versions, TASER's warnings notified users that its current warnings supersede all prior revisions and relevant Training Bulletins:

These warnings are effective May 1, 2010, and supersede all prior revisions and relevant Training Bulletins. The most current warnings are online at www.TASER.com.

[*Id.*p.1]. TASER's warnings also advised users that law enforcement agencies are sophisticated users and are responsible for setting their own policies and standards:

[5] Law enforcement agencies are force and force tools experts and are solely responsible for their own Guidance. "Guidance" includes, but is not limited to, policy, procedure, rule, order, directive, training, continuum, and standard. TASER has no power or authority to mandate or require Guidance, set policy, require training, or establish standards of care or conduct.

[6] Law enforcement agencies, government entities, and Users are sophisticated purchasers, sophisticated users, and learned intermediaries with respect to law enforcement weapons (including ECDs), force, force use, legality of force use, and reporting.

[*Id.* at n.5&6]. Contrary to Plaintiff's allegation that TASER falsely represented that its ECDs were "not lethal" [Complaint at ¶ 72(a)], TASER explicitly warned that its ECDs are designed to "reduce the likelihood of death or serious injury":

> When lawfully Used as directed, ECDs are designed in probe-deployment mode to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury. Any use of force, physical exertion, capture, control, restraint, or incapacitation involves risks that a person may get hurt or die.[7]

[*Id.*p.2]. However, unlike the March 1, 2007 Product Warnings on which Dep. Wright was trained, TASER's May 1, 2010 Product Warnings contained the following warnings about the possibility of an ECD exposure affecting a suspect's "heart rate and rhythm" and that "[a]dverse physiologic or metabolic effects [including heart rate and rhythm] may increase risk of death or serious injury:"

> **Physiologic or Metabolic Effects.** The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium), heart rate and rhythm; lactic acid; myoglobin; pH; respiration; stress hormones or other biochemical neuromodulators (*e.g.*, catecholamines). Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects. In human studies of electrical discharge from a single ECD of up to 15 seconds, these effects on acidosis, CK, electrolytes, stress hormones, and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Adverse physiologic or metabolic effects may increase risk of death or serious injury.

[*Id.*p.4]. Likewise, the May 1, 2010 warnings warned about potential risk of "cardiac arrest":

> **Physiologically or Metabolically Compromised Persons.** Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD"). The factors that may increase susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal, sensitization to arrhythmias, etc), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD Use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

[*Id.*]. Importantly, the May 1, 2010 Product Warnings also warned users to avoid targeting sensitive parts of the body, like the chest, when possible:



[*Id.*p.2] All of this language regarding heart rate, heart rhythm, cardiac arrest, and avoiding the chest as a sensitive body part also was included in TASER's Product Warnings dated September 30, 2009, which was incorporated into Version 16 of TASER's training materials and in effect at the time Dep. Wright underwent his training. [ExI-9].

TASER's Version 17 training materials and PowerPoint presentations further warned instructors and users about potential cardiac risks and provided detailed instruction on how to minimize those risks. As with prior versions, TASER's Version 17 training materials contained the following slide warning that its ECDs are not risk free; directing instructors and users comply with <u>current</u> training materials; and for users to visit TASER.com frequently to ensure they have the most current version of TASER's warnings:



**Instructor Notes:** The Law Enforcement Warnings are contained in the instructor manual, the DVD, and at TASER.com. Check the website frequently to ensure you have the most current copy of the warnings.

[ExI-16(Ver.17UserPP)Slide8]. TASER further emphasized its policy of going to TASER's website 72 hours before teaching a course to ensure use of TASER's most current version of training materials.



> **Instructor Notes:** Be sure you copy all the most current TASER Warnings and hand them out to all your students for their review prior to proceeding with the training. The most current warnings are located on TASER's website at www.TASER.com. Also share the product and training manuals with all end users. Review all the materials on the training DVD that you will receive during the classroom portion of this course. Be sure that you frequently, and always within 72 hours of teaching any TASER courses, check the TASER website for training bulletins and to ensure you are using the most current version of the training materials.

[*Id.*Slide9]. Version 17 also included several slides on medical and cardiac safety:



> **Instructor Notes:** The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is not zero, but is sufficiently remote that making accurate

estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications.

*Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191.*

This paper describes the first methodology and results for estimating the order of probability for a TASER ECD directly causing human ventricular fibrillation (VF). The probability of an X26 Taser causing human VF was estimated using: (1) current density near the human heart estimated by using 3D finite-element (FE) models; (2) prior data of the maximum dart-to-heart distances that caused VF in pigs; (3) minimum skin-to-heart distances measured in erect humans by echocardiography; and (4) dart landing distribution estimated from police reports. The estimated mean probability of human VF was 0.000006 for data from a pig with no resection when inserting a blunt probe.

One risk of applying electricity to a human is the direct induction of ventricular fibrillation (VF). In addition to electrically induced direct VF induction, other risks include, but are not limited to: cardiac capture/pacing for sufficiently long duration to deteriorate to VF and through sufficiently significant physiological or metabolic effects to negatively impact the heart.



**Instructor Notes:** Experts have identified heart to dart distance as being a key determining factor in whether an ECD can affect the heart. The VF probability for a given dart location decreased with the dart-to-heart horizontal distance (radius) on the skin surface. The further an ECD dart is away from the heart, the lower the risk of affecting the heart.

*Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191.*

## Cardiac

- When possible, avoiding chest shots with ECDs reduces the risk of affecting the heart and avoids the controversy about whether ECDs do or do not affect the human heart.

Preferred Target Areas in Blue



TASER TRAINING ACADEMY

---

## Physiologically or Metabolically Compromised Persons

- Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD")
- The subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors
- Any physiologic or metabolic change may cause or contribute to death or serious injury
- Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

TASER TRAINING ACADEMY

---

## Warning

- Avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, chest/breast, or known pre-existing injury areas without legal justification.

- The preferred target areas are the lower center mass (below chest) for front shots and below the neck area for back shots.

TASER TRAINING ACADEMY



[*Id.*Slides22-24,29,119,121,respectively].[12]

Finally, Version 17 required students to pass a written test to become a TASER certified user. The test questions *again* reinforced that officers were expected to know, understand, and adhere to current law, department policies, current training program, warnings, instructions, and information; that they should avoid targeting a suspect's chest; that the risk of TASER induced cardiac arrest was not zero; and that instructors are required to go to TASER's website 72 hours before a course to ensure use of current training material and warnings. [ExI¶54].

Neither Plaintiff nor her experts have identified any other law enforcement weapons manufacturer that has studied its product or trained and warned its users to the extent that TASER does with its ECDs. Plaintiff's expert, Geofferey Alpert ("Alpert"), agreed TASER does a "good job" with training and the TASER ECD is a "very good device" and "very important device to law enforcement" when used properly. [ExO(Alpert Depo)pp.131,146].

## STANDARD OF REVIEW

"The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential

---

[12] A nearly identical slide regarding the new preferred targeting zone (lower torso) (slide 121) was contained in Version 16 of TASER's training materials. [ExI¶52]. The Version 16 slides also referred the Instructor and end user trainee to the current Product Warnings. [*Id.*].

to that party's case, and on which that party will bear the burden of proof at trial." *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 199-200 (4th Cir. 1997) (*quoting Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). When considering a motion for summary judgment, the "court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## ARGUMENT AND AUTHORITIES

To prove a products liability claim, whether based on negligence or breach of implied warranty, a plaintiff must show (1) that the product was unreasonably dangerous for its ordinary use or for some other reasonably foreseeable use, (2) that the unreasonably dangerous condition existed when the product left the manufacturer's hands, and (3) that the defect caused the alleged harm. *See Morgen Indus. Inc. v. Vaughan*, 252 Va. 60, 65, 471 S.E.2d 489, 492 (1996); *Hartwell v. Danek Med., Inc.*, 47 F.Supp.2d 703, 707 (W.D. Va. 1999); *McAlpin v. The Electric Furnace Co.*, 1996 U.S. Dist. LEXIS 12618, *6 (W.D. Va. August 9, 1996). A products liability claim can be based on a design, manufacturing, or warning defect. *See Morgen*, 252 Va. at 65-66, 471 S.E.2d at 492 (*citing Austin v. Clark Equip. Co.*, 48 F.3d 833, 836 (4th Cir. 1995); *Bly v. Otis Elev. Co.*, 713 F.2d 1040, 1043 (4th Cir. 1983)).

Plaintiff alleges all three bases for her products liability claim against TASER: negligent design [*see* Complaint at ¶¶ 57, 66], negligent manufacture [*see* Complaint at ¶¶ 57, 66], and

negligent failure to warn [*see* Complaint at ¶¶ 59, 67, 72, 85].[13] While she made those initial allegations, Plaintiff has not adduced any evidence of design or manufacturing defects with the TASER X26 involved in this incident. This products liability case is, therefore, based solely on an alleged failure to warn. [*See* ExP(Plaintiff's Responses to Requests for Admission)Nos.82-85] (relying on alleged inadequate warnings to support claims for design and manufacturing defects); ExQ(Plaintiff's Answers to TASER's Interrogatories Nos.14-15) (failing to specify any design or manufacturing defect)].[14]

Under Virginia law, a manufacturer may be liable for an alleged failure to warn if the manufacturer (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, (b) has no reason to believe that those for whose use the chattel is supplied will realize its' dangerous condition, and (c) fails to exercise reasonable care to inform the user of its dangerous condition or of the facts which make it likely to be dangerous. *Reibold v. Simon Aerials, Inc.*, 859 F. Supp. 193, 200 (E.D. Va. 1994) (*quoting Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366-67 (1979)).

## I. BECAUSE OF RUSSELL'S CONTRIBUTORY NEGLIGENCE AND HIS ASSUMPTION OF THE RISK, TASER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S NEGLIGENCE CLAIMS.

---

[13] Plaintiff alleged misrepresentation as part of her claim that TASER breached a duty to warn. [Complaint¶¶74-75]. There is no separate claim for negligent misrepresentation under Virginia law. *See Lescs v. William R. Hughes, Inc.*, 168 F.3d 482, 1999 U.S. App. LEXIS 475, * 29 (4th Cir. 1999) ("[T]he federal courts of this Circuit repeatedly have determined that Virginia does not recognize a general cause of action for negligent misrepresentation.) (citations omitted). Instead, allegations of misrepresentation support claims for actual or constructive fraud in Virginia. *See Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 556-59, 507 S.E.2d 344, 346-47 (1998) (noting allegations of misrepresentation as supporting fraud claims). A necessary element of either an actual or constructive fraud claim is *reliance by the injured party*. *McDevitt Street*, 256 Va. at 557-58, 507 S.E.2d at 346-47. Plaintiff cannot claim that Russell relied on any alleged misrepresentation by TASER, thus, any attempted claim for fraud based on any such alleged misrepresentations fails as a matter of law.

[14] Plaintiff's experts have not identified any alleged defect other than inadequate warnings.

**A.** **Because Russell's Unreasonable Conduct On October 30, 2010 Was A Proximate Cause Of His Injuries TASER Is Entitled To Judgment As A Matter Of Law As To Plaintiff's Negligence Claims.**

Russell did not just "cause" ACSO's use of force by getting drunk, assaulting his nine year old son, fleeing his home and then disobeying law enforcement commands. He left ACSO's deputies with no choice but to use force by telling them, "**Why don't you just taser me**" while stepping toward them. [ExG¶6;ExG-2;ExG-3]. Because Virginia follows a contributory negligence regime for products liability cases grounded in negligence, Russell's actions are an absolute bar to Plaintiff's negligence claims. *See Freeman v. Case Corp.*, 924 F. Supp. 1456, 1469 (W.D. Va. 1996), *rev'd on other grounds*, 118 F.3d 1011 (4th Cir. 1997) (*citing Jones v. Meat Packers Equip. Co.*, 723 F.2d 370, 373 (4th Cir. 1983); *Hoban v. Grumman Corp.*, 717 F. Supp. 1129, 1136 (E.D. Va. 1989)).

"[C]ontributory negligence analysis revolves around the conduct of the plaintiff. In Virginia, contributory negligence is a complete bar to recovery in a negligence action." *King v. Flinn & Dreffein Eng'g Co.*, 2012 U.S. Dist. LEXIS 105333, *20, 2012 WL 3133677, *7 (W.D. Va. July 30, 2012) (*citing Smith v. Va. Elec. & Power Co.*, 204 Va. 128, 133, 129 S.E.2d 655, 659 (1963)). "A plaintiff's negligence claim is barred by his contributory negligence if he failed to act as a reasonable person would have acted for his own safety under the circumstances." *Freeman*, 924 F. Supp. at 1469 (citations omitted); *King*, 2012 U.S. Dist. LEXIS 105333 at *20-*21 (citations omitted). *See also Flakne v. Chesapeake & Potomac Tel. Co. of Va.*, 199 Va. 31, 34, 97 S.E.2d 650, 652 (1957) ("One cannot charge another in damages for negligently injuring him when his own failure to exercise due and reasonable care was responsible for the occurrence of which he complains."). "[I]n order for a plaintiff to be charged with contributory negligence, that negligence must have been a proximate cause of the plaintiff's accident." *King*,

2012 U.S. Dist. LEXIS 105333 at *21 (citations omitted). "Under Virginia law, '[t]he proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred.'" *Valladares v. Cordero*, 2007 WL 2471067, *5, 2007 U.S. Dist. LEXIS 63273, *20 (E.D. Va. Aug. 27, 2007) (*quoting Doherty v. Aleck*, 273 Va. 421, 428, 641 S.E.2d 93, 97 (2007)), *aff'd* 552 F.3d 384 (4th Cir. 2009); *Jenkins v. Payne*, 251 Va. 122, 128, 465 S.E.2d 795, 799 (1996)). There may be more than one proximate cause of an event. *Doherty*, 273 Va. at 428, 641 S.E.2d at 97; *Jenkins*, 251 Va. at 128, 465 S.E.2d at 799.

Contributory negligence is judged by an objective standard. *Freeman*, 924 F. Supp. at 1469 (citation omitted); *King*, 2012 U.S. Dist. LEXIS 105333 at *21 (*citing Kelly v. Va. Elec. & Power Co.*, 238 Va. 32, 40-41, 381 S.E.2d 219, 223-24 (1989)). "Generally, questions of negligence and contributory negligence are for the jury . . . but where reasonable men may draw but one inference from the facts, they become questions of law for the court." *King*, 2012 U.S. Dist. LEXIS 105333 at *21 (*quoting Smith*, 204 Va. at 132, 129 S.E.2d at 659). *Accord Kelly*, 238 Va. at 39, 381 S.E.2d at 222 ("Ordinarily, the issue of contributory negligence is a question for the jury. Nevertheless, when persons of reasonable minds could not differ upon the conclusion that such negligence has been established, it is the duty of the trial court so to rule.").

In *Valladares*, 2007 U.S. Dist. LEXIS 63273 at *18-*21, the district court granted a motion for summary judgment based on Virginia's contributory negligence doctrine in a police use-of-force case. The district court first held that the plaintiff's interference with a police officer's efforts to arrest his brother were negligent. The court then held that the plaintiff's interference was the cause of the police officer's efforts to subdue him, as well as his resulting injuries. The court determined that the plaintiff's injuries would not have occurred absent the

plaintiff's negligence. The court also held that it was foreseeable that the plaintiff's interfering with the arrest of his brother could result in physical harm to the plaintiff. The court concluded that the plaintiff's negligence was, as a matter of law, a proximate cause of the incident. Accordingly, the plaintiff's negligence claims were barred. *Id.* at *20.

Here, like in *Valladares,* Russell's actions were negligent and were a proximate cause of his injuries. Russell knew of his medical condition; he was aware that he had two prior heart attacks and a weak heart. Russell also knew that he had a decades long cocaine habit which had exacerbated his heart condition and that his doctors had ordered him to stop using drugs and alcohol. Despite this knowledge, Russell engaged in an evening of drinking at his home and at a restaurant in Farmville. [ExA78-82]. He consumed so much alcohol that he had a 0.17 BAC at the hospital following the incident. [ExBpp.175-176]. After *driving* home from Farmville, he physically assaulted his son, Rhett, to the point that his other son, Andrew, called 911. [ExDpp.8-9;ExCpp.49-52]. When he learned that his son had called 911, Russell fled his home and led Sheriff's deputies on a brief car chase. [ExG-2]. Upon stopping his truck he quickly exited his vehicle and took several steps toward the deputies who were exiting their patrol cars. [*Id.*]. Russell paused briefly, but he refused to follow the lawful directives of the officers to get down on the ground. [*Id.*]. Instead, he remained standing with his hands at times in the vicinity of his waist band, which was covered by his untucked shirt (which would have concealed any weapons that might have been lodged in his waist band). [*Id.*; ExFpp.68-69,74-75;ExEp.160;ExR(Gallagher Depo.)pp.33-37,121,132-134]. Russell observed that the officers had weapons drawn – Dep. Wright had drawn his X26 while Mattox had drawn his firearm. [ExG-2]. Nonetheless, with one last chance to alter the course of events that he had set in

motion, he told the deputies "**Why don't you just taser me**" and took another step toward them. [*Id.*;ExG-3].

Russell had many opportunities on October 30, 2010 to avoid the injuries he ultimately suffered. But at every turn, Russell chose to create and ignore significant risks and dangers that would have been apparent to, and avoided by, any reasonably prudent person. He could have elected not to assault his son, but he chose to do so. After his other son called 911, he could have elected not to flee his residence. After pulling over, he could have remained in his vehicle. He could have heeded the lawful directives of law enforcement officers for him to get on the ground. He could have kept his hands high in the air instead of keeping them in the vicinity of his waist band. When the deputies had weapons trained on him, he again could have complied with their directives to get on the ground. Russell did not do any of those things. Instead he invited the deputies to "taser" him as he continued to move toward them. [*See* ExEpp.157;ExFpp.73,75-76;ExRpp.33-37,70,94-95,107,126-127].

Contributory negligence focuses on what an ordinarily prudent person would have done under similar circumstances. A reasonably prudent person would not ignore risks and dangers which should have been apparent to him. A reasonably prudent person would have made different choices at every turn. Russell, unfortunately, made many unreasonable choices that led to his injuries. Russell's actions clearly were unreasonable and, therefore, negligent.[15] Further, much like the plaintiff's actions in *Valladares*, but for Russell's actions he would not have been in a position where Sheriff's deputies attempted to subdue him through the use of force. Finally,

---

[15] In fact, Russell's actions constitute negligence *per se*. Virginia Code §§ 18.2-460 and 18.2-479.1 make it a crime to obstruct justice and resist arrest. Russell violated both of those statutes. He "was negligent *per se* because . . . he violated several regulations and statutes. Negligence per se can bar plaintiff's recovery if it was a proximate cause of the injury." *Staton v. United States*, 566 F.Supp. 174, 181 (W.D. Va. 1983) (citation omitted). [*See also* ExFp.115].

it is inherently foreseeable that an individual who refuses to abide by lawful directives from law enforcement officers, takes steps towards those officers that could be perceived as aggressive, and challenges officers to "shoot" or "taser" him would, in fact, be subjected to force. Significantly, courts have recognized that, "[a]lmost every use of force, however minute, poses some risk of death." *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1280 n.12 (11th Cir. 2004)). *See also Lillo v. Bruhn*, 2009 U.S. Dist. LEXIS 82025, *25, 2009 WL 2928774, *6 (N.D. Fla. Sept. 09, 2009). [*See also* ExRp.143].

While contributory negligence may generally be left to the province of the jury, it is proper for a court to enter judgment as a matter of law on such a clear set of facts such as presented in this case. State courts and federal courts applying Virginia law have found contributory negligence as a matter of law when appropriate. As discussed above, a court in the Eastern District of Virginia found contributory negligence as a matter of law in *Valladares* when the plaintiff interfered with police efforts to arrest his brother. 2007 U.S. Dist. LEXIS 63273 at *18-*21. Judge Turk granted summary judgment in *King* because the plaintiff had acted unreasonably by failing to ensure that the equipment at issue was in a safe operating mode, entering an area beyond a safety barrier, and attempting to fix the equipment using a pipe wrench while standing on a wet surface. 2012 U.S. Dist. LEXIS 105333 at *22-*23. Judge Turk also granted summary judgment in *Bowers v. Martin* where the plaintiff used a table saw without a blade guard because "reasonable minds cannot differ on the conclusion that the plaintiff's own actions helped cause her injuries . . . ." 1996 U.S. Dist. LEXIS 8897, *14-*15 (W.D. Va. February 21, 1996). In *Freeman*, Judge Williams held that an individual who eschewed safe alternatives such as turning his tractor off or placing it in neutral was contributorily negligent as a matter of law where he left the tractor in gear and accidentally

depressed the accelerator. 924 F.Supp. at 1470-71.[16] The United States Court of Appeals for the Fourth Circuit affirmed a finding of contributory negligence as a matter of law in *Walker v. Caterpillar Indus.*, 34 F.3d 1067, 1994 U.S. App. LEXIS 20301, 1994 WL 406563 (4th Cir. August 4, 1994). In *Walker*, the district court had granted summary judgment because the plaintiff was contributorily negligent in the manner in which he drove a forklift. *Id.* at *10-*11. In *Hoban*, Judge Clarke granted a motion for directed verdict where the evidence established that the plaintiff's decedent committed "pilot error" causing the plane crash that resulted in his death. 717 F. Supp. at 1136-37. *See also Kelly*, 238 Va. at 34-39, 381 S.E.2d at 219-24; *Smith*, 204 Va. 128, 129 S.E.2d 655; *Flakne*, 199 Va. 31, 97 S.E.2d 650.

"[I]f there was a reasonable opportunity for the plaintiff to avoid the accident up to the moment of its happening, it was his duty to do so." *Straughan v. Nash*, 215 Va. 627, 632, 212 S.E.2d 280, 283 (1975). Russell failed to do so multiple times and therefore was the "co-author of his own misfortune". *Id.* Thus, summary judgment should be granted for TASER.

**B.    Russell Also Assumed The Risk Of The Consequences Of His Actions On October 30, 2010 And, Therefore, TASER Is Entitled To Judgment As A Matter Of Law As To Plaintiff's Negligence Claims.**

While contributory negligence involves an objective standard, assumption of the risk "focuses on the injured person's subjective state of mind, asking whether plaintiff fully understood the nature and extent of a known danger and voluntarily exposed himself to it." *Freeman*, 924 F.Supp. at 1471 (citation and internal quotation omitted). "Virginia law requires that for a plaintiff to have assumed the risk she must have knowingly ventured into a dangerous situation." *Bowers*, 1996 U.S. Dist. LEXIS 8897 at *13 (citation omitted). "An action

---

[16] The United States Court of Appeals for the Fourth Circuit reversed on other grounds but specifically did not overrule the lower court's determination on contributory negligence. *Freeman*, 118 F.3d at 1014 n.2.

constitutes a voluntary assumption of the risk if the plaintiff has knowledge of and fully appreciates the inherent danger, and still exposes herself to it without compulsion from the outside." *Id.* at *13-*14 (citations omitted). *See also Amusement Slides Corp. v. Lehmann*, 217 Va. 815, 819, 232 S.E.2d 803, 805 (1977).

The same facts that support a finding of contributory negligence as a matter of law under an objective standard support finding assumption of the risk as a matter of law under a subjective standard. It is incontrovertible that immediately before Dep. Wright used his TASER X26, Russell stated "Why don't you just taser me" and began stepping toward the officers. It is uncontroverted that he made this statement while Sheriff's deputies had weapons trained on him – one a firearm and one a TASER X26 – and after Dep. Mattox had instructed Dep. Wright to "tase" Russell. Russell's statement clearly indicated an appreciation of the fact that weapons were trained on him and could be used on him. With that knowledge, he continued to ignore repeated directives to "get down" on the ground and proceeded to step toward the deputies; a move that would force them to use those weapons. Russell took all of these actions with the knowledge of his heart condition. Making those statements while refusing to follow lawful directives of law enforcement officers and then taking steps toward those deputies indicates an appreciation of the fact that he is facing the risk that one of those weapons will be discharged. Russell's actions show that he was willing to assume the risk of the harm or injuries that would flow from such use of force.

Here, reasonable minds could not differ as to whether Russell appreciated and voluntarily incurred the risk that he would be subjected to force, including exposure to a TASER ECD, by law enforcement officers. Russell clearly assumed the risk that the weapons trained on him would be discharged and he assumed the risk of the consequences of the

discharge of such weapons, including possible death. Therefore, TASER is entitled to judgment as a matter of law as to Plaintiff's negligence claims.

## II. ALL OF PLAINTIFF'S PRODUCTS LIABILITY CLAIMS FAIL AS A MATTER OF LAW BECAUSE SHE CANNOT PROVE THAT TASER BREACHED ANY DUTY TO WARN.

### A. Plaintiff Cannot Prove Causation Where TASER Provided Product Warnings And Training Materials About The Risk Of Cardiac Arrest And The Avoidance Of Chest Shots To ACSO, But ACSO Failed To Deliver Those Warnings And Training Materials To Dep. Wright.

"Under any theory of tortious injury, one requisite element of a claim is a causal connection between defendant's conduct and plaintiff's injury. The law of products liability in Virginia does not permit recovery where responsibility is conjectural. To succeed on a products liability claim, the plaintiff must demonstrate that a product defect is the only reasonable explanation or cause of the complained-of injury." *Danek Medical*, 47 F.Supp.2d at 707 (internal citations and quotations omitted). *See also Butler v. Navistar Int'l Transp. Corp.*, 809 F.Supp. 1202, 1207 (W.D. Va. 1991) (under both negligence and implied warranty theories, "plaintiff is required to prove that any breach of duty by [manufacturer] was the proximate cause of [decedent's] death.").

TASER shipped the X26 ECD involved in the Russell incident on May 18, 2007. [ExI¶32]. The following warning, which expressly advised users to obey all other warnings and comply with <u>current</u> training materials and requirements, was affixed to the ECD and included in the Product Manual, Product Warnings, and training program shipped with the ECD:



[ExI¶34]. TASER's Version 17 training program and May 1, 2010 Product Warnings were in effect on the date of the Russell incident (October 30, 2010), and had been in effect for some six months prior. [*Id.*¶¶42,49]. Despite ACSO having been notified of the release of Version 17 via TASER's Training Bulletin 16.1 on April 27, 2010, none of these materials were provided to Dep. Wright. [*Id.*¶¶42-43]. In fact, neither Dep. Burton nor Sgt. Irvin trained Dep. Wright had provided Dep. Wright with any of TASER's Version 15 training material, Version 16 training material, its Training Bulletin 15.0, or its Product Warnings dated September 30, 2009. [ExN]. Accordingly, Dep. Wright was never provided with the extensive warnings and information regarding the cardiac safety factors and risks of ECD exposures, nor was he trained on TASER's new preferred target zone. [*See* ExT(Laughery Depo)pp.95-98].

While Dep. Wright did sit through a meeting where Dep. Burton orally "went over" a synopsis of TASER Bulletin 15.0, that synopsis explicitly advised that it should only be distributed to *current ECD certified* users. [ExI¶48;ExI-11]. Dep. Wright was not a certified ECD user and, in fact, had never even been trained on the use of the ECD at the time of the staff meeting. Further, he has no recollection of ever seeing or reading a copy of the synopsis or a preferred target zone graphic prior to October 30, 2010.[ExN¶¶5,7;ExEp.229]. Regardless, Dep. Wright's subsequent training by Dep. Burton was done with outdated, obsolete materials (Version 14 and March 1, 2007 Product Warnings) which did not contain TASER's new

preferred target zones or its current warnings, information or instructions regarding potential cardiac risks and preferred targeting. [ExI-7;ExI-13].

Where warnings are distributed to, but not read by, the intended user of the product, a causal connection between any alleged inadequacy in the warnings and the alleged injury cannot be proven. In *Rule v. Best Indus., Inc.*, 1997 U.S. App. LEXIS 22649, *6 (4th Cir. August 25, 1997), the doctor did not read the materials provided by the medical device manufacturer with its product. The United States Court of Appeals for the Fourth Circuit held that "[i]t would not have mattered what the [the manufacturer's] warnings said" because the user of the product never read the warnings. The court concluded, therefore, "the alleged lack of warning was not a proximate cause of [plaintiff's] injury." *Id*.

The court reached a similar result *Begley v. Gehl Co.*, 1996 U.S. Dist. LEXIS 8198 (W.D. Va. April 2, 1996), *aff'd* 1997 U.S. App. LEXIS 12182 (4th Cir. May 27, 1007). There, the plaintiff claimed that a manufacturer failed to adequately warn of certain risks associated with a forklift. *Id*. at *12. The court granted summary judgment as to plaintiff's failure to warn claim because "[n]one of the warnings provided by [the manufacturer] were ever read." *Id*. at *13. Judge Kiser held that "the failure to read posted warnings, or warnings printed in manuals, preclude recovery for failure to warn." *Id*. Judge Kiser also noted that a manufacturer "could reasonably expect the user" to acquaint himself with the "capabilities and uses for which the product was appropriate." *Id*.

In *Belton v. Ridge Tool Co.*, 911 F.2d 720, 1990 WL 116783, *1 (4th Cir. June 4, 1990), the manufacturer had placed a warning about possible "severe injury" on the exterior of a pipe and bolt threading machine. Additional warnings were included in the machine's operator's manual. *Id*. The plaintiff had not read the warnings. The United States Court of Appeals for the

Fourth Circuit agreed with the lower court that the plaintiff could not prove causation where he had not read the warnings. "To establish proximate cause in a case in which plaintiff challenges the adequacy of the warnings provided, plaintiff must at least have demonstrated that he read those warnings." *Id*. *See also Blue v. Walls Indus.*, 28 F.3d 1208, 1994 U.S. App. LEXIS 16998, *2 (4th Cir. July 12, 1994) (plaintiff cannot prove causation in a failure to warn case where he was not aware of warnings); *Johnson v. Niagara Machine & Tool Works*, 666 F.2d 1223, 1225 (8th Cir. 1981) ("[A]n issue as to the adequacy of a warning necessarily presupposes that the operator had read the warning.").

ACSO, a law enforcement agency, made the decision to purchase the X26 for use by its law enforcement officers. [ExLp.12]. ACSO is solely responsible for establishing its use of force policy; purchasing and distributing weapons; and making decisions as to how to incorporate its weapons into its policy. [ExI¶¶24,47;ExKp.92;ExLp.58;ExMp.113] ACSO selected which deputies would administer its ECD program and be responsible for training its deputies. [ExLpp.13-16]. Sheriff Staples testified that he selected Sgt. Irvin and Dep. Burton to administer the program. [*Id*.]. Sgt. Irvin and Dep. Burton were responsible for training other deputies on the use of the X26 ECD. [*Id*.pp,18,22;ExKpp.9-10;ExMp.7]. Sheriff Staples testified that he relied on Sgt. Irvin and Dep. Burton to disseminate information received from TASER and that he expected them to disseminate all such information. [ExLpp.33-34]. Sgt. Irvin testified that he knew that new TASER training materials supplant older materials, [ExMpp.21,44,114], and that training of end-users was to be conducted in accordance with the most recent TASER training materials [*Id*.pp.23,29-30].

As noted, TASER disseminated revised Product Warnings on September 30, 2009 and May 1, 2010, and it disseminated Versions 16 and 17 of its training materials prior to the

incident on October 30, 2010. These documents apprised ACSO of the alleged risk of cardiac arrest from ECD exposure and warned against aiming the TASER ECD at the chest, the very issues involved in this litigation. TASER put ACSO on notice of these risks and related warnings. TASER reasonably relied on ACSO and ACSO's selected trainers to convey these risks and warnings to those deputies, including Dep. Wright, to whom ACSO issued ECDs. Yet none of these risks and warnings were provided to Dep. Wright during or after his training.

Plaintiff's evidence must make the "obligatory connection between injury and defect". *Danek Medical*, 47 F.Supp. 2d at 708. Plaintiff cannot make this connection, however. ACSO's failure to provide to Dep. Wright information regarding risks and warnings that had been delivered to ACSO by TASER breaks any possible causal connection between any alleged inadequacy of those warnings and Russell's injuries. Any inadequacy in those warnings could not have caused Dep. Wright's actions and resulted in Russell's injuries because Dep. Wright never read the warnings. Further, no different warning would have mattered because it also would not have been read by Dep. Wright. Causation cannot be established when even an allegedly adequate warning would not have altered the outcome. Simply put, additional or different warnings would not have altered Dep. Wright's conduct because they would not have been presented to and read by Dep. Wright.

### B. TASER Did Not Have Any Duty To Warn About Avoiding Chest Shots Or The Risk Of Cardiac Arrest Under Virginia Law.

Plaintiff's own experts conclusively resolve any issue of whether TASER had reason to know of a risk of cardiac arrest from ECD exposure "based on the science". Applying a very broad agreed upon definition of "literature,"[17] Dr. Douglas Zipes ("Zipes"), Plaintiff's

---

[17] In his deposition, Zipes agreed that the terms "peer-reviewed literature" or "literature" are synonymous terms and are defined as and accepted to mean or broadly and completely include

cardiology expert, testified that, prior to April 30, 2012, no published, peer-reviewed literature existed that found, stated, or concluded that an X26 ECD caused cardiac capture (when a pacemaker was not present), ventricular tachycardia ("VT"), VF, cardiac arrest, or lethal cardiac consequences in a human; and that there was no published, peer-reviewed literature that found, stated, or concluded that an X26 ECD caused cardiac capture that resulted in VT, VF, cardiac arrest, or lethal cardiac consequences in a human. [ExBpp.230-231,236-240; ExB-1]. On May 22, 2012, in his *Circulation* litigation case series, Zipes stated "[t]o date, no peer-reviewed publication has definitely concluded that ECD shocks can precipitate ventricular fibrillation (VF) causing sudden cardiac arrest and death in humans." [ExU(Zipes Bachtel Depo)pp.110-111]. On May 23, 2011, Zipes testified that none of the ECD epidemiological field studies support his opinion that ECDs cause VF or cardiac arrest in humans. [ExV(Zipes Rich Depo)p.105]. On August 2, 2012, Zipes testified that to the best of his knowledge "no epidemiological study has found a link between ECD shocks and sudden cardiac death . . . has been published." [ExW(Zipes Fahy Depo)p.213]. And, on August 9, 2012, Zipes testified that it is correct that "there is not a single epidemiological study that has found, stated, or concluded that a TASER Electronic Control Device applied to a human has been shown to cause a negative cardiac effect." [ExUpp.143-144]. Zipes also testified that cardiac capture is not synonymous with VT, VF, cardiac arrest, or lethal cardiac consequences; and just because an electrical device induces cardiac capture does not mean that the device causes VT, VF, cardiac arrest, or lethal cardiac consequences. [ExBpp.243-245].

---

all medical, scientific, electrical, or engineering: peer-reviewed literature, prospective human studies, epidemiological or field-use studies, finite-element-modeling studies, modeling or theoretical studies, literature reviews, learned treatises, published statements by professional organizations, animal studies, case series anecdotes/case reports, letters to the editor, and meta analyses since the dawn of time (the beginning of the universe thought to be 13.7 billion years ago) through the anticipated conclusion of the deposition. [ExBpp.35-38].

Applying a similarly broad definition of "literature," Plaintiff's bioelectrical scientist Dr. John Webster ("Webster") testified that prior to April 30, 2012 no literature found, stated, or concluded that an X26 ECD causes cardiac capture, cardiac pacing, VT, VF, cardiac dysrhythmia, or lethal cardiac consequences in humans. [ExS(Webster Depo)pp.57-59; *see also* ExSpp.106-107,109,120,122]. Alpert testified that he had never opined that an ECD should not be deployed at a person's chest because of a risk of negative cardiac affects. [ExOpp.105-106]. Alpert also characterized the risks from an ECD exposure as "some information that the electricity has some effect on people." [*Id*.pp.117-118]. Alpert conceded that "it's unknown what impact the electricity [from an ECD] has." [*Id*.pp.119-120].

"A manufacturer is not an insurer of its product's safety, and a manufacturer has a duty to warn only if it knows or has reason to know that its product is dangerous." *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 413 S.E.2d 630 (1992) (*citing Featherall*, 219 Va. at 962, 252 S.E.2d at 366). In *Owens-Corning*, "the Supreme Court of Virginia made unmistakably clear that a manufacturer's duty to warn of a product's dangers imposes no underlying duty to conduct additional studies or tests because a failure to warn claim rests on a *reason to know* standard rather than the broader *should have known* standard." *Torkie-Tork v. Wyeth*, 757 F.Supp.2d 567, 572 (E.D. Va. 2010) (emphasis in original) (*citing Owens-Corning*, 243 Va. 128, 413 S.E.2d 630).

*Torkie-Tork* was a negligent failure to warn case. *Id*. at 568, 572. The plaintiff argued that the duty to warn in Virginia included an obligation for the defendant pharmaceutical company to conduct additional studies of its drug to assess the potential risk of causing breast cancer. *Id*. at 568-69. In rejecting the plaintiff's argument, the district court concluded that the "only dangers for which [the manufacturer] had a duty to warn adequately are those dangers

which [the manufacturer] knew or had reason to know existed *based on the science* available at the time the product left [the manufacturer's] hands." *Id.* at 573 *(citing Owens-Corning*, 243 Va. at 134-36, 413 S.E.2d at 630; *Morgen*, 252 Va. at 65, 471 S.E.2d at 489) (emphasis added).

Based on Plaintiff's evidence, as of October 30, 2010, there was no published, peer-reviewed scientific study linking exposure to an electrical discharge from a TASER X26 to VT, VF, cardiac arrest, or lethal cardiac consequences in humans. At the time of shipment in May 2007 and the time of the incident in October 2010, there was no basis for imposing upon TASER a duty to warn about any such risk. That TASER chose to issue such warnings out of an abundance of caution does not establish that it was under a duty to do so based upon known scientific evidence. Even today, Plaintiff's experts are unable to quantify the risk that exposure to an electrical discharge from a TASER X26 would cause VF or cardiac arrest in humans. Webster characterized the risk of death or cardiac arrest from a TASER ECD exposure as a "very low probability", "very small", "rare", and less likely than other mechanisms such as stress and coronary artery disease. [ExSpp.106-107,109,120,122]. Zipes likewise expressed, as he has published and also testified multiple times, his opinion that he could not determine how often an exposure to a TASER ECD would result in VF. [ExBpp.253-254].

Where the alleged risk was not known at the time of delivery (May 2007) or the time of the incident (October 2010), and in fact cannot even be quantified at this time, TASER necessarily could not have known or had reason to know that its product was likely to be dangerous for the use for which it was supplied. Thus, TASER did not have a duty under Virginia law to warn about any risk of cardiac arrest posed by targeting the chest area. *See Smith v. United States*, 155 F. Supp. 605, 609 (E.D. Va. 1957) ("The duty to caution or warn of unusual hazards or dangers must only arise where there is a reasonable anticipation that the use

of a product as instructed or directed will produce injury."); *Rosa v. TASER,* 684 F.3d 941, 946, 950 (9th Cir. 2012) (finding TASER had no "duty to warn of every report of a possible risk, no matter how speculative, conjectural, or tentative," and untested hypothesis concerning acidosis in humans was insufficient as a matter of law to require warning).

Because TASER had no duty to warn, it is entitled to judgment as a matter of law on Plaintiff's negligence and breach of implied warranty claims.

### C.    Plaintiff Does Not Have The Required Expert Testimony To Prove That TASER's Warnings and Training Materials Were Inadequate.

Plaintiff is required to produce expert testimony that an alleged defect in TASER's product was the cause of Russell's injuries in this complex products liability case. *See*, *e.g.*, *Alevromagiros v. Hechinger Co.*, 993 F.2d 417 , 421 (4th Cir. 1993) ("'Absent an established norm in the industry,' a court is constrained to rely on the opinion testimony of experts to ascertain the applicable safety standard.") (*quoting Ford Motor Co. v. Bartholomew*, 224 Va. 421, 430, 297 S.E.2d 675, 679 (1982)); *Rohrbaugh v. Wyeth Labs., Inc.,*, 916 F.2d 970, 972 (4th Cir. 1990) (requiring expert testimony to prove causation in vaccination case); *Chase v. General Motors Corp.*, 856 F.2d 17, 20 (4th Cir. 1988) (noting that expert witnesses "necessarily may play a significant part" in products liability cases); *Danek*, 47 F.Supp. at 707 (expert testimony required in medical device case); *Logan v. Montgomery Ward & Co.*, 216 Va. 425, 428-31, 219 S.E.2d 685, 687-89 (1975) (plaintiff could not prove case without expert testimony). Plaintiff fails in this regard as to an essential element of her claim.

First, for the reasons stated in TASER's forthcoming motion to exclude Laughery as an expert, Laughery is not qualified to testify as an expert on the inadequacy of warnings related to cardiac risks or the use of force. Therefore, Plaintiff cannot prove an essential element of her

claim, namely that TASER failed to exercise reasonable care to inform the user of a product's dangerous condition or of the facts which make the product likely to be dangerous.

Further, as the Fourth Circuit held in *Spruill v. Boyle-Midway, Inc.*, "[t]he sufficiency of the warning is to be judged on the basis of the nature of the danger, and the degree of care required is 'commensurate with the risk therefrom reasonably to be foreseen'." 308 F.2d 79, 86 (4th Cir. 1962) (*quoting Sadler v. Lynch*, 192 Va. 344, 347, 64 S.E.2d 664, 665-66 (1951)). Plaintiff's warnings expert, Dr. Laughery, admitted that he has no expertise or specialized knowledge in the fields of cardiology, law enforcement use of force, or the functionality of an X26. [ExT(Laughery Depo)pp.11,40,65-68]. He has no knowledge of the nature of the cardiac risk allegedly associated with an ECD exposure or of the degree of care required in a dynamic police use-of-force situation. Without any understanding of the nature of the cardiac risk associated with an ECD exposure or the degree of care in a use-of-force situation, Dr. Laughery's purported testimony as to the inadequacy of warnings is meaningless. Where Plaintiff's warnings expert admittedly has no expertise as to the nature of any danger posed by the ECD or the degree of care required of law enforcement officers in the use of force, his opinion about the adequacy of TASER's warnings amounts to nothing more than idle speculation. Plaintiff cannot prove that TASER failed to exercise reasonable care to inform the user of its product's dangerous condition or of the facts which make it likely to be dangerous.

Furthermore, Laughery cannot testify to the content of the training material Wright should have been trained on or the warnings in effect on the date of the incident. Laughery testified that Wright should have been trained on Version 17 [Ex.Tpp.107-109], but Laughery never actually reviewed the training material that came with Version 17 [*Id.*p.94]. In fact, Laughery does not know what materials TASER sent ACSO when it shipped the ECD at issue

[*Id*.pp.13-15); he does not know what training version or product warnings were in effect on the date of incident [*Id*.pp.19-25]; he does not know what information and materials are included in TASER's Version 14, 15 or 16 training programs [*Id*.pp.32-33], and he does not know how long a TASER ECD certificate is valid [*Id*.pp.35-36].

Finally, Dr. Laughery conceded that TASER's September 30, 2009 Product Warnings directed law enforcement officers to lower their point of aim below the chest, alerted readers of the Product Warnings regarding the concern over dart-to-heart distance, and highlighted TASER's preferred target zone. [ExTp.107]. By his own testimony, the warnings directly addressed the very issues in this litigation. Thus, Dr. Laughery's purported opinion as to the inadequacy of any TASER warnings is fatally contradicted by his own testimony that the September 30, 2009 warnings accomplished these goals.

In the absence of qualified expert testimony that TASER's warnings were inadequate to address a remote risk of cardiac arrest in a law enforcement use of force situation, TASER is entitled to judgment as a matter of law.

**D.      TASER's Warnings Are Adequate As A Matter Of Law.**

TASER also is entitled to summary judgment because the warnings it provided prior to the October 30, 2010 incident were adequate as a matter of law. The issue of the adequacy of warnings is customarily left for the jury. *See Spruill*, 308 F.2d at 86. However, where reasonable minds could not disagree and only a single conclusion or inference may be drawn from the facts, the question of the sufficiency of the warning may be taken from the jury and decided by the court. *Id*. (*citing Nehi Bottling Co. v. Lambert*, 196 Va. 949, 955, 86 S.E.2d 156, 159 (1955)).

According to plaintiff's allegations and expert testimony, Russell allegedly suffered cardiac arrest as a result of being targeted in the chest with the ECD's probes. It is uncontroverted that TASER disseminated its September 30, 2009 and May 1, 2010 Product Warnings and Versions 16 and 17 of its training materials. A plain reading of these Product Warnings and training materials reveals that they warned law enforcement officers in detail about possible cardiac risks and to avoid targeting the chest. Laughery conceded as much when he testified that TASER's September 30, 2009 Product Warnings directed law enforcement officers to lower their point of aim below the chest, alerted readers of the Product Warnings regarding the concern over dart-to-heart distance, and highlighted TASER's preferred target zone. [ExTpp.95-98,107].

It is respectfully submitted that these warnings are adequate as a matter of law. *See Carroll v. Harris County, Tex.*, No. H–08–2970, 2011 WL 2457935, at *5 (S.D. Tex. May 25, 2011), report and recommendation of Magistrate adopted *Carroll v. Harris County, Tex.* No. H-08-2970, 2011 WL 2457517 (S.D.Tex. Jun 16, 2011) (TASER's warnings adequate as a matter of law); *Gray v. Taser Int'l, Inc.*, 2012 U.S. Dist. LEXIS 45515, * 15, 2012 WL 1078081, *5 (W.D. La. Mar. 30, 2012) (TASER warnings adequate where they advised that TASER ECD use "involved a degree of risk that someone could get hurt" or that the ECD "could cause injury."); *Marquez v. City of Phoenix*, 693 F.3d 1167, 1172-73 (9th Cir. 2012) (granting summary judgment to TASER and finding TASER's warnings were sufficient); *Butler v. TASER Int'l, Inc.*, 2012 U.S. Dist. LEXIS 126752, *5-*8, 2012 WL 3867105, *2-*3 (N.D. Tex. Sept. 6, 2012) (granting summary judgment to TASER because warnings were "more than adequate to warn of the exact injuries [plaintiff] claimed to have suffered"); *Williams v. City of Cleveland, Miss.*, 2012 U.S. Dist. LEXIS 117559, *13-*21, 2012 WL 3614418, *4-*6 (N.D.

Miss. Aug. 21, 2012) (TASER's warnings were adequate because they "warned of the risk complained of" and because "there is *no* evidence presented by Plaintiff that additional or different warnings would have altered the officers' use of the Taser ECDs under the factual circumstances presented in this case"); *Kandt v. TASER Int'l, Inc.*, 2012 U.S. Dist. LEXIS 96024, *14, 2012 WL 2861583, *5 (N.D.N.Y. July 10, 2012) (holding that "Taser's warning is adequate as a matter of law" despite testimony to the contrary from Dr. Laughery).

## III. TASER DISCLAIMED ALL IMPLIED WARRANTIES AND EXCLUDED CONSEQUENTIAL DAMAGES; THEREFORE, TASER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S WARRANTY CLAIMS.

In Virginia, a manufacturer may disclaim the implied warranties of merchantability and fitness for a particular purpose. VA. CODE ANN. § 8.2-316 (authorizing exclusion or disclaimer of implied warranties); *Waytec Elecs. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459 F.Supp.2d 480, 493 (W.D. Va. 2006). Disclaimers of implied warranties are valid even though the underlying products liability claim involves personal injuries. *See Buettner v. R.W. Martin & Sons*, 47 F.3d 116, 120 n.2 (4th Cir. 1995) (disclaimer under VA. CODE ANN. § 8.2-316 applies to personal injury claim based on breach of warranty); *Reibold*, 859 F.Supp. at 198-99 (holding that manufacturer's disclaimer of implied warranties applies to personal injury claims); *Bowers*, 1996 U.S. Dist. Lexis 8897 at *7-*9 (noting that warranty variant of product liability claim can be disclaimed under VA. CODE ANN. § 8.2-316 even where plaintiff suffers personal injury). Because an injured third-party has no greater warranty than existed between the original contracting parties, the disclaimer applies even where the injured plaintiff is not a party to the sale of goods contract that included the disclaimer. *Buettner*, 47 F.3d at 118-19 (disclaimer in contract between parties to sale of goods contract applies to third parties); *Reibold*, 859 F.Supp. at 197-98; *Bowers*, 1996 U.S. Dist. Lexis 8897, *8 (*citing Goodbar v. Whitehead Bros.*, 591

F.Supp. 552, 567 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F2d 213 (4th Cir. 1985)).

A manufacturer also can expressly limit its exposure to consequential damages for an alleged breach of warranty with regard to non-consumer goods. VA. CODE ANN. § 8.2-719 (authorizing exclusion of consequential damages); *Reibold*, 859 F.Supp at 196-97 (discussing distinction between disclaiming warranties and excluding consequential damages). A limitation on consequential damages includes a limitation on damages for personal injuries. *Blevins v. New Holland of America, Inc.*, 97 F. Supp.2d 747, 749-50 (W.D. Va. 2000) ("Personal injuries, such as those claimed here, are a type of consequential damages.").

Here, TASER has disclaimed all implied warranties under VA. CODE ANN. § 8.2-316 and excluded consequential damages under VA. CODE ANN. § 8.2-719. The disclaimer and limitation on remedies were first included in its sales document. [ExI-2]. The disclaimer and limitation on remedies were restated in TASER's Product Manual. [ExI-3p.27].

The warranty disclaimers are clearly valid under Virginia law. They specifically mention merchantability, are in writing, and are conspicuous. *See* VA. CODE ANN. § 8.2-316 (requirements for disclaiming implied warranties of merchantability and fitness for a particular purpose). Because the disclaimer is in all capital letters, the language is conspicuous as a matter of law. *See* VA. CODE ANN. § 8.1-201(10); *Armco, Inc. v. New Horizon Dev. Co.*, 229 Va. 561, 566-67, 331 S.E.2d 456, 459-60 (1985). The language is similar to the language approved by the district court in *Waytec Electronics*, 459 F.Supp.2d at 493 & n.14.

Likewise, the limitation on consequential damages is valid. Clearly, the TASER X26 is not a consumer good. *See Blevins*, 97 F.Supp.2d at 750 (hay baler not a consumer good so exclusion of consequential damages not unconscionable); *Begley*, 1996 U.S. Dist. Lexis 8198 at

*14-*15 (forklift not a consumer good so exclusion of personal injury damages not unconscionable); *Reibold*, 859 F.Supp. at 198 (aerial lift is not a consumer good so limitation on remedies not unconscionable); *Bowers*, 1996 U.S. Dist. Lexis 8897 at *8-*9 (disclaimer of warranty applies to personal injury claim involving a table saw, which is not consumer good); *Fisher v. Monsanto Co.*, 863 F. Supp. 285, 290 (W.D. Va. 1994) (disclaimer of warranty applies to personal injury claims not involving consumer goods).

TASER disclaimed all implied warranties as permitted by VA. CODE ANN. § 8.2-316. TASER also excluded consequential damages as permitted by VA. CODE ANN. § 8.2-719. Either the disclaimer of warranties or the exclusion of consequential damages is sufficient to grant TASER judgment as a matter of law as to Counts IV and V of Plaintiff's Complaint. *See*, *e.g.*, VA. CODE ANN. § 8.2-719, Official Comment 3.

## IV. BASED ON THE UNCONTROVERTED FACTS, PLAINTIFF CANNOT RECOVER PUNITIVE DAMAGES AGAINST TASER.

There is no evidence that would support an award of punitive damages against TASER. "Punitive damages do not arise from ordinary negligence." *Wallen v. Allen*, 231 Va. 289, 297, 343 S.E.2d 73, 78 (1986). Punitive damages are only recoverable if a defendant "has acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to civil obligations. Willful or wanton conduct imports *knowledge and consciousness that injury will result* from the act done." *Id.* (citation omitted) (emphasis in original) (reversing jury award of punitive damages as a matter of law); *see also Bartholomew*, 224 Va. at 437, 297 S.E.2d at 683-84 (affirming trial court's dismissal of punitive damages as a matter of law in a products liability case). To recover punitive damages, a plaintiff would have to prove that a defendant failed to take any remedial action upon learning of a defect. Where a defendant takes some precautions which show concern for the safety of others, punitive

damages cannot be awarded. *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 407-09, 368 S.E.2d 268, 283-84 (1988); *see also Dudley v. Bungee Int'l Mfg. Corp.*, 76 F.3d 372, 1996 U.S. App. LEXIS 1267 (4th Cir. 1996) (per curiam) ("Virginia law, however, precludes a finding of willful or wanton negligence when a defendant has shown some care for the safety of others.") (citation omitted).

Plaintiff cannot meet this high burden. As an initial matter, the TASER product is designed and intended to *protect life* and *promote public safety*. [*See* ExI¶¶ 3-4]. It affords law enforcement officers a use of force option that is less-than-lethal but also does not require the law enforcement officers to get in close proximity to the perpetrator as with a baton. [ExRpp. 76-77]. It is a use-of-force option that also is less impactful on the perpetrator than other less-than-lethal options such as a baton or pepper spray. [Id.;ExOp.17 (comparing ECD favorably to pepper spray);ExRpp.143-144;ExEp.238]. The utility of its ECDs has been underscored time and time again by law enforcement. [ExOpp.131,146;ExI¶55].

Rather than failing to take remedial steps, TASER in fact regularly took steps that showed care and concern for others. TASER conducted scientific and medical research regarding its products and regularly updated its training materials and warnings accordingly. [ExI¶56]. Indeed, it issued warnings regarding cardiac arrest and the avoidance of chest shots years *before* any peer-reviewed studies indicated that there was a causal connection between the TASER product and cardiac arrest. TASER issued warnings regarding cardiac arrest and the avoidance of chest shots even though Plaintiff's own use-of-force expert testified as to the relatively slight risk posed by TASER products.

For these reasons, even if any of the substantive claims against TASER survive this motion for summary judgment, TASER is entitled to judgment as a matter of law as to Plaintiff's punitive damages claim.[18]

## **CONCLUSION**

For the reasons stated herein, it is respectfully submitted that TASER is entitled to judgment as a matter of law.

TASER International, Inc.

Respectfully submitted,

/s/ Jeremy E. Carroll
Jeremy E. Carroll (VSB # 41331)
GLENN, FELDMANN, DARBY &
GOODLATTE
37 Campbell Avenue, S.W.
P. O. Box 2887
Roanoke, Virginia 24001-2887
Telephone: (540) 224-8036
Facsimile: (540) 224-8050
E-mail: jcarroll@gfdg.com

Isaiah Fields, Esq. (AZ# 024640)
TASER International, Inc.
17800 N. 85th Street
Scottsdale AZ 85255
Telephone: 480.502.6280
Facsimile: (480) 905.2027
Email: Isaiah@TASER.com

---

[18] Punitive damages cannot be awarded based solely upon a breach of warranty; tortious conduct must be proven. *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1048-49 (4th Cir. 1988); *RMA Lumber, Inc. v. Pioneer Mach., LLC*, 2009 U.S. Dist LEXIS 108346, *38, 2209 WL 4015928 (W.D. Va. 2009). Thus, if the Plaintiff's negligence claims are dismissed, the claim for punitive damages also should be dismissed, even if the warranty claims proceed to trial.

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2012 I electronically filed the foregoing Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Elizabeth K. Dillon, Esq.
Guynn, Memmer & Dillon, P.C.
415 South College Avenue
Salem, Virginia 24153
elizabeth.dillon@gmdlawfirm.com

Peter Andrew Miller, Esq.
Jeffrey Alan Travers, Esq.
Timothy Andrew Litzenburg, Esq.
The Miller Law Firm, LLC
The Sherman Building
108 Railroad Avenue
Orange, Virginia 22960
pmiller@millerfirmllc.com
jtravers@millerfimllc.com
tlitzenburg@millerfirmllc.com

/s/    Jeremy E. Carroll
Jeremy E. Carroll