UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| ANITA RUSSELL, Personal | ) | |
| Representative for the Estate | ) | |
| of Daniel Russell, | ) | |
| | ) | Civil Action No. 3:11-cv-00075-GEC |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| v. | ) | **OPPOSITION TO MOTION FOR** |
| | ) | **SUMMARY JUDGMENT BY** |
| DENNEY WRIGHT, et al., | ) | **TASER INTERNATIONAL, INC.** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

COMES NOW the Plaintiff, Anita Russell, Personal Representative for the Estate of

Daniel Russell, by counsel, and hereby files this memorandum in opposition to the motion for

summary judgment filed by Defendant TASER International, Inc. ("TASER"). For the reasons

explained in detail below, TASER'S motion lacks legal credence and should be denied.

<u>**INTRODUCTION**</u>

This case concerns the tragic death of Daniel Russell ("Russell"), a Virginia husband and

father, at the hands of a TASER-manufactured electrical control device ("ECD") known as the

X26. During an encounter with local Sheriff's deputies, Russell was shot in the chest by the X26

and went into immediate cardiac arrest. Although TASER attempts to disclaim all liability for

Russell's untimely death, TASER neglected its duty to properly warn of the dangers of the X26

weapon. TASER knew of dangers associated with targeting the devices at the chest but

neglected to properly update their device training information.

STATEMENT OF FACTS

**I.    The Incident.**

TASER's account of the incident wherein Defendant Deputy Denney Wright ("Wright" or "Deputy Wright") deployed the TASER-manufactured X26 ECD against Russell is both inaccurate and misleading. These inaccuracies are reflected in both the record and the video of the incident.

Wright is a deputy employed by the Appomattox County Sheriff's Office ("Sheriff's Office"). During the late evening of October 30, 2010, Deputies Wright, John Mattox ("Mattox" or "Deputy Mattox"), and Christopher Samms ("Samms" or "Deputy Samms") were dispatched to Russell's residence of 7724 Red House Road in Appomattox, Virginia to investigate what was reported as a domestic disturbance. (Ex. A Wright Dep. 116.) Each Deputy reported to the scene in a separate police vehicle, with Deputy Wright following Deputy Mattox's vehicle. (Wright Dep. 116.) As Deputies Wright and Mattox neared the residence, they saw Russell's truck pull out of the driveway. (Second Amended Complaint and Demand for Jury Trial ("SAC") ¶ 9.) The Deputies turned their cars around and proceeded to follow Russell with their vehicle lights flashing and their sirens turned on. (Ex. B Fredericks Decl. 11.) Deputy Mattox drove the vehicle which led the pursuit. (Ex. D Mattox Dep. 56.)

Russell pulled over at the next safe location in an empty parking lot approximately six-tenths of a mile down the road. (Ex. C Alpert Dep. 34.) Deputy Wright testified that he did not know whether Russell was exceeding the posted speed limit prior to pulling his vehicle over. (Wright Dep. 232.) There was no shoulder on the short stretch of road between Russell's residence and this parking lot. Plaintiff's expert concluded and will testify that Mr. Russell was not eluding the police. (Alpert Dep. 39-42.)

2

After pulling over, Russell exited his vehicle with his hands up and out. (Mattox Dep. 59, 90-91; Wright Dep. 151). Deputy Wright acknowledged that Mr. Russell did not make a threatening gesture. (Wright Dep. 151.) Russell did not violate any law in exiting his vehicle after being pulled over by law enforcement officers. (Alpert Dep. 35-40.).

Deputy Mattox exited his vehicle at the same time but failed to turn off his police car siren. (Mattox Dep. 64; Wright Dep. 120, 151.) The siren emitted a loud, consistent noise from the front of the vehicle and was directed outward in front of the vehicle. (Wright Dep. 124, 152.)

Deputy Wright turned off his vehicle siren as he pulled up to the empty lot. (Wright Dep. 148.) However, due to the loud, constant blare of Deputy Mattox's siren, it was extremely hard to hear anything over the siren.[1] (Wright Dep. 120.). Russell took a few steps from his vehicle. (Wright Dep. 151). Deputy Mattox began to tell Russell to get down. (Mattox Dep. 62, 73, 91-92),

---

[1] As depicted by the aligned videos prepared by TASER's forensic video analyst expert, Grant Fredericks, the shouts of Deputies Wright and Mattox are barely audible over the loud, constant blare of the police siren. To produce the audio, the Deputies wore microphones in the chest pockets of their uniforms. (Mattox Dep. 63; Wright Dep. 182.) Sounds that are somewhat audible in the videos would not be audible to a person standing several yards away, as Russell was. Notably, the audio portion of the aligned videos was actually enhanced by Fredericks' technician, Larry Compton. (Fredericks Dep. 86.)

3

This prompted Russell to drop his hands to his sides and raise his arms in surrender. (Alpert Dep. 35). Due to the loud, blaring noise constantly issuing from the siren, Deputy Mattox's shouts were likely inaudible to Russell, who was standing several yards away. (Alpert Dep. 50.).

While Deputy Mattox aimed his loaded police-issued gun directly at Russell, Deputy Wright approached Russell from the side. (Mattox Dep. 66.) Deputy Wright placed the laser dot of his TASER-manufactured X26 weapon on Russell's chest. (Wright Dep. 154-55) Deputy Mattox told Wright to tase Russell. (Mattox Dep. 65, 73.). Russell asked the Deputies, "Are you going to Tase me?"[2] Plaintiff's expert will testify that there was no immediate threat posed to the officers. (Albert Dep. 34). In particular, Plaintiff's expert will testify that Mr. Wright made no threatening gestures, presented no signs of brandishing a weapon, and made no sudden movements. (Alpert Dep. 34-35).

From a distance of approximately 15 feet, Deputy Wright shot Russell in the chest with his X26, causing electricity to flow through Russell's body. (Wright Dep. 102-03). Upon being hit in the chest with the X26 darts, Russell stiffened, fell backward onto the ground, and went into immediate cardiac arrest. (Ex. E Carey Dep. 39, 43.). The duration of the entire time in which Mr. Russell exited his vehicle to the time he was tased was approximately 17 seconds. (Ex. F DVD ASCO Video).

---

[2] Wright and Deputy Mattox both testified that Russell stated, "Go ahead and shoot me." (Mattox Dep. 71; Wright Dep. 123.) However, TASER's forensic video analyst expert, Grant Fredericks, specifically rejected this characterization of Russell's statement. (Ex. H Fredericks Dep. 94.) Mr. Fredericks, who is not an expert in audio, opined that Russell asked, "Why don't you just Tase me?" (Fredericks Decl. 14; Fredericks Dep. 18, 85-87.) Plaintiff's expert, in contrast, asserts that Russell may have said, "Are you going to Tase me?" as he opined that the tape was too noisy due to the siren to form conclusions on what was said. (Alpert Dep 34-40).

4

Due to the cardiac arrest he suffered, Russell was without oxygen for over eight minutes. (Ex. G Webster Expert Rep. 7-8).  This lack of oxygen for a prolonged period of time caused Russell to suffer severe and permanent brain injury leading to his untimely death.  (Carey Dep. 34-35, 43, 63).  After being shot with the X26 weapon, Russell was never revived but rather slipped into a coma and died six months later.

At the time of his death, Russell was 53 years old and had been married to Plaintiff, Anita Russell, for ten years.  (Ex. I Anita Russell Dep. 7.).  The couple had two children, Andrew and Rhett.  (Anita Russell Dep. 7.)

## II.    TASER and the X26 ECD.

TASER began manufacturing the X26 ECD in 2003.  (Ex. J Smith Decl. 5.)  The X26 has two modes: a probe mode and drive-stun mode.  (Smith Decl. 6.)  The dart mode, which was used on Russell, has been described as follows:

> The X26 uses compressed nitrogen to propel a pair of "probes" aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires toward the target at a rate of over 160 feet per second.  Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes into his muscles.  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  *See Draper v. Reynolds*, 369 F.3d 1270, 1273 n. 3 (11th Cir. 2004); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993).  The tasered person also experiences an excruciating pain that radiates throughout the body.

*Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010).

When the trigger on the X26 is pressed and released, a five-second jolt of electrical charge is discharged.  (Smith Decl. 7.)  Russell received the standard five-second jolt on the night of October 30, 2010.  (Wright Dep. 70-71.).

5

III.     **TASER's Training and Certification Procedures**

The TASER X26 that Deputy Wright eventually deployed against Russell was shipped by TASER to Southern Police Equipment on May 18, 2007.  The Sheriff's Office subsequently purchased the ECD from Southern Police Equipment.  (Ex. K Irvin Dep. 34.).

TASER's sales documents that accompanied shipment of the ECD to the Sheriff's Office were comprised of an invoice and a packing slip.  (Defense Ex. I ¶ 33 & Ex.. I-2.)  The packing slip listed various terms and conditions of sale.  (Defense Ex. I ¶ 33 & Ex.. I-2, p. 3.)  The terms and conditions contained a limited warranty wherein TASER warranted that the X26 ECD was free from defects in workmanship and materials for a period of one year from the date of purchase.  (Defense Ex. I ¶ 33 & Ex. I-2, p. 3, & 6.)  Under this limited warranty, TASER agreed to repair or replace defective products within the warranty period.  (Defense Ex. I ¶ 33 & Ex. I-2, p. 3, & 6.)  The terms and conditions on the packing slip further stated that this warranty was the exclusive remedy with respect to the X26 weapon, and that TASER disclaimed all other express or implied warranties, including implied warranties of merchantability and fitness for a particular purpose.  (Defense Ex. I ¶ 33 & Ex.. I-2, p. 3, & 7.)   In addition, TASER disclaimed liability for incidental and consequential damages.  (Defense Ex. I ¶ 33 & Ex.. I-2, p. 3, & 9.)

Deputy Sean Burton ("Deputy Burton"), a certified TASER Instructor, trained Deputy Wright to use the X26 on April 26, 2010.  (Ex. L Burton Dep. 9, 15, 72, 93, 96.)  In performing this training, Deputy Burton used an outdated version of TASER's Training Manual, Version 14. (Burton Dep. 20.)  TASER asserts that the Training Version in effect on the date of training was Version 16.  Memo at 10.  Regardless of the TASER Training Version used, the TASER

6

materials ineffectively communicated the risk of ventricular fibrillation or potential cardiac arrest when targeting the heart. (Ex. M Laughery Report 8-9).

Plaintiff will provide testimony that TASER's warnings were insufficient in their totality. In particular, all versions of the Training manual fail to adequately warn of the risk of cardiac events and their severity. (Laughery Report 8). In various publications, TASER asserted language stating that the health risk of targeting the heart was negligible or practically zero. Id. Also, the severity of the injury was downplayed as the risk of "death" was rarely added to these warnings. (Laughery Report 9). TASER maintains these stances to this day in spite of clear evidence demonstrating a causal connection between cardiac events and deploying the TASER to the chest. For example, the Guilbault bulletin (discussed in detail below) remains widely circulated and in fact is the first attachment listed on TASER's website under "Training Resources". (Ex. N TASER Website Exhibit).

Further, TASER negligently organized and coordinated trainings. (Laughery Report 8). Contrary to TASER's representations, TASER does not certify end users but provides guidelines to officers they believe should attain the status of a certified end user. (Ex. O User Certification Handout p. 278). These requirements only require a minimum of a 6 hour training course, training with a TASER lesson plan, and the firing of two cartridges annually. Id. Most importantly, TASER provides trainers with literature and updates that fundamentally downplays the risk of targeting the chest. (Laughery Report 8).

IV.     **TASER's Product Warnings**

7

Prior to September 30, 2009, TASER recommended that end users of the X26 ECD aim for the center of the targeted person's chest. (Irvin Dep. 30.) TASER did not provide any warnings of cardiac dangers associated with this targeted area. (Irvin Dep. 56-57.)

On September 30, 2009, TASER sent Deputy Burton and Sergeant Irvin its "Training Bulletin 15.0: Medical Research Update and Revised Warnings." (Defense Ex. I, Docs. 9 & 10.) In Training Bulleting 15.0, TASER lowered the recommended point of aim from center of mass to lower-center of mass for front shots. (Defense Ex. I, Doc. 9, p. 2.) Three reasons are listed for this change in the recommended target area:

    a.      Simplify targeting for all TASER systems to one easy to remember map, avoiding chest shots when possible and the risk of a head/eye shot in a dynamic situation, as is standard for impact munitions.

    b.      When possible, avoiding chest shots with ECDs avoids the controversy about whether ECDs do or do not affect the human heart.

    c.      Close-spread ECD discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region.

Back shots remain the preferred area when practical.

(Defense Ex. I, Doc. 9, p. 2.)

Training Bulletin 15.0 goes on to discuss potential cardiac effects of X26 darts to the chest, close to the heart and states the following conclusion:

Conclusion regarding the potential for cardiac effects: Researchers have been able to demonstrate changes in heart rate and rhythm consistent with cardiac pacing and, in some cases, ventricular fibrillation (VF) in small swine, an arrhythmia that can be fatal without intervention, and have concluded that the close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. The threshold for VF has been estimated to be 12.6 times that for cardiac pacing. This risk is judged to be extremely low in field use. In order to increase the safety margin and since field experience shows that ECD discharges are effective when deployed to the large muscles of the back, abdomen, legs and pelvic triangle, users should aim for the back or (when practical) toward the mid lower abdomen and avoid intentionally targeting the chest area with probe applications to increase effectiveness and avoid the remote potential risk of cardiac effect.

8

(Defense Ex. I, Doc. 9, p. 8.)

In conjunction with its issuance of formal Training Bulletin 15.0, TASER also released a far more "user friendly" and readable Training Bulletin Synopsis: Bulletin 15.0. (Defense Ex. I, Doc. 10.) The top portion of the Synopsis contained the following Advisory: "We have lowered the **preferred** point of aim for frontal TASER 7 Electronic Control Device (ECD) discharges by about 5 inches to avoid the head, neck, and chest area when possible." (Defense Ex. I, Doc. 10.) The Synopsis goes on to state that "[t]he risk of an adverse cardiac event related to an ECD discharge is deemed to be extremely low. These guidelines further reduce this remote risk and improve risk management." (Defense Ex. I, Doc. 10.) The bottom of the page states:

> NOTE: ECD **discharges to sensitive areas are not prohibited.** It is expressly understood that confrontation, capture, control, and restraint situations are dynamic and fluid and that ECD discharges to these areas will occur. These guidelines are intended to improve effectiveness while reducing risk and post-incident litigation.

(Defense Ex. I, Doc. 10.)

By letter dated October 15, 2009, and sent to the Sheriff's Office, TASER provided a clarification of its Training Bulletin 15.0. This clarification sets forth three frequently asked questions and the answers thereto. In response to the first question, "Why was the preferred target zone changed?", TASER stated: "**The Answer to this has less to do with safety and more to do with effective risk management for law enforcement agencies**" (emphasis added).

Rick Guilbault ("Guilbault"), Vice President of Training and Education for TASER, also issued a four-page statement entitled "TASER International's Preferred Target Zones" to further

explain the reason for Training Bulletin 15.0's change in the preferred target zone. This Bulletin states, in relevant part:

> By avoiding the chest, the officer can avoid the controversy about whether or not the ECD could have caused a cardiac event. The available research does not support the idea that a TASER ECD can cause ventricular Fibrillation (VF) and demonstrates that while it may not be possible to say that an ECD could never affect the heart under any circumstances, the risk of VF is extremely rare and would be rounded to near zero. An argument put forward by plaintiff's attorneys is that an ECD can cause a cardiac event and this puts law enforcement and TASER International in a position of having to prove that that is not the case.

> . . . .

> **The intent of the new preferred target zones is risk mitigation, pure and simple.** It is no secret that TASER International is involved in several lawsuits, and we often partner with law enforcement agencies in defending use of force litigation. We know the tactics being used by plaintiff's attorneys and we are trying to protect our law enforcement customers and ourselves from the lengthy and unpleasant process of civil litigation. . . . With the **scientifically unsupported** claims of the Braidwood Commission (Canada) that ECDs can cause cardiac arrest, TASER would have been negligent if we did nothing. Instead, we carefully crafted a message to lower your litigation risk without exposing you to any more liability than you currently face.

(Ex. P Guilbault Bulletin, p. 1, 3-4) (emphasis added). The Sheriff's Office received the Guilbault bulletin on October 16, 2009. (Burton Dep. 32.) This letter nullified any warning that existed in the training manuals because it emphasized that the warnings were only to avoid litigation, there was in effect zero risk of VF, and there was no scientific support for claims that ECDs could cause cardiac arrest.

Deputy Burton notified other officers of the change in preferred target zones but emphasized that it was not a safety issue but done as a method to avoid potential liability. (Burton Dep. 84-85.). In a staff meeting held in February 2010, Deputy Burton orally reviewed the Synopsis to Training Bulletin 15.0 with the officers in the Sheriff's Department, including Deputy Wright. (Burton Dep. 84-85, 100; Wright Dep. 85, 90, 231.) Deputy Burton told the

10

officers that TASER recommended users avoid shooting the X26 at a person's chest area, if possible. (Wright Dep. 90, 231.)

However, in the same meeting, Deputy Burton also notified the officers that TASER had recanted its cardiac warnings set forth in Training Bulletin 15.0 in subsequent communications by stating that this Bulletin was a means of preventing litigation and that it was actually safe for users to target the upper torso, including the area surrounding the heart. (Burton Dep. 43-45; Wright Dep. 90-92.) Based on these communications, Deputy Burton understood that TASER had made a risk management decision to change the preferred target zone so as to help prevent litigation. (Burton Dep. 26, 31, 43-45.) These subsequent TASER communications left Deputy Wright with the similar impression that the sole reason as to why TASER recommended law enforcement officers avoid taking chest shots was to avoid controversial lawsuits. (Wright Dep. 91-92.)

The TASER training Deputy Wright received after the issuance of the Guilbault memo, the version 15 synopsis, and version 15 taught him to aim the X26 at the target's upper torso. (Wright Dep. 83-84, 222.) Upon completing the TASER training, Deputy Wright felt certain that the X26 would not cause the victim to suffer cardiac arrest. (Wright Dep. 87.) In teaching this method to Deputy Wright, Deputy Burton relied on the materials sent from TASER emphasizing that the change in target area was simply litigation driven. (Burton Dep. 26, 31, 43-45.)

Based on the TASER training materials and other TASER communications Deputy Wright received through the Sheriff's Office, Deputy Wright believed on October 30, 2010, that X26 shots to the chest were just as safe as were shots to the back. (Wright Dep. 73, 155-56, 221.) Even after Russell lay inertly on the ground for several minutes after being shot in the

11

chest with the X26, it did not enter Deputy Wright's mind that Russell had suffered cardiac arrest as a result of the electric shock he received from the ECD. (Wright Dep. 166, 177, 221.)

Deputy Wright testified that if TASER had effectively communicated that there was a risk of deploying the X26 to an individual's chest, he would not aim for the chest area. (Wright Dep. 207.) Similarly, if a warning existed that shooting someone in the heart area could cause ventricle fibrillation, Deputy Wright testified that he would not shoot a person in the chest area. (Wright Dep. 208-09.) However, Wright had been told that there was no safety risk to deploying the device to the chest and any warnings against such deployment were the product of litigation risk management.

## **STANDARD OF REVIEW**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate only where the moving party is able to prove that no genuine dispute exists as to any material fact, and the movant is entitled to the entry of judgment as a matter of law. A material fact is one that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

When a motion for summary judgment is analyzed, the plaintiff "is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S. Ct. 67, *and cert. denied*, 513 U.S. 814, 115 S. Ct. 68 (1994). In addition, the court "is required to view the facts and draw inferences in a light most favorable to the nonmoving party." *Id.*

In analyzing a motion for summary judgment, "the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

12

genuine issue for trial". *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. To make this determination, the court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251, 106 S. Ct. at 2512.

"Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Communications, Inc. v. Clear Channel Communications, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012). If the defendant is able to meet this burden, the burden of production then shifts to the plaintiff to "come forward with specific facts showing that there is a genuine issue for trial." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir. 1999) (internal citations and quotation marks omitted), *overruled on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003). On the other hand, if the defendant is unable to satisfy its initial burden of proof, its motion for summary judgment must be denied. *Ray Communications*, 673 F.3d at 299.

<u>ARGUMENT AND AUTHORITIES</u>

I. **RUSSELL'S CONDUCT ON THE NIGHT OF THE INCIDENT DOES NOT NEGATE HIS NEGLIGENCE CLAIMS AGAINST TASER**

At the outset, TASER incorrectly contends that Russell's negligence claims against the company are barred as a matter of law by the doctrines of contributory negligence and assumption of the risk. This contention contravenes the record and established principles of Virginia law and should be rejected.

13

## A.      Contributory Negligence

"Contributory negligence is a defense that is based on the objective standard of whether a plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances." *Ponirakis v. Choi*, 262 Va. 119, 124, 546 S.E.2d 707, 710 (2001); *see also Hoar v. Great E. Resort Mgmt., Inc.*, 256 Va. 374, 390, 506 S.E.2d 777, 787 (1998).  "The essence of contributory negligence is carelessness."  *Ponirakis*, 262 Va. at 124, 546 S.E.2d at 710.

To prevail on the affirmative defense of contributory negligence under Virginia law, the defendant must prove by the greater weight of the evidence "that the plaintiff was negligent and that such negligence was a proximate cause of the plaintiff's injuries." *Kelly v. Va. Elec. & Power Co.*, 238 Va. 32, 39, 381 S.E.2d 219, 222 (1989).  This means the plaintiff's negligent actions must have been "a direct, efficient contributing cause of the accident" *Whitfield v. Dunn*, 202 Va. 472, 477, 117 S.E.2d 710, 714 (1961).

In addition, "the plaintiff's negligence must be concurrent with the defendant's negligence." *Ponirakis*, 262 Va. at 125, 546 S.E.2d at 711; *see also Gravitt v. Ward*, 258 Va. 330, 335, 518 S.E.2d 631, 634 (1999).  For concurrence to exist, the plaintiff's negligent act must be contemporaneous with the alleged negligent act of the defendant.  *Ponirakis*, 262 Va. at 125, 546 S.E.2d at 711.

Here, Plaintiff alleges that TASER was negligent in failing to properly disclose the dangers associated with the deployment of the X26 dart into the chest of a victim and in failing to manufacture and sell reasonably safe devices that would not subject the ultimate consumer to an unreasonable risk of harm.  (SAC ¶ 93 - ¶ 98.)  Russell's allegedly negligent conduct on October 30, 2010, is in no way contemporaneous with TASER's manufacture, sale, and promotion of the X26 ECD to law enforcement agencies throughout the country, including the

14

Sheriff's Office. Hence, the doctrine of contributory negligence is wholly inapplicable to Russell's negligence claims against TASER.

Although TASER's counsel is well-aware of the legal requirements pertaining to a contributory negligence claim, including the requirement of concurrence in time, the fact that TASER nevertheless devotes several pages of its Memorandum to this meritless defense is telling. Clearly, TASER wishes to prejudice the Court against Russell by depicting him as a bad person who was deserving of corporal punishment. Russell's actions on the night of October 30, 2010, however, are in no way connected with TASER's negligent failure to warn Deputy Wright of the cardiac dangers associated with aiming the X26 at the center of a person's chest.[3] *See Piskura v. Taser Int'l*, No. 1:10-cv-248, 2012 WL 5378805, at *15 (S.D. Ohio Oct. 29, 2012), slip op. (individual's state of intoxication did not negate claim that his death resulted from ECD exposure).

At the same time, TASER's claims of contributory negligence conveniently ignore the company's own egregious actions. Under Virginia law, however, the doctrine of contributory negligence does not apply in situations where the defendant has committed an intentional tort or is willfully or wantonly negligent. *Griffin v. Shively*, 227 Va. 317, 322, 315 S.E.2d 210, 213 (1984).

---

[3]To the extent that TASER wishes to contend that alcohol toxicity rather than ECD exposure caused Russell's cardiac arrest, TASER is free to introduce evidence pertaining to this theory at trial. It is up to the jury to assess the effect, if any, that Russell's intoxicated state had upon the cardiac arrest he suffered when he was hit in the chest with darts from Deputy Wright's X26. *See Piskura v. Taser Int'l*, No. 1:10-cv-248, 2012 WL 5378805, at *15 (S.D. Ohio Oct. 29, 2012), slip op. (declaring that presence of factual dispute as to whether individual's death resulted from alcohol toxicity or ECD exposure was precisely why summary judgment is inappropriate in this case).

"Willful and wanton negligence is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Id.* "The hallmark of this species of tortious conduct is the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness." *Infant C. v. Boy Scouts of Am., Inc.*, 239 Va. 572, 581, 391 S.E.2d 322, 327 (1990).

Here, the record evidence demonstrates that TASER'S actions amount to willful or wanton negligence. On September 30, 2009, TASER issued Training Bulletin 15.0, wherein TASER changed its recommended target zone for frontal shots and stated that end users should avoid targeting the chest area due to potential cardiac effects arising from X26 shots to the chest, close to the heart. However, TASER'S Synopsis of Training Bulleting 15.0, minimized these cardiac dangers by stating that "[t]he risk of an adverse cardiac event related to an ECD discharge is deemed to be extremely low." (Def's Ex. I, Doc. 10.)

Two weeks later, TASER effectually recanted its cardiac warnings altogether by issuing a letter that "clarified" Training Bulletin 15.0. In response to the often-asked question, "Why was the preferred target zone changed?", TASER stated: "**The Answer to this has less to do with safety and more to do with effective risk management for law enforcement agencies**" (Ex. Q TASER letter of Oct. 16, 2009) (emphasis added).

In conjunction with the clarification letter, Mr. Guilbault, TASER'S Vice President of Training and Education, issued a telling statement:

> By avoiding the chest, the officer can avoid the controversy about whether or not the ECD could have caused a cardiac event. The available research does not support the idea that a TASER ECD can cause ventricular Fibrillation (VF) and

16

demonstrates that while it may not be possible to say that an ECD could never affect the heart under any circumstances, the risk of VF is extremely rare and would be rounded to near zero. An argument put forward by plaintiff's attorneys is that an ECD can cause a cardiac event and this puts law enforcement and TASER International in a position of having to prove that that is not the case.

. . . .

**The intent of the new preferred target zones is risk mitigation, pure and simple.** It is no secret that TASER International is involved in several lawsuits, and we often partner with law enforcement agencies in defending use of force litigation. We know the tactics being used by plaintiff's attorneys and we are trying to protect our law enforcement customers and ourselves from the lengthy and unpleasant process of civil litigation. . . . With the scientifically unsupported claims of the Braidwood Commission (Canada) that ECDs can cause cardiac arrest, TASER would have been negligent if we did nothing. Instead, we carefully crafted a message to lower your litigation risk without exposing you to any more liability than you currently face.

(Guilbault Bulletin, p. 1, 3-4) (emphasis added).

Based on these later TASER communications, Deputy Burton understood that TASER had made a risk management decision to change the preferred target zone so as to help prevent litigation. Accordingly, Deputy Burton notified the Deputies in the Sheriff's Office, including Deputy Wright, that TASER had basically rescinded the cardiac warnings set forth in Training Bulletin 15.0 by stating that this Bulletin was a means of preventing litigation and that it was actually safe for users to target the upper torso, including the area surrounding the heart. These subsequent TASER communications left Deputy Wright with the impression that the sole reason as to why TASER recommended law enforcement officers avoid taking chest shots was to avoid controversial lawsuits, that it was safe to target the chest area, and that a victim would not suffer cardiac arrest as a result of being shot in the chest with X26 darts.

By effectively rescinding its earlier warnings about the cardiac dangers associated with X26 shots to the chest area in order to maintain sales and profits, TASER demonstrated a

17

complete disregard for and reckless indifference to public safety. TASER issued the rescinding communications with full knowledge of the fact that some persons shot in the chest with X26 darts would likely suffer dangerous cardiac events, such as cardiac capture or cardiac arrest, as a result of the company's indifferent and reckless attitude. As a result, TASER is guilty of willful and wanton negligence. *See Infant C.*, 239 Va. at 581, 391 S.E.2d at 327; *Griffin*, 227 Va. at 322, 315 S.E.2d at 213. This willful and wanton negligence precludes TASER from avoiding tort liability for negligence based on any act of contributory negligence by Russell. *Griffin*, 227 Va. at 322, 315 S.E.2d at 213.

In any event, as a general rule, "the issue of contributory negligence is a question for the jury." *Kelly*, 238 Va. at 39, 381 S.E.2d at 222; *see also Whitfield*, 202 Va. at 476, 117 S.E.2d at 713. At a minimum, it must be concluded that the question as to whether Russell is guilty of contributory negligence so as to bar Plaintiff's negligence claims against TASER presents an issue of fact for the jury to determine.[4] TASER is not entitled to the entry of judgment on this issue as a matter of law.

### B. Assumption of the Risk

TASER incorrectly contends that Russell assumed the risk of injury on October 30, 2010, by failing to obey Deputy Maddox's shouts for him to get down on the ground. According to TASER, Russell's disobedience necessarily equates to a finding that Russell voluntarily assumed the risk of being shot with an ECD weapon. In making this argument, however, TASER overlooks the fundamental point that due to the loud, constant blare of Deputy Maddox's police car siren, Russell could not hear and/or decipher what Deputy Maddox was saying. Further, the

---

[4]*See also* n. 3, *supra.*

18

incident occurred in only 17 seconds while Wright was in a state of confusion and attempting to surrender.

Assumption of the risk is an affirmative defense that "connotes venturousness and involves a subjective test, *i.e.*, whether a plaintiff fully understood the nature and extent of a known danger and voluntarily exposed himself to it." *Artrip v. E.E. Berry Equipment Co.*, 240 Va. 354, 358, 397 S.E.2d 821, 824 (1990). In an assumption of the risk case, the court must determine "what the particular plaintiff in fact sees, knows, understands and appreciates." *Hoar*, 256 Va. at 390, 506 S.E.2d at 787 (quoting *Amusement Slides Corp. v. Lehmann*, 217 Va. 815, 818-19, 232 S.E.2d 803, 805 (1977)).

"Knowledge of the risk is essential to its assumption." *Budzinski v. Harris*, 213 Va. 107, 110, 189 S.E.2d 372, 375 (1972). In addition, for the assumption of the risk doctrine to apply, "the risk must be voluntarily incurred." *Amusement Slides Corp. v. Lehmann*, 217 Va. 815, 819, 232 S.E.2d 803, 805 (1977); *see also Buffalo Shook Co. v. Barksdale*, 206 Va. 45, 48, 141 S.E.2d 738, 741 (1965).

In cases where a factual dispute exists as to whether the plaintiff "fully understood the nature and extent of the danger and voluntarily exposed himself to it", summary judgment cannot be entered in favor of the defendant based on an assumption of the risk defense. *Hoar*, 256 Va. at 390, 506 S.E.2d at 787. Instead, the matter must be left to the jury for decision. *Id.*

In the present case, a material dispute of fact exists as to whether and to what extent Russell heard and understood Deputy Mattox's commands over the loud, constant blare of the police siren. Although Deputy Mattox's shouts are marginally audible on the aligned videos, the Deputies' microphones were placed in their chest pockets. By all accounts, Russell was standing approximately 15 feet away. Plaintiff's expert will testify he believes Russell could not hear or

19

understand the officers. Russell was also in a state of confusion from the flashing lights of the three police cars, the noise of the siren, and the fact that two Sheriffs Deputies were targeting him with some type of firearm. Clearly, the extent, if any, to which Russell actually heard and understood the words that Deputy Mattox was shouting at him is open to interpretation and a factual dispute not subject to summary judgment.

Under the circumstances, it cannot be definitively concluded that Russell fully understood and appreciated the nature and extent of the danger he was facing by not laying himself prone on the ground, as would be required for the assumption of the risk doctrine to apply. *See Artrip*, 240 Va. at 358, 397 S.E.2d at 824; *Budzinski*, 213 Va. at 110, 189 S.E.2d at 375. In addition, the assumption of the risk doctrine does not entitle TASER to summary judgment because it cannot be concluded as a matter of law that Russell voluntarily exposed himself to the risk that he would be shot in the chest with Deputy Wright's X26 ECD. *See Amusement Slides Corp.*, 217 Va. at 819, 232 S.E.2d at 805; *Buffalo Shook Co.*, 206 Va. at 48, 141 S.E.2d at 741. Hence, TASER'S motion for summary judgment must be denied as to Plaintiff's negligence claims.

## II.  TASER IS NOT ENTITLED TO THE ENTRY OF JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM FOR BREACH OF THE DUTY TO WARN

Virginia has adopted the standard set forth in the Restatement (Second) of Torts ' 388 for establishing a manufacturer's liability for the tort of failure to warn. *See Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 134-35, 413 S.E.2d 630, 634 (1992); *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979). Under this test, a product manufacturer is liable when it:

20

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c ) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts ' 388 (1965); *see Featherall*, 219 Va. at 962, 252 S.E.2d at 366. "The duty to warn stems from the view that the manufacturer should have superior knowledge of his product and it extends not only to the immediate purchaser but to other persons who might in the ordinary and natural course of events be subjected to danger." *Featherall*, 219 Va. at 962, 252 S.E.2d at 366.

Contrary to TASER'S contentions, analyzed in detail below, a jury could reasonably conclude, based on the record evidence, that TASER is liable for failing to issue adequate warnings to end users as of October 30, 2010, about the cardiac risks associated with deploying the X26 ECD to a person's chest area near the heart. As a result, TASER'S motion for summary judgment on this issue should be denied.

### A. Effect of Deputy Wright's Failure to Read Warning Issued by TASER

TASER incorrectly contends that Deputy Wright's failure to read the most current warnings issued by TASER as of October 30, 2010, bars Plaintiff's failure to warn cause of action due to inability to prove causation. According to TASER, it provided sufficient product warnings to the Sheriff's Office regarding cardiac safety factors and risks of ECD exposures in its Bulletin 15.0 dated September 30, 2009, but the Sheriff's Office failed to pass these warnings on to Deputy Wright. This notion is directly contradicted by testimony from Deputies Wright

and Burton that Deputy Wright was briefed on Training Version 14[5] and the Training Bulletin

Version 15. Deputy Wright specifically recalled reviewing information related to deployment in

the chest and did not find the information conclusive of a safety risk posed by deployment to the

chest. Deputy Wright reached this conclusion because TASER effectively rescinded and negated

the Training Bulletin Version 15 warning by issuing subsequent statements to law enforcement

agencies, including the Sheriff's Office, that the X26 posed no threat to cardiac safety and the

warnings were only litigation based.

---

5 Plaintiff alleges that the Version 15, 16, and 17 training pamphlets fail to warn as they failed to adequately advise
of the known risk of cardiac events upon targeting the chest. However, to fully assess the warnings at the time, the
fact finder must examine the training pamphlets in conjunction with supplemental letters and bulletins disseminated
by TASER to trainers and end users.

Defendants attempt to use technicalities to undermine the clear fact that Deputy Wright had been advised of problems relating to targeting the chest and their inadequate warnings prior to the incident. For example, Defendants emphasize that Deputy Wright was not a certified ECD user at the time he was informed of the issues related to targeting the chest. See Memo at 33. However, TASER does not certify any end users. Also, the fact that Deputy Wright was not certified at the time he received the company's information related to targeting the chest does not change the fact that Deputy Wright received the defective warning about chest targeting prior to administering the taser on Mr. Russell. Defendants also emphasize that the training bulletin 15 was not distributed among the officers. See Memo at 34. This again makes no difference as to causation as Deputy Wright received a detailed briefing of the bulletin and it was posted for viewing among all the officers. Thus, the fact finder should not be misguided by Defendants' allegations of technical deficiencies in training and instead, focus on the larger deficiencies, which were bulletins and letters downplaying any perceived health risk of deployment to the chest sent from TASER.

To begin with, TASER'S Synopsis to Training Bulletin 15.0 minimized the cardiac risks associated with X26 shots to the chest by stating that "[t]he risk of an adverse cardiac event related to an ECD discharge is deemed to be extremely low. These guidelines further reduce this remote risk and improve risk management." (Def's Ex. I, Doc. 10.) This statement strongly suggests that TASER'S real motivation behind the warning was simply to avoid meritless litigation instituted by victims of ECD shots to the chest. Plaintiff will provide expert testimony supporting this warning is deficient.

Next, in a letter dated October 15, 2009, TASER "clarified" its cardiac warnings issued in Training Bulletin 15.0 by expressly setting forth its rationale for changing the preferred target

zone for frontal ECD shots from the center of the chest to below center mass. In response to the

"frequently asked question" concerning the need for the change in the preferred target zone,

TASER stated: "**The Answer to this has less to do with safety and more to do with effective**

**risk management for law enforcement agencies.**" (Def's Doc. 10) (emphasis added). A

subsequent bulletin issued by Mr. Guilbault, Vice President of Training and Education for

TASER, further explained:

> By avoiding the chest, the officer can avoid the controversy about whether or not
> the ECD could have caused a cardiac event. The available research does not
> support the idea that a TASER ECD can cause ventricular Fibrillation (VF) and
> demonstrates that while it may not be possible to say that an ECD could never
> affect the heart under any circumstances, the risk of VF is extremely rare and
> would be rounded to near zero. An argument put forward by plaintiff's attorneys
> is that an ECD can cause a cardiac event and this puts law enforcement and
> TASER International in a position of having to prove that that is not the case.
>
> . . . .
>
> **The intent of the new preferred target zones is risk mitigation, pure and
> simple.** It is no secret that TASER International is involved in several lawsuits,
> and we often partner with law enforcement agencies in defending use of force
> litigation. We know the tactics being used by plaintiff's attorneys and we are
> trying to protect our law enforcement customers and ourselves from the lengthy
> and unpleasant process of civil litigation. . . . With the scientifically unsupported
> claims of the Braidwood Commission (Canada) that ECDs can cause cardiac
> arrest, TASER would have been negligent if we did nothing. Instead, we
> carefully crafted a message to lower your litigation risk without exposing you to
> any more liability than you currently face.

(Guilbault Bulletin, p. 1, 3-4) (emphasis added).

The inadequacy of TASER'S warnings concerning the cardiac dangers associated with

aiming the X26 at the center of a targeted person's chest negates any claim TASER may

otherwise have had based on an end user's failure to read said warning. As the Virginia Supreme

Court has long recognized, "an insufficient [product] warning is in legal effect no warning."

*Sadler v. Lynch*, 192 Va. 344, 347, 64 S.E.2d 664, 666 (1951). Thus, "where the manufacturer is

24

obligated to give an adequate warning of danger the giving of an inadequate warning is as complete a violation of its duty as would be the failure to give any warning." *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79, 87 (4th Cir. 1962).

Moreover, case law from other jurisdictions has established that the failure to read a product warning "does not necessarily bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer . . . to communicate the dangers of the product to the buyer or user." *White v. W.G.M. Safety Corp.*, 707 F. Supp. 544, 549 (S.D. Ga. 1988), *aff'd*, 891 F.2d 906 (11th Cir. 1989); *see also Nowak By & Through Nowak v. Faberge, U.S.A., Inc.*, 812 F. Supp. 492, 498 (M.D. Pa. 1992), *aff'd*, 32 F.3d 755 (3rd Cir. 1994); *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala. 1985). "An ineffective warning is tantamount to no warning at all and a manufacturer cannot reply upon a warning which was insufficient to prevent the injury." *Nowak*, 812 F. Supp. at 498. Notwithstanding the user's failure to read a product warning, "a jury could conclude that the danger was sufficiently great that the warning should have been presented in a way immediately obvious to even a casual reader." *Id.*

If the nature of the alleged inadequacy in the product warning is such that it prevents the user from reading the warning, the user's failure to read the warning does not bar an action based on the manufacturer's failure to provide an adequate warning. *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1236 (N.D. Iowa 1994); *E.R. Squibb & Sons.*, 477 So. 2d at 971. In effect, if the "nature of the alleged inadequacy [in a product warning] prevents [the plaintiff] from reading the warning, the plaintiff has a viable failure to warn claim." *Elam v. Lincoln Elec. Co.*, 362 Ill. App. 3d 884, 889-90, 841 N.E.2d 1037, 1042-43 (2005), *appeal denied*, 218 Ill. 2d 537, 850 N.E.2d 807 (2006).

This is exactly what occurred in the present case.  In a February 2010 staff meeting attended by Deputy Wright, Deputy Burton orally reviewed the cardiac warnings contained in TASER'S Synopsis to Training Bulletin 15.0.  Deputy Burton also notified Sheriff's Office deputies, including Deputy Wright, that TASER had basically recanted its cardiac warnings set forth in Training Bulletin 15.0 by stating in subsequent communications that this Bulletin was simply a means of preventing litigation, and that it was actually safe for ECD users to target the upper torso, including the area surrounding the heart.  Deputy Burton posted this updated synopsis on the door of the police station.  Further, Deputy Wright had access to TASER's website in which the Guilbault Bulletin and other warnings downplayed the danger of targeting the device to the chest.

Deputy Wright testified that if TASER had issued a warning on the X26 not to shoot a targeted person in the chest, he would not aim for the chest area.  (Wright Dep. 207.)  Similarly, if a warning existed that shooting someone in the heart area could cause ventricle fibrillation, Deputy Wright testified that he would not shoot a person in the chest area.  (Wright Dep. 208-09.)  Under those circumstances, Deputy Wright found the act of aiming for the chest would amount to force that is not reasonably necessary light of the circumstances confronting the officer.  (Wright Dep. 207.)  Thus, the record reflects that Deputy Wright would have altered his behavior in light of a stronger warning.

Also, Plaintiff will provide expert testimony on the extent of knowledge of taser deployment to the chest in connection with ventricular fibrillation.  Plaintiff has two renowned experts, Dr. Zipes and Dr. Webster, that will testify as to the early warnings of causal connections.  Further, Dr. Laughery will testify in detail about the insufficiency of the warnings, including the Guilbault Bulletin and Training Bulletin 15.0.

26

Where a product warning is insufficient, the manufacturer "cannot be permitted to take aid and comfort from it to any extent." *Spruill*, 308 F.2d at 87. The wholly inadequate product warnings issued by TASER prevented Deputy Wright from reading TASER'S latest cardiac warnings and becoming informed as to the cardiac dangers associated with X26 shots to the chest as of the night of October 30, 2010. Thus, Plaintiff is entitled to pursue her tort claim for failure to warn. *See Rowson*, 866 F. Supp. at 1236; *E.R. Squibb & Sons.*, 477 So. 2d at 971; *Elam*, 362 Ill. App. 3d at 889-90, 841 N.E.2d at 1042-43.

In any event, "[w]hether adequate efforts were made to communicate a warning to the ultimate user and whether the warning if communicated was adequate are uniformly held questions for the jury." *Stapleton v. Kawasaki Heavy Indus., Ltd.*, 608 F.2d 571, 573 (5th Cir. 1979), *opinion amended on denial of reh'g*, 612 F.2d 905 (5th Cir. 1980); *see also Rich v. Taser Int'l, Inc.*, No. 2:09-cv-02450-ECR-RJJ, 2012 WL 1080281, at *5 (D. Nev. Mar. 30, 2012), slip op.; *White*, 707 F. Supp. at 549. Clearly, the question as to whether TASER adequately warned Deputy Wright about the dangers of deploying X26 darts into a person's chest on October 30, 2010, presents a question of material fact for the jury to resolve. Accordingly, TASER'S motion for summary judgment must be denied as to Plaintiff's claim for breach of the duty to warn.

**B.    Under Virginia law, TASER Had a Duty to Warn ECD Users on October 30, 2010, About the Cardiac Risks Associated With Deploying Shots to the Center of a Person's Chest**

Incredibly, TASER has the gall to contend that on the date of the Russell incident[6], October 30, 2010, it had no duty to warn law enforcement of the cardiac dangers associated with ECD chest shots and the necessity to avoid targeting the X26 to the center of a person's chest because the company could not have known or had reason to know that this ECD was likely to be dangerous for the use for which it was supplied.  According to TASER, it cannot be held liable for failure to warn because "as of October 30, 2010, there was no published, peer-reviewed scientific study linking exposure to an electrical discharge from a TASER X26 to VT, VF, cardiac arrest, or lethal cardiac consequences in humans."  (Def's Memo., p. 39.)

---

[6]TASER shipped the X26 weapon in question to the Sheriff's Office on May 18, 2007; however, Deputy Wright did not use the X26 against Russell until October 30, 2010.  Under current Virginia law, it is unclear whether TASER'S duty to warn attaches on the date of sale or the date of the incident.  The Virginia Supreme Court has not yet addressed whether a manufacturer has a post-sale duty to warn of product dangers.  Recently, however, the U.S. District Court for the Western District of Virginia concluded that based on the Virginia Supreme Court's opinion in *Featherall*, dicta by the Fourth Circuit in *Bly v. Otis Elevator Co.*, 713 F.2d 1040 (4th Cir. 1983), "the public policy implications of a post-sale duty to warn, and the modern trend among states, it is likely that the Virginia Supreme Court would recognize a post-sale duty to warn."  *King v. Flinn & Dreffein Eng'g Co.*, No. 7:09-cv-00410, 2012 WL 4459568, at *8 (W.D. Va. May 16, 2012), slip op.

28

Under Virginia law, for a manufacturer such as TASER to be held legally accountable for the tort of failure to warn, it is sufficient to show that the manufacturer had a reason to know that its product is or is likely to be dangerous for the use for which it is supplied. *Owens-Corning Fiberglas Corp.*, 243 Va. at 135-36, 413 S.E.2d at 635. For purposes of this tort, a "[r]eason to know" means that the actor "has information from which a person of reasonable intelligence or of the superior intelligence of the factor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." *Id.* at 135, 413 S.E.2d at 635 (quoting Restatement (Second) of Torts ¶ 12)).

The record evidence clearly demonstrates that as of October 30, 2010, the date of the incident[7], TASER had reason to know that the deployment of the X26 ECD to the center of a person's chest could cause cardiac arrest. Indeed, the evidence shows that as far back as 2006, a year before TASER sold the X26 weapon in question to the Sheriff's Office, that TASER had reason to know that the X26 could affect cardiac rhythms when darts were shot in a person's chest.

In September 2005, the *New England Journal of Medicine* published a letter entitled "Ventricular Fibrillation After Stun Gun Discharge" which stated that cardiac electrophysiologists Dhanunjaya Lakkireddy, M.D. and Patrick J. Tchou, M.D. found that X26 discharges through darts on the front chest of anaesthetized pigs "captured" cardiac rhythm, a precursor to cardiac arrest. (Ex. R Zipes Expert Rep. 31-33.) The authors published these findings in the peer-reviewed *Journal of the American College of Cardiology* in March 2006. In this article, the authors stated that their "study was the first to capture ventricular myocardium

_____

[7]*See* n. 6, *supra*.

29

during application of [ECD] pulses" and that "pigs frequently have been used in fibrillation and defibrillation threshold studies with the results generalized to humans." The authors further cautioned that avoidance of darts to the front of the chest, near the heart, "would greatly reduce any concern for induction of ventricular arrhythmias." (Zipes Expert Rep. 32-33.)

In May 2006, Kumaraswamy Nanthakumar, M.D., another cardiac electrophysiologist, reported in the *Journal of American College of Cardiology* that 52 of 53 TASER X26 discharges to the chest of test animals resulted in cardiac capture. In contrast, the author stated that no non-chest discharge caused capture. These findings demonstrated a high correlation between X26 darts in the chest, close to the heart, and potential arrhythmias. The researchers caused ventricular arrhythmias with a stock X26; one animal experienced ventricular tachycardia that spontaneously reverted to sinus rhythm, while another animal sustained ventricular fibrillation and cardiac arrest when the shocks followed administration of epinephrine to simulate the cardiac excitation of a person in a police confrontation. (Zipes Expert Rep. 28, 33-35.)

The evidence of dangerous cardiac effects continued to build. Independent researchers at Stroeger Hospital of Cook County Medical Center reported in the peer-reviewed *Journal of Trauma* of anesthetized pigs subjected to stock X26 shocks to the chest. Two developed ventricular tachycardia progressing to ventricular fibrillation. Three showed capture, stopping when the shocks stopped. (Zipes Expert Rep. 36-37.) In a follow-up study, published in the August 2007 *Journal of Trauma*, the researchers injected test animals with a paralyzing agent and still were able to induce cardiac capture with a standard X26 in all eight animals tested, causing one to experience ventricular fibrillation. (Zipes Expert Rep. 37.)

In a peer-reviewed article entitled "Taser-Induced Rapid Ventricular Myocardial Capture Demonstrated by Pacemaker Intracardiac Electrograms" published in the May 2007 *Journal of*

30

*Cardiovascular Electrophysiology*, a human prisoner was struck on the right chest with probes from an X26.  Although he recovered, subsequent evaluation of his pacemaker revealed high-rate ventricular heart rhythms corresponding to the time and duration of the X26 shocks.  (Zipes Expert Rep. 41-42.)

Between 2007 and 2010, Dr. John G. Webster, Plaintiff's expert engineering consultant, published several reviewed scientific journal papers that documented a direct correlation between electric shocks from TASER-manufactured ECDs and cardiac events such as ventricular fibrillation.  (Webster Expert Rep. 4-6 & Exs. 9-17.)  These papers were primarily based on animal studies.

TASER'S Training Version 14, which was in effect at the time the X26 weapon in question was shipped to the Sheriff's Office, contained no warnings about the danger of cardiac arrest if a person was shot in the chest.  Instead, TASER instructed law enforcement officers using the X26 to aim for the center of the chest.  At the time TASER issued this Training Version, the company knew of the published, peer-reviewed test results from different groups of independent researchers which showed that darts to the chests of animals showed a high correlation between X26 darts in the chest, close to the heart, and potential arrhythmias.

Training Version 14 was used by the Sheriff's Office at the time Deputy Wright received his TASER training in April 2010.  By October 30, 2010, the date of the Russell incident, TASER was clearly on notice of the correlation between dangerous cardiac events such as cardiac arrest and X26 darts to the chest.  Indeed, TASER admitted the existence of this correlation when it issued Training Bulletin 15.0, which lowered the recommended target area from the chest to the stomach area.  (Def's Ex. I, Doc. 9.)  However, TASER negated this

31

warning by issuing the subsequent letter and bulletin downplaying the dangers of cardiac events and the importance of an alternative preferred target zone.

The hypocrisy of TASER's position is evidenced by their argument that prior to April 2012, no published, peer-reviewed literature reported a causal relationship between the deployment of X26 darts to the chest and cardiac consequences in human beings as opposed to animals. According to TASER, the dearth of human studies necessarily means that it had no reason to know on October 30, 2010, that the deployment of Deputy Wright's X26 would cause Russell to suffer cardiac arrest. In making this argument, TASER wholly ignores the many animal studies reported in peer-reviewed literature, as set forth above, as well as its own Training Bulletin 15.0.

Less than a month ago, another federal district court rejected TASER'S motion in limine seeking to exclude Dr. Zipes as an expert witness in a products liability case on the grounds that he was not qualified to testify on the effects of ECD electrical current on the human body and that his theory did not meet the *Daubert* criteria for reliability. See Ex S *Piskura*, 2012 WL 5378805, at *5. In reaching this conclusion, the court found that the fact Dr. Zipes' theory as to causation is "primarily based on animal studies and has not been tested on humans" did not mean that his theory was not sufficiently reliable to be admissible at trial. *Id.* Any doubts as to the validity of Dr. Zipes' methodology went to the weight and not to the admissibility of his opinion. *Id.*

TASER'S attempt to ignore any possible correlation between animal studies in which ECD shocks induced cardiac events in animals and the effect of ECD shocks on humans should not be condoned. As the *Piskura* court recognized, "with respect to the scarcity of results . . . from human studies, Dr. Zipes' explanation that human testing [of ECDs] is limited by ethical

32

consideration (such as being ethically precluded from inducing cardiac arrest in human subjects) is persuasive and well-taken." 2012 WL 5378805, at *6; *see also Rich*, 2012 WL 1080281, at *6 (finding unconvincing TASER'S "argument that Dr. Zipes can point to no peer-reviewed study that ECDs cause[] cardiac arrest").

In Ex. T *Fontenot v. TASER Int'l, Inc.*, No. 3:10cv125-RJC-DCK, 2011 WL 2535016 (W.D.N.C. June 27, 2011) (not reported in F. Supp. 2d), a 17-year old store clerk died shortly after being hit in the chest with a TASER-manufactured X26. In support of the claim that TASER knew of the dangers of cardiac arrest associated with such shots to the chest, the plaintiff cited the 2006 published animal studies referred to above, all of which were published before the clerk's death. 2011 WL 2535016, at *11. Although TASER attempted to distinguish those studies from the case at hand, the court found that the evidence was sufficient to establish that TASER knew or should have known that "without including a warning or instructions about avoiding chest shots, the X26 ECD was in an unreasonably dangerous condition." *Id.*

Based on the published, peer-reviewed studies set forth above, TASER clearly had reason to know on October 30, 2010, a danger existed that a person such as Russell might suffer cardiac arrest upon being shot in the chest with X26 darts. Accordingly, TASER had a mandatory duty to warn end users, including Deputy Wright, of this danger. TASER's failure to issue an adequate warning subjects it to potential liability for the tort of failure to warn.

### C. TASER Is Not Entitled to Judgment as a Matter of Law Based on Its Contention that Dr. Laughery, One of Plaintiff's Experts, Is Unqualified to Testify at Trial

TASER incorrectly contends that it is entitled to the entry of summary judgment on Plaintiff's failure to warn claim because Dr. Kenneth Laughery, one of Plaintiff's experts, is not qualified to testify in this case. Contrary to TASER'S suggestions, Plaintiff has identified more

33

than one expert to substantiate her failure to warn claim at trial. Moreover, because TASER has not yet filed a motion to exclude Dr. Laughery as an expert, TASER's motion for judgment as a matter of law based on Dr. Laughery's lack of qualifications is premature at best and is not ripe for review.

A motion similar to TASER'S was rejected by the District Court for the Eastern District of Virginia in *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895 (E.D. Va. 2010). In that case, the defendant Wyeth, a drug manufacturer, filed a motion for summary judgment on product liability claims for negligent design defect and fraud brought by a patient who got breast cancer after taking a hormone therapy drug Wyeth manufactured. In support of its summary judgment motion, Wyeth argued in part that the patient's causation expert physician based his opinion on unreliable methods and, therefore, the patient failed to prove causation on any of her claims. *Id.* at 907. Wyeth challenged the right of the expert to testify at trial in a separate pending motion. *Id.*

The court ruled that although success on the separate motion to exclude the expert's testimony could potentially entitle Wyeth to summary judgment on the patient's claims, "that is issue is not yet ripe for adjudication." *Id.* Because the court had not yet issued a ruling on Wyeth's motion to exclude, it would be premature for the court to enter a ruling as a matter of law in favor of Wyeth on the issue of causation. *Id.*

This line of reasoning is directly applicable to the present case. Like Wyeth, TASER contends that Dr. Laughery, Plaintiff's expert, is not qualified to testify at trial and states that it intends to file a separate motion to exclude. Because such a motion to exclude has not yet been decided by the Court (and, indeed, is not yet even pending), it would be premature for the Court to enter a ruling as a matter of law based on Dr. Laughery's alleged lack of qualification to serve

34

as an expert. This issue is not yet ripe for adjudication and cannot serve as a valid ground for the entry of summary judgment against Plaintiff. Hence, TASER'S motion for summary judgment should be denied as to Plaintiff's failure to warn claim.

Moreover, even if it should somehow be concluded that Dr. Laughery is unqualified to testify as an expert at trial, TASER has provided no evidence to indicate that Plaintiff's other experts are not qualified to offer testimony which proves that TASER'S product warnings and training materials were inadequate. Hence, TASER is not entitled to the entry of summary judgment on this issue. *See Anderson*, 477 U.S. at 251, 106 S. Ct. at 2512 *Ray Commc'ns*, 673 F.3d at 299

Finally, TASER's claim that expert testimony is necessary to prove that TASER's warnings and training materials were inadequate is simply incorrect. It is for the jury to resolve whether a manufacturer provided adequate warnings of the dangers associated with a particular product. *Stapleton*, 608 F.2d at 573; *White*, 707 F. Supp. at 549. The Court could reasonably conclude that an expert's testimony on this ultimate issue would serve only to confuse the jury, and that the jury is able to resolve this issue based on their own judgment. *See Rich*, 2012 WL 1080281, at *5. Accordingly, Plaintiff's failure to warn claim is not dependent on a judicial decision regarding Dr. Laughery's qualifications to serve as an expert witness in this case, and TASER's motion for summary judgment is not well-taken. *See id.*

### D. TASER's Product Warnings Are Not Adequate as a Matter of Law

As explained in regard to each of TASER's other arguments above, the question as to whether TASER provided adequate warnings to ECD users as of October 30, 2010, about the cardiac risks associated with deploying X26 shots to a person's chest area, near the heart, is for

35

the jury to resolve. The evidence concerning this issue is not "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251, 106 S. Ct. at 2512. Hence, TASER'S motion for summary judgment must be denied as to Plaintiff's tort claim for failure to warn.

### III. TASER'S PURPORTED DISCLAIMER OF IMPLIED WARRANTIES AND EXCLUSION OF CONSEQUENTIAL DAMAGES IS INSUFFICIENT TO BAR LIABILITY FOR BREACH OF THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

#### A. Disclaimer of Implied Warranties of Merchantability and Fitness for a Particular Purpose

TASER incorrectly contends that it cannot be held liable for breaching the UCC's implied warranties of merchantability and fitness for a particular purpose because it inserted a disclaimer of these implied warranties in its sales documents. This argument lacks legal merit and should be rejected.

In Virginia, a lack of privity between parties in a chain of distribution does not bar an action against a manufacturer for breach of express or implied warranty. In this regard, Va. Code Ann. § 8.2-318 provides, in pertinent part:

> Lack of privity between a plaintiff and defendant shall be no defense in any action brought against the manufacturer . . . to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer . . . might reasonably have expected to use, consume, or be affected by the goods[.]

This statute "preserves for remote users the warranties already enjoyed by an immediate purchaser." *Buettner v. R.W. Martin & Sons, Inc.*, 47 F.3d 116, 118 (4th Cir. 1995).

Here, Russell was a person whom TASER might reasonably have expected to be affected by a law enforcement officer's deployment of the X26 ECD. Hence, Russell has an actionable

Case 3:11-cv-00075-GEC-BWC   Document 66   Filed 11/28/12   Page 36 of 46   Pageid#: 1976

claim against TASER for breach of the implied warranties of merchantability and fitness despite the lack of privity between the parties. V.C.A. § 8.2-318.

The disclaimer of implied warranties contained in the sales documents TASER ultimately provided to the Sheriff's Office is ineffective against Plaintiff, in her capacity as Personal Representative of Russell's Estate, for a variety of reasons. First, the disclaimer was made post-sale and, therefore, was ineffective against the Sheriff's Office. Second, Russell was not a third-party beneficiary of the sales contract and, therefore, was not bound by the disclaimer. Third, the limited remedy provided in the sales contract is ineffective due to its failure of essential purpose. Fourth, under the circumstances, the disclaimer of implied warranties is unconscionable.

### 1. Post-Sale Disclaimer

It is well-established that a manufacturer such as TASER cannot unilaterally disclaim express or implied warranties made in conjunction with a sale or contract after the sales contract has been executed or consummated. *See Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 291 (4th Cir. 1982). In effect, TASER cannot unilaterally avoid "warranties embodied in or arising from an executory contract or completed sale" through a post-sale warranty disclaimer. *Id.*

Here, the record evidence shows that TASER did not provide its unilateral terms and conditions of sale, including the disclaimer of the implied warranties of merchantability and fitness, to the Sheriff's Office until some time after the Sheriff's Office had purchased the X26 ECD. This post-sale warranty disclaimer is invalid. *See id.* Hence, TASER's motion for summary judgment on Plaintiff's claim for breach of the implied warranties of merchantability and fitness must be denied.

### 2. Third Party Beneficiary

37

Generally speaking, a manufacturer may contractually disclaim liability for the implied warranties of merchantability and fitness by complying with the precepts of Va. Code Ann. § 8.2-316. Under this provision, "[w]arranty disclaimers and limitations have been enforced against third-party beneficiaries, despite lack of privity." *Va. Transformer Corp. v. P.D. George Co.*, 932 F. Supp. 156, 161 (W.D. Va. 1996); *see Buettner*, 47 F.3d at 118-19. However, warranties created through representations or communications "between parties outside the chain of distribution must be disclaimed between those parties themselves, not through an intermediate distributor." *Va. Transformer Corp.*, 932 F. Supp. at 161.

Here, Russell was not an intended third-party beneficiary of the sales contract between TASER and the Sheriff's Office. *See Neal-Lomax v. Las Vegas Metro. Police Dep't* , 60 U.C.C. Rep. Serv. 2d 361, 2006 WL 2022989, at *3 (D. Nev. July 18, 2006) (not reported in F. Supp. 2d) (where Taser entered into an agreement with police department to sell taser guns, train [police] officers on the taser gun's usage, and to provide ongoing support to [police department's] taser gun supply, individual shot by taser was not a named or intended third party beneficiary of the contract between the police department and TASER). Hence, Plaintiff, in her capacity as Personal Representative of Russell's Estate, is not bound by the disclaimer of implied warranties contained in the sales contract. *See Va. Transformer Corp.*, 932 F. Supp. at 161.

TASER'S communications with the Sheriff's Office, documented throughout this Memorandum, assured law enforcement officers that X26 shots to the chest were safe, and that the chances of a victim suffering a cardiac event such as cardiac capture or cardiac arrest were, for all practical purposes, zero. TASER did not effectively disclaim any express or implied warranties created through these direct communications. Further, TASER did not effectively disclaim express and implied warranties to Russell, the ultimate consumer. As a result,

38

TASER'S attempted warranty disclaimer is ineffective as to Russell. Accordingly, TASER is not entitled to the entry of summary judgment on Plaintiff's implied warranty claims.

### 3. Failure of Essential Purpose

Va. Code Ann. § 8.2-719(2) states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act". The Virginia Supreme Court has explained the meaning of this clause as follows:

> [A]ccording to Official Comment 1, . . . where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article. The language of the subsection does not speak to clauses oppressive at their inception, but focuses on the application of the agreement to novel circumstances not contemplated by the parties that arise during performance. Anderson, *Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2-719 of the Uniform Commercial Code*, 31 Sw. L.J. 759, 763-64 (1977).

*Envirotech Corp. v. Halco Eng'g, Inc.*, 234 Va. 583, 592, 364 S.E.2d 215, 219-20 (1988).

Here, TASER's exclusive remedy of repair or replacement of the X26 ECD cannot even begin to compensate Plaintiff for Russell's needless and tragic death at the hands of a TASER-manufactured X26 weapon. Under the unique and novel circumstances presented in this case, it is clear that TASER'S exclusive remedy of repair and replacement failed of its essential purpose. Hence, TASER'S attempted disclaimer of the implied warranties of merchantability and fitness for a particular purpose should be ruled ineffective, and Plaintiff's implied warranty claims should be allowed to proceed to trial.

### 4. Unconscionability

In cases involving the sale of goods, the court has the authority to refuse to enforce a warranty disclaimer on the grounds of unconscionability:

39

> If the court as a matter of law finds the contract or any clause of the contract to
> have been unconscionable at the time it was made the court may refuse to enforce
> the contract, or it may enforce the remainder of the contract without the
> unconscionable clause, or it may so limit the application of any unconscionable
> clause as to avoid any unconscionable result.

V.C.A. § 8.2-302(1).

Unconscionability generally involves "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Carlson Gen. Motors Corp.*, 883 F.2d 287, 293 (4th Cir. 1989), *cert. denied*, *Alston v. Gen. Motors Corp.*, 495 U.S. 904, 110 S. Ct. 1923, *and cert. denied*, *Gen. Motors Corp. v. Carlson*, 495 U.S. 910, 110 S. Ct. 1936 (1990) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)).  In determining whether a given transaction is unconscionable, courts within the Fourth Circuit consider the following factors:

> the nature of the injuries suffered by the plaintiff; whether the plaintiff is a
> substantial business concern; the relative disparity in the parties' bargaining
> power; the parties' relative sophistication; whether there is an element of surprise
> in the inclusion of the challenged clause; and the conspicuousness of the clause.

*Kaplan v. RCA Corp.*, 783 F.2d 463, 467 (4th Cir. 1986).

Here, the TASER issued its disclaimer of implied warranties in the sales documents that were sent with the box in which the ECD was shipped.  The Sheriff's Office was not provided with any choice as to the disclaimer but rather was forced to accept TASER'S boilerplate terms and conditions of contract in their entirety.  These terms and conditions, including the disclaimer of implied warranties, are unreasonably favorable to TASER.  In addition, TASER misled the Sheriff's Office into executing the contract by falsely assuring the officers that its ECD weapons were safe and if used in the manner recommended by TASER would not seriously injure a

40

suspect.  TASER then went on to withhold and to mischaracterize pertinent information

pertaining to the correlation between X26 shots to the chest and dangerous cardiac events.

This is not a situation in which sophisticated businessmen enter into a contract after

negotiating at arms-length.  *Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 871

(E.D. Va. 2011).  TASER'S duplicity ultimately resulted in the untimely and tragic death of

Russell.  Under the circumstances, TASER'S disclaimer of the implied warranties of

merchantability and fitness for a particular purpose was unconscionable and should be set aside.

### B.     Disclaimer of Consequential Damages

TASER'S sales documents contain an attempted disclaimer of liability for consequential

damages.  (Ex. I, Smith Decl., & 33.)  A manufacturer's right to make such a disclaimer is

subject to the parameters of Virginia Code Ann. § 8.2-719(3), which states, in relevant part:

> (3) Consequential damages may be limited or excluded unless the limitation or
> exclusion is unconscionable.  Limitation of consequential damages for injury to
> the person in the case of consumer goods is prima facie unconscionable but
> limitation of damages where the loss is commercial is not.

Pursuant to this section, if the product in question is classified as consumer goods, a

manufacturer cannot disclaim liability for consequential damages arising from a consumer's

personal injuries.  If the product in question is not consumer goods, then the manufacturer may

disclaim liability for consequential damages unless the disclaimer is unconscionable under the

circumstances.  Consumer goods are goods "used or bought for use primarily for personal,

family or household purposes."  V.C.A. § 8.2-103(3).

Although the X26 is used as a tool of law enforcement officers, it is directed at or used

against consumers, that is, private individuals.  In a similar context, firearms have been classified

as consumer goods.  *See In re Brown*, 189 B.R. 653, 672 (Bankr. M.D. La. 1995); *Jackson v. El*

*Dorado Sch. Dist.*, 74 Ark. App. 433, 435, 48 S.W.3d 558, 559 (2001). Under the circumstances, TASER's attempted disclaimer of liability for consequential damages arising as a result of personal injuries suffered by the ultimate consumer should be declared prima facie unconscionable.

Even if the X26 is not classified as consumer goods, the disclaimer should still be ruled invalid and unconscionable. In this regard, "the unconscionability analysis should focus on the relative bargaining power of the companies who entered into the agreement." *Reibold v. Simon Aerials, Inc.*, 859 F. Supp. 193, 197 (E.D. Va. 1994).

As explained above in regard to TASER's attempted disclaimer of the implied warranties of merchantability and fitness, TASER has superior bargaining power over both the Sheriff's Office and Russell. TASER requires ECD users such as the Sheriff's Office to accept its boilerplate terms and conditions of contract in their entirety. These terms and conditions are unreasonably favorable to TASER. In addition, TASER'S communications misled the Sheriff's Office into executing the sales contract in the first instance. TASER has a long-established practice of falsely assuring law enforcement officers that its ECD weapons are perfectly safe and that there is virtually no danger that a suspect will suffer a cardiac event such as cardiac capture or cardiac arrest if shot in the chest. Under the circumstances, TASER'S attempted disclaimer of consequential damages should be declared void on the grounds of unconscionability.

42

IV.    **TASER IS NOT ENTITLED TO THE ENTRY OF JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES**

In Virginia, "punitive damages are warranted not only by malicious conduct", but also by "negligence which is so willful or wanton as to evince a conscious disregard of the rights of others". *Etherton v. Doe*, 268 Va. 209, 213, 597 S.E.2d 87, 90 (2004) (quoting *Booth v. Robertson*, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988)).  As discussed in detail above in regard to TASER's contributory negligence claim, the record evidence demonstrates that TASER's conduct rises to the requisite level of egregiousness necessary to be classified as willful and wanton.  By effectively recanting its warnings about the cardiac dangers associated with X26 shots to the chest area in order to maintain sales and profits, TASER demonstrated a complete disregard for and reckless indifference to public safety.  TASER issued the rescinding communications with full knowledge of the fact that some persons shot in the chest with X26 darts would likely suffer dangerous cardiac events, including cardiac arrest, as a result of the company's indifferent and reckless attitude.

In *Piskura*, another federal district court recently denied TASER's motion for summary judgment as to plaintiffs' punitive damages claim.  2012 WL 5378805, at *22.  In that case, the court found that "[t]he testimony and evidence cited by the parties demonstrates that there are facts in dispute with regard to whether TASER engaged in misconduct that amounted to a flagrant disregard of the safety of individuals likely to be tased in issuing its warnings regarding the dangers of the X26 ECD." *Id.* at *21.  On the one hand, TASER "put forth evidence that their ECDs are widely used by law enforcement internationally and are accompanied by warnings that ECD exposure may lead to death in certain cases." *Id.*  Plaintiffs, on the other hand, "proffered evidence indicating that TASER failed to properly account for and/or warn end

43

users of the risks associated with targeting ECD units at suspects' chests despite its knowledge of evidence that ECD use can induce cardiac capture and cardiac arrest." *Id.* This contrasting evidence, combined with the fact that the court had ruled genuine issues of material fact existed with regard to plaintiffs' state law products liability and negligence claims, led the court to conclude that it was "improper to dispose of plaintiffs' punitive damages claim at this juncture." *Id.*

The *Piskura* court's reasoning is directly applicable here. At a minimum, it must be concluded that a genuine issue of material fact exists as to whether TASER "failed to properly account for and/or warn end users of the risks associated with targeting ECD units at suspects' chest despite its knowledge of evidence that ECD use can induce cardiac capture and cardiac arrest." *Id.* The presence of this material factual dispute precludes the proper entry of judgment as a matter of law on Plaintiff's punitive damages claim.

44

## <u>CONCLUSION</u>

For the foregoing reasons, TASER'S motion for summary judgment should be denied.

Dated this 28th day of November, 2012.

Respectfully submitted,

By: <u>/s/ Peter A. Miller</u>

The Miller Firm, LLC
108 Railroad Avenue
Orange, VA  22960
Telephone:  (540) 672-4224
Facsimile:  (540) 672-3055
E-mail: Pmiller@Millerfirmllc.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 28th day of November, 2012, electronically filed the

foregoing Plaintiff's Memorandum in Opposition Motion for Summary Judgment by Taser

International, Inc. with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to:

Elizabeth K. Dillon, Esq.
Guynn, Memmer & Dillon, P.C.
415 S. College Ave.
Salem, VA 24153
E-mail: elizabeth.dillon@gmdlawfirm.com
*Counsel for Defendant Denney Wright*

Jeremy E. Carroll, Esq.
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P.O. Box 2887
Roanoke, VA 24001-2887
E-mail: jcarroll@gfdg.com

Isaiah Fields, Esq.
TASER International, Inc.
17800 N. 85th Street
Scottsdale, AZ 85255
E-mail: isaiah@TASER.com
*Counsel for TASER International, Inc.*


/s/ Peter A. Miller