UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ANITA RUSSELL, Personal Representative for the Estate of Daniel Russell,<br><br>  Plaintiff,<br><br>v.<br><br>DENNEY WRIGHT, et al.,<br><br>  Defendants. | Civil Action No. 3:11-cv-00075-GEC<br><br>**REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE WARNING OPINIONS OF KENNETH LAUGHERY, Ph.D.** |

Defendant TASER International, Inc. ("TASER") hereby files this reply memorandum in support of its Motion (Dkt. 78) ("Mot.") to exclude the warning opinions of Kenneth Laughery, Ph.D., pursuant to *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993) and Fed. R. Evid. 702.

Plaintiff's Response (Dkt. 89) ("Resp.") states that "Plaintiff will look to Dr. Laughery to assist the trier of fact in understanding [TASER's] training system, which documents in that system are relevant to the case, and how the documents negligently failed to warn in their totality." (Resp. 9). Setting aside that opinions regarding the ultimate issue of "negligence" necessarily invade the province of the fact finder, there is one issue on which the parties agree: TASER's *relevant* warnings must be "consider[ed] as a whole" and "in their totality." (*Id.* 9, 14).

It is precisely this requirement that warrants exclusion of Laughery. The record demonstrates that he has no understanding of TASER's warning system, no idea when TASER's training and warning documents were provided to the Appomattox County Sheriff's Office ("ACSO"), and no knowledge of the information or materials contained in TASER's Versions 16 *or* 17 training programs. Moreover, Laughery's opinions contain no discussion of TASER's actual cardiac warnings, but instead focus almost entirely on a few superseded and obsolete

1

communications from the Fall of 2009 discussing TASER's lowering of the preferred targeting zone (to avoid the chest). But all of these documents had been superseded by subsequent TASER training materials as of the date ACSO trained Dep. Wright in April 2010. Indeed, Dep. Wright had *zero* exposure to all but one of these documents - a one page Bulletin 15.0 "Synopsis" which was discussed *orally* at a staff meeting - prior to the October 30, 2010 Russell incident. Because Laughery lacks personal knowledge regarding TASER's warning system "in its totality," and because the opinions he does offer are focused on documents never read by Dep. Wright, his opinions are unreliable and irrelevant.

Further, because Plaintiff utilizes her response memorandum as much to reargue her opposition to TASER's summary judgment motion as she does to oppose the Laughery *Daubert* motion, it must be reiterated that this Court need not even reach the adequacy of Laughery's warning opinions because Plaintiff cannot prove warnings causation in the first instance. A claim challenging the adequacy of a warning "necessarily presupposes that the operator has read the warning," *Belton v. Ridge Tool Co.,* 911 F.2d 720, *1 (4th Cir. 1990)(quoting *Johnson v. Niagara Mach. & Tool Works,* 666 F.2d 1223, 1225 (8th Cir. 1981).[1] Here, ACSO improperly

---

[1] In addition to the many cases cited for this proposition by TASER in its summary judgment briefs (Dkt. 60 at 32-36; Dkt. 79 at 11-14), many other courts have reached this same conclusion. *See e.g., Powell v. Harsco Corp.,* 209 Ga.App. 348, 433 S.E.2d 608, 610 (Ga.Ct.App. 1993) (granting summary judgment because of absence of proximate cause, recognizing, "We do not decide whether, as a matter of law, the [warning is adequate], because the failure of the installer to follow or even to read the installation instructions from the sales literature renders all remaining factual issues immaterial."); *J & W Enters., Inc. v. Economy Sales, Inc.,* 486 N.W.2d 179, 181 (Minn.Ct.App. 1982) (granting summary judgment on failure to warn claim where plaintiff failed to read warnings, quoting a case from the Eighth Circuit Court of Appeals for the proposition that "an issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning."); *Foltz v. Smith & Wesson Corp.,* No. 3:08–cv–0858–K, 2009 WL 2596598, at *3 (N.D.Tex. Aug. 20, 2009) ("[B]ecause plaintiff failed to read the safety instructions ... [he] cannot establish the necessary causal link between allegedly inadequate warnings and his injury to survive summary judgment."); *Motus v. Pfizer Inc.,* 358 F.3d 659, 661

2

trained Dep. Wright using TASER's superseded and obsolete Version 14 training program (which included TASER's superseded and obsolete March 30, 2007 product warnings). Because Dep. Wright did not read or rely upon TASER's *relevant* warnings and training materials in effect at the time of his training (April 30, 2010) or the time of incident (October 30, 2010), any alleged inadequacy in those materials simply cannot be a cause in fact of this incident.[2] *Id.*

## I. LAUGHERY'S OPINIONS ARE UNRELIABLE AND IRRELEVANT.

To be admissible, Laughery's opinions must "fit" the facts of the case, that is, they must assist the trier of fact in understanding the evidence or determining some fact actually at issue. *Daubert*, 509 U.S. at 592-93; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184-85 (2d Cir. 2001); Fed. R. Evid. 702. It follows, therefore, that "reliable" expert opinion concerning the adequacy of a warning system necessarily presupposes that the expert can actually identify the warnings. *See Rich v. TASER International, Inc.,* 2:09-cv-02450, 2012 WL 1080281, *5 (D. Nev. Mar. 30, 2012) (holding that a warnings expert cannot offer reliable opinions regarding warnings he cannot identify). Here, Laughery cannot offer reliable opinions regarding TASER's

---

(9th Cir. 2004) (affirming summary judgment based on lack of causation; reasoning that stronger warnings would not have changed patient's treatment since prescribing physician "testified that he did not read the warning label"); *Porterfield v. Ethicon, Inc.,* 183 F.3d 464, 468 (5th Cir. 1999) (same); *In re Zyprexa Prods. Liab. Litig.,* 2009 WL 1514628, at *12 (E.D.N.Y. 2009) (applying West Virginia law and finding no proximate causation; reasoning that "[b]ecause there is no evidence that [plaintiff] ever read any of defendant's warnings of possible risks from Zyprexa, there is no evidence from which a jury could find that a different warning by [the drug manufacturer] would have prevented him from taking Zyprexa"); *Meade v. Parsley,* 2010 WL 4909435, *10 (S.D.W.Va. November 24, 2010) (same); *see also Shanklin v. Allis–Chalmers Mfg. Co.,* 254 F.Supp. 223 (S.D.W.Va. 1966) (holding that defendant's failure to supply proper operating manual for harvester did not proximately cause user's injury where user had not read manual supplied and would not have read proper manual if it had been supplied).

[2] TASER Training Version 16 and September 30, 2009 product warnings were in effect on the date of Dep. Wright's ACSO training on April 26, 2010. TASER's Training Version 17 and May 1, 2010 product warnings were in effect on the date of the October 30, 2010 Russell incident.

3

warning system "in its totality" because he cannot even identify and has not reviewed all of the relevant warnings and training materials in the first instance.

> A.  Laughery Cannot Offer Reliable Opinions Regarding Materials He Cannot Identify and Has Not Reviewed.

As an initial matter, the parties dispute whether TASER's "relevant" warning system includes its Version 16 training program and September 30, 2009 product warnings (effective on the date of Dep. Wright's April 26, 2010 training), or its Version 17 training program and its May 1, 2010 product warnings (in effect on the date of the Russell incident of October 30, 2010). Plaintiff argues for the former based on the fact that if Dep. Wright *had* been properly trained and certified by ACSO with TASER's Version 16 training materials he would not have been required to re-certify with TASER's Training Version 17 upon its release a few days later. (Resp. 14-15)[3]. But Plaintiff's reliance on TASER's recommendation in light of some hypothetical training with Version 16 is misplaced. Dep. Wright was *not* trained with Version 16. Moreover, as admitted multiple times in Plaintiff's response to TASER's summary judgment motion, her claim hinges on whether TASER "is liable for failing to issue adequate warnings to end users as of October 30, 2010." (Dkt. 66 at 21, 27-29, 31-35). TASER delivered its Version 17 training program (which includes its May 1, 2010 product warnings) to ACSO six months prior to the Russell incident. While TASER can recommend how its materials should be used, it was solely ACSO's prerogative as to whether and how they used TASER's materials and warnings with

---

[3] It is undisputed that Dep. Wright was not trained on the Version 16 training program, including the September 30, 2009 product warnings, when ACSO trained him on April 26, 2010. Instead, ACSO utilized outdated and superseded Version 14 training program and March 30, 2007 product warnings. Additionally, while Plaintiff's Response references an "Instructor and User Warnings, Risks, Liability Release and Covenant Not to Sue" dated 4/26/10, the document is in fact TASER's March 1, 2007 Release from Version 14 *signed* by Dep. Wright on April 26, 2010. (*See* Ex. M (Wright Release)). This release did not contain TASER's current cardiac warnings, and further demonstrates that Dep. Wright was trained with superseded and obsolete material.

4

their deputies. *See Williams v. City of Cleveland,* 2:10-CV-215-SA-JMV, 2012 WL 3614418, *5-6 (N.D. Miss. August 21, 2012) (TASER cannot dictate field-related policy decisions).

All of that said, the distinctions between TASER's Training Versions 16 and 17 are largely irrelevant for purposes of this motion. **Dep. Wright never received or read *any* of these materials prior to the Russell incident October 30, 2010**. Unbelievably, Laughery also never reviewed the Version 17 training program, and he only "very quickly" scanned the Version 16 training program. (Ex. D (Laughery Depo.) 82, 94). These training programs, which include user and instructor PowerPoint™ courses, product warnings, live fire training drills (including training on targeting the preferred target zones), and certification exams, are the heart and soul of TASER's warnings system. (*See generally* DVDs containing TASER's entire Versions 16 and 17 training programs, attached as Exhibits E & F, respectively.) It defies reason that Plaintiff persists in seeking to offer Laughery as a TASER ECD "warnings system" expert when the record establishes that Laughery is wholly unfamiliar with TASER's warnings system either as it existed at the time of the Russell incident or at the time of Dep. Wright's training.

Laughery's lack of knowledge regarding TASER's relevant warning system became abundantly clear during his deposition when he testified that he **doesn't know**:

➢ The date the subject ECD was sold to ACSO. (Ex. D at 12).

➢ Excepting the warning sticker affixed to the ECD, what materials were shipped to ACSO with the ECD. (*Id*. 14-15).

➢ What version of TASER's training was in effect on October 30, 2010, the date of the Russell incident. (*Id*. 24).

➢ What version of TASER's product warnings were in effect on the date of Russell incident. (*Id*. 24-25, 40, 80)

5

- What materials came with Versions 14, 15, 16 and 17 training programs. (*Id*. 32-33, 82).

- Which product warnings were in effect at the same time the Version 14, 15, 16 and 17 training programs were in effect, respectively. (*Id*. 36-37, 108-09).

- That TASER's Bulletin 15.0 was superseded by subsequent training materials.[4] (*Id*. 38).

- Whether ACSO Dep. Burton and Sgt. Irvin were provided notice of the release of Versions 14.2, 15, 16 or 17 training programs. (*Id*. 38-39).

- Of the documents Laughery reviewed and listed in his report, how many were in effect on the date of the Russell incident. (*Id*. 77).

Plaintiff asks this Court to ignore Laughery's testimonial admissions in favor of her sweeping generalization that Laughery has "extensively" reviewed TASER's warning system. (Resp. 12-13). But again, Laughery's testimony speaks for itself:

> Q. Did you look at 16?
>
> A. Again, I think what I did was I scanned those very quickly.
>
> Q. Okay. As you sit here today can you tell me what is on DVD TASER Training Version 16?
>
> A. No.

(Ex. D 82).

> Q. And you reviewed Version 16?

---

[4] To clarify, TASER's Training Version 15 was released on August 24, 2009 and contained product warnings dated April 28, 2008. On September 30, 2009, TASER issued updated product warnings (consisting of six pages) which contained new cardiac warnings and referenced the new preferred target zone which had been modified from center mass to lower center mass (below the chest). (Dkt. 60 at Ex. I-10). These updated warnings were accompanied by Training Bulletin 15.0 (consisting of 12 pages) providing a medical update and an overview of some of the training implications of the new warnings. (*Id.*). TASER's Training Version 15 and all training bulletins issued under Version 15 (including Bulletin 15.0) were subsequently superseded when TASER released its Version 16 training program on December 7, 2009. (Dkt. 60 at Ex. I, ¶¶ 19, 40).

A. Not much.

Q. And you reviewed Version 17?

A. No.

(*Id.* 94).

Understandably, Laughery did not list the Version 17 training program or the May 1, 2010 product warnings in his report as materials he reviewed (because he admitted to *never* reviewing them). However, as to the materials Laughery did list in his report, he testified that he had no idea how many of those documents were in effect on the date of the Russell incident. (*Id.* 77). Because Laughery has demonstrated a fundamental lack of knowledge and familiarity with TASER's training system, his opinions would not be reliable or helpful to the jury and, therefore, should be excluded. *See Daubert*, 509 U.S. at 592-93 and Fed. R. Evid. 702.

B. **The Opinions Laughery Does Offer Do Not "Fit" the Facts of this Case.**

Plaintiff recently conceded at oral argument on TASER's summary judgment motion that TASER's *actual* cardiac warnings are adequate, but that her claim rests on the theory that prior communications produced by TASER effectively "recanted" those warnings.[5] This explains why Laughery offers no analysis of TASER's *actual* cardiac warnings, but instead focuses almost

---

[5] Plaintiff's allegation that TASER prospectively "recanted" its subsequent TASER Training Versions 16 and 17 warnings and training materials collapses on itself when placed on a timeline. The only allegedly "recanting" document that Dep. Wright had any exposure to was the one page Bulletin 15.0 Synopsis that Dep. Burton briefly went over *orally* at a staff meeting in February 2010. It was *subsequent* to this meeting that Dep. Wright received ECD training from ACSO (on April 26, 2010) using TASER's obsolete Version 14 training program (which does not contain the preferred target zone and cardiac warnings in effect starting September 30, 2009). Dep. Wright testified that he did not recall being given any warnings regarding "chest tasing" during this April training and that **prior to the Russell incident had never seen the blue man preferred target zone demonstrative**. (Ex. G (Wright Depo.) 87-88, 229-230; Dkt. 60 at Ex. N ("Wright Declaration")). Accordingly, even if Dep. Wright had been provided TASER's actual cardiac warnings and preferred target zone materials in February 2010 (which again he was not), it is ACSO's subsequent use of superseded and obsolete training materials that would have "recanted" those warnings.

7

exclusively on a few superseded and obsolete documents from the Fall of 2009 discussing TASER's lowering of the preferred target zone to avoid the chest. However, excepting the oral discussion of the one page Bulletin 15.0 Synopsis during a staff meeting in February of 2010, there is no evidence that Dep. Wright ever received, read or relied on *any* of the communications focused on by Laughery.

Plaintiff's purported smoking gun is a 2009 "memo" prepared by TASER employee Rick Guilbault which contains a statement that TASER's change to the preferred targeting zone was "risk mitigation, pure and simple." (Resp. 9).[6] Plaintiff alleges that Dep. Wright was briefed on this document, and that Laughery's testimony will be "crucial" for a jury to understand how this and the other communications from TASER diminished TASER's warnings such that Dep. Wright believed that TASER's otherwise adequate warnings "were not factually correct." (*Id.*).

First and foremost, the Guilbault document is not a memo or training bulletin produced by TASER. It is an article that Mr. Guilbault wrote for a journal published by the International Law Enforcement Educators and Trainers Association ("ILEETA"). (*See* Ex. H, ILEETA Journal Volume 9, Number 4, at pp. 7-8). As explained by TASER Chief Executive Officer Rick Smith, this article is not a statement generated by TASER or a training bulletin sent to customers. (Ex. I (Smith Depo.) 73-75) ("That's not an official position of TASER International, which is what you have seen in the documents that we have reviewed previously."). While TASER does list it along with other independent articles on its website, it is unknown when or how this article came to be in the possession of the ACSO. Regardless, the article is irrelevant as **neither Dep. Wright nor Dep. Burton ever saw the article prior to the Russell incident.** This fact was made crystal clear during Dep. Burton's deposition:

---

[6] Plaintiff's emphasis on "risk mitigation" as if it is a pejorative phrase is misplaced. Mitigating risk is the purpose behind product warnings.

8

> Mr. Anderson: I'm just going to clean the record up a little bit. You hadn't seen that document [Exhibit 3 – Guilbault ILEETA Article] prior to the lawsuit; right?
>
> Dep. Burton:   No.

(Ex. J (Burton Depo.) 28-29).

Plaintiff obfuscates the issue by citing to an excerpt from Dep. Wright's deposition where he testified that "as far as I know" it was the Guilbault ILEETA journal article that was read by Dep. Burton during the February 2010 ACSO staff meeting. (Resp. 10-12; Ex. F at 9). But Plaintiff omits Dep. Wright's subsequent testimony where he testified that in fact he was not sure whether Dep. Burton read the Guilbault ILEETA article or some other document. (Ex. G 230). In light of Burton's subsequent testimony that he had not seen the Guilbault ILEETA article prior to this litigation, it necessarily follows that the article was not the document Dep. Burton discussed at the February 2010 ACSO staff meeting. Accordingly, Plaintiff and Laughery cannot claim that the article played *any* role in Dep. Wright's decision-making process during the Russell incident, and all of Laughery's opinions flowing from this article are irrelevant, unreliable and prejudicial.

In fact, the only document Dep. Burton "read" or "discussed" during the Feb. 2010 ACSO staff meeting was TASER's one page Bulletin 15.0 Synopsis. (Ex. J 82-83). While Dep. Burton claims to have distributed the Synopsis in mailboxes and by posting it on an office door, Dep. Wright has no recollection of ever actually seeing the document prior to the Russell incident. (Dkt. 60 at Ex. N (Wright Declaration) at ¶5). But regardless, that Synopsis was only supposed to be distributed to currently certified (i.e., fully trained) ECD users, and Dep. Wright had never received any ECD training prior to the February 2010 staff meeting. (Dkt. 60 at Ex. I ¶48 and Ex. I-11). Furthermore, Training Bulletin 15.0, the Bulletin 15.0 Synopsis, and any other

9

training bulletins issued by TASER under Version 15.0 were superseded when TASER released Training Version 16 on December 7, 2009. None of the allegedly "offending" language regarding the "reasons" for TASER's modification of its preferred target zone were incorporated into the Version 16 or 17 user training PowerPoint courses.

In any event, while Laughery criticizes these late 2009 communications and the Guilbault ILEETA article as downplaying the cardiac risks of ECD exposure, he is unable to identify a single word in any of these materials that is not 100% accurate. (Ex. D 83). Laughery does not offer an opinion that these materials are in any way inconsistent with then existing scientific and medical research regarding ECD exposure risks, nor has he created a proposed alternative warning that would be more "adequate" than that provided by TASER. (Ex D 68). In fact, he concedes that that TASER's September 30, 2009 Training Bulletin explicitly directed law enforcement officers (1) "to lower the point of [ECD] aim below the chest;" (2) alerted officers "regarding the [ECD] dart-to-heart distance," and (3) showed the "preferred target zone in a blue man graphic as below the chest." (Ex. D 107). Critically, Dep. Wright testified that he had never been shown TASER's preferred target zone demonstrative where the chest *wasn't* colored in prior to October 30, 2010. (Ex. G 229).

As set forth in TASER's initial memorandum (Dkt. 78 at 9-10, 12), Laughery's opinion in this case is nearly identical to the opinion rejected by the District Court in *Kandt v. TASER Int'l, Inc.,* 5:09-CV-0507 NPM-ATB, 2012 WL 2861583, *4-5 (N.D.N.Y. July 10, 2012) (rejecting Dr. Laughery's opinion that TASER's warning system "downplayed the risk" of fractures where, "[o]n its face, TASER's warning clearly identifies the risk of vertebral fractures, and is sufficiently forceful to convey that risk."). Notably, Plaintiff's response makes no attempt to distinguish *Kandt* from the case at bar.

Because Laughery's opinions focus almost entirely on documents never reviewed by Dep. Wright, and because he fails to offer any meaningful critique of TASER's actual warnings, his opinions do not "fit" the circumstances of this case and should be excluded accordingly.

## II. LAUGHERY IS UNQUALIFIED TO OFFER OPINIONS REGARDING ECD WARNING SYSTEMS FOR LAW ENFORCEMENT PROFESSIONALS.

In his response memorandum, Plaintiff essentially argues that because this is a warnings case, and because Laughery has experience in the field of warnings, all of his opinions necessarily are relevant. (Resp. 7-9). This argument does not pass even modest scrutiny. Although Rule 702 does not require Laughery to be "precisely informed about all details of the issue raised in order to offer an opinion," *Thomas J. Kline, Inc., v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir. 1989) (citations omitted), it also does not provide an open forum for expert testimony that will not assist the trier of fact. *See Broadcort Capital Corp. v. Summa Medical Corp.,* 972 F.2d 1183, 1195 (10th Cir. 1992) (expert that is generally familiar in the field may still be unqualified to testify about a highly specialized area); *see also Virginia Vermiculite, Ltd. V. W.R. Grace & Co. –Conn. & the Historic Green Springs, Inc.,* 98 F.Supp.2d 729 (W.D.Va. 2000) (holding that general business experience unrelated to antitrust economics does not render a witness qualified to offer an opinion on complicated antitrust issues); *Hendrix v. Evenflo Co.,* 609 F.3d 1183, 1201 (11th Cir. 2010) ("merely demonstrating that an expert has experience does not automatically render every opinion and statement by that expert reliable."); *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) ("because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). An expert's credentials must relate to the specific opinions offered, and Dr. Laughery's credentials are utterly deficient.

11

Here Plaintiff's only refutation to the fact that Laughery has no law enforcement experience or training (Ex. D 66-67), has never written or produced any kind of cardiac warning for any purpose (*Id.* 68), and has never received a millisecond of training with any of TASER's training materials (*Id.* 90), is a single naked claim by Plaintiff that Laughery has testified in court regarding aviation "yet he is not a pilot nor was there a threshold requirement of the same." (Resp. 7). Like so many other statements in Plaintiff's Response, it is impossible to evaluate this claim because it is wholly unsupported by any supporting documentation or case cite.[7] Accordingly, the circumstances of the "aviation" case, the jurisdiction, or whether or not the opposing party even made a challenge to the admissibility of Laughery's alleged "aviation warning" opinions are unknown and cannot be evaluated. But regardless, the record in *this* case establishes that Laughery has no qualifications in the specialized area of ECD warning systems for law enforcement professionals.

Further demonstrating Laughery's lack of qualifications and the unreliability of his opinions is the fact that he has no personal knowledge of the alleged risk of ECD induced cardiac arrest upon which he claims TASER failed to adequately warn. "I'm not an expert on the hazard of cardiac arrest associated with being Tased in the upper chest area. I'm – those are assumptions on my part." (Ex. D 41). Before holding himself out as an expert in this case, Laughery could have conducted independent research of the published, peer-reviewed literature to determine what, if any, alleged cardiac risk was associated with ECD exposure to inform whether TASER's

---

[7] Plaintiff also states, without citation, that TASER is an "unregulated corporation." (Resp. 8). This statement is absurd. TASER is regulated by a myriad of federal and state agencies too numerous to list. Moreover, Plaintiff's own electrical engineering expert, John Webster, Ph.D., testified that the TASER X26 ECD were to be assessed according to the standards of the International Electrotechnical Commission ("IEC") 2006 and Underwriters Laboratory ("UL") 2003 safety standards for electric fences it would pass the tests. (Ex. K (Webster Depo.) 111-112). Further, the X26 ECD would pass a similar standard proposed by Webster himself for testing the safety of ECDs. (*Id.*).

12

cardiac warnings were adequate. He did not do that, and if he had he would quickly have learned that prior to April 30, 2012 there was not a single piece of published, peer-reviewed literature concluding that a TASER X26 ECD exposure to the chest was capable of causing ventricular fibrillation or cardiac arrest in a human. (Ex. L (Zipes Depo.) 237-240).

Instead, Plaintiff summarily dismisses TASER's challenge on grounds that Laughery purportedly relies on opinions of other qualified experts. (Resp. 7). However, Laughery was required to produce a report containing a complete statement of all of his opinions and the basis and reasons for them, as well as the facts or data he considered in forming them. *See* Fed.R.Civ.P. 26(a)(2)(B). Nowhere in Laughery's report (or at deposition) does he identify which "experts" he's relying on, what "opinions" from those experts he's relying on, or how those opinions are in any way inconsistent with the detailed cardiac warnings TASER provided to ACSO. Because Laughery has no personal knowledge regarding the cardiac risk TASER allegedly failed to warn against, and because he fails to support his opinion with citation to any competent published literature or expert support, his opinion that TASER's warning system inadequately warned against known cardiac risks is unqualified and unreliable.

## CONCLUSION

Dr. Laughery's "warning" opinion in this case is an improper attempt to stamp Plaintiff's counsel's closing argument with the imprimatur of an "expert". Nothing more. In light of Laughery's significant, adverse testimonial admissions, his lack of knowledge and experience regarding law enforcement training, TASER ECDs, and the alleged risk of ECD induced cardiac arrest, as well as the absence of any factual basis that Dep. Wright ever read TASER's relevant warnings or the few superseded documents relied on by Laughery, TASER respectfully requests this Court exclude him as a witness on the basis that his opinions are unreliable and irrelevant.

TASER International, Inc.

Respectfully Submitted,

*/s/ Isaiah Fields*
Isaiah Fields, Esq. (AZ# 024640)
TASER International, Inc.
17800 N. 85th Street
Scottsdale AZ 85255
Telephone: 480.502.6280
Facsimile: 480.905.2027
Email: Isaiah@TASER.com

Jeremy E. Carroll (VSB# 41331)
GLENN, FELDMANN, DARBY & GOODLATTE
37 Campbell Ave., S.W.
P.O. Box 2887
Roanoke, VA 24001-2887
Telephone: 540.224.8036
Facsimile: 540.224.8050
Email: jcarroll@gfdg.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of December, 2012, I electronically filed the foregoing Joinder in Motion to Exclude Geoffrey Alpert with the Clerk of this Court using the CM/ECF system, which will send notification of such filing, and Federal Expressed Exhibits E and F, to Peter A. Miller, The Miller Firm, LLC, 108 Railroad Ave., Orange , VA 22960, Pmiller@Millerfirmllc.com; and to Elizabeth Kay Dillon, Guynn Memmer & Dillon, 415 S. College Avenue, Salem VA 24153, Elizabeth.Dillon@GMDLAWFIRM.COM.

*/s/ Isaiah Fields*
Isaiah Fields