CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 0 4 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

ANITA RUSSELL, Personal Representative )
for the Estate of Daniel Russell, )
)                    Civil Action No. 3:11-cv-00075
        Plaintiff, )
)
v. )                    **MEMORANDUM OPINION**
)
DENNEY WRIGHT, et al., )
)                    By: Hon. Glen E. Conrad
        Defendants. )                    Chief United States District Judge
)

This case involves claims brought by Anita Russell, the representative of Daniel Russell,

against Deputy Denney Wright and TASER International, Inc.  The claims against Wright are for

the use of excessive force in violation of the United States Constitution, state law claims for

gross negligence and assault and battery, and a claim seeking punitive damages.  The claims

against TASER are for breach of the implied warranties of merchantability and fitness for a

particular purpose, failure to warn, a general negligence claim, and a claim for punitive damages.

For the reasons that follow, Deputy Wright's motion for summary judgment will be granted in

full, and TASER's motion for summary judgment will be granted in part and denied in part.

### CLAIMS AGAINST DENNEY WRIGHT

I.      **Factual Background**

    A.      **The Incident**

Late in the evening on October 30, 2010, Appomattox County Sherriff's Deputy Denney

Wright was speaking with Deputy John Mattox in the Appomattox High School parking lot.  At

11:41 p.m., Mattox and Sergeant Christopher Samms were dispatched to a call at 7724 Red

House Lane, Appomattox County. They were responding to a 911 call received from Andrew

Russell (Daniel Russell's 16 year old son), reporting injuries to his younger brother sustained in

a fight with the decedent. Andrew reported that his brother had been kicked in the ribs, and that

the injury "looked bad." Since Wright was with Mattox, he radioed in that he would respond to

the call as well. Wright and Mattox proceeded to the residence in their marked vehicles, and

before arriving were told that Daniel Russell was leaving the house in his Chevy pickup and that

he had been drinking. Dispatch asked Andrew if his father had any weapons on him and Andrew

reported that he did not, but this information was never conveyed to the officers.

Accompanying defendant TASER's motion for summary judgment is an "aligned" video

of the incident that was prepared by Grant Fredericks, an expert in video analysis. The video

shows footage from three sources: Mattox's and Wright's dashboard cameras, and a camera

inserted into the TASER-manufactured X26 device. Mr. Fredericks synchronized the footage

from the three cameras so that they can be viewed simultaneously.

As Wright and Mattox approached the Russell residence, they saw Russell pull out of the

driveway in his truck and head in the opposite direction. Both officers immediately activated

their lights and sirens and proceeded to follow Russell. They pursued him for roughly .6 or .7

miles. (Mattox Dep. at 59.) Mattox reported that they were going about 60 miles an hour, and

that Russell passed numerous driveways and areas where he could have safely pulled off the

road. (Id. at 58.) The plaintiff asserts that Russell pulled over in the first safe location, an empty

parking lot on the left side of the road. Wright testified that he did not know whether Russell

was exceeding the posted speed limit. (Wright Dep. at 232.) The video shows that from the

moment the officers activated their lights to the moment Russell began applying his brakes to

pull over, roughly 50 had seconds elapsed.

Mattox pulled into the parking area behind Russell, who immediately exited his truck and started walking toward the officers. Wright and Mattox both testified that this was unusual for a driver who is pulled over in Appomattox County, although they acknowledged it is not illegal. (Wright Dec. ¶ 6; Mattox Dec. ¶ 4.) As Russell walked toward Mattox, he held his hands above his head, palms facing out. Russell was wearing a t-shirt underneath an unbuttoned and untucked over-shirt. The officers testified that they could not tell whether Russell was armed because they could not see his waistband or the small of his back. (Wright Dep. at 160; Mattox Dep. at 68.)

By that point, Wright had exited his vehicle as well.[1] Mattox drew his firearm and aimed it at Russell. Wright approached Russell from the side with his taser trained on Russell's chest. The laser dot from the device can be seen on Russell's chest in the video. Mattox shouted at Russell to "get down – get down on the ground," a number of times. Mattox testified that because his car's siren was still activated, he shouted his commands to be sure they could be heard. (Mattox Dep. at 62.) The commands are clearly audible in the video. Wright and Mattox both testified that they believed Russell could hear his commands, although they acknowledge it was loud and that they could not hear everything Russell said. (Wright Dep. at 160; Mattox Dep. at 67-68). Russell remained standing as Mattox repeatedly shouted for him to get down on the ground. After a couple of seconds, Russell dropped his hands to his sides.

The video then captures Mattox telling Wright to "tase him." The video also shows Russell saying something to the officers, although exactly what was said is disputed by the parties. Wright and Mattox testified that Russell said, "go ahead and shoot me." (Wright Dep. at 123; Mattox Dep. at 71.) Grant Fredericks, TASER's video expert, opined that Russell said,

---

[1] Sergeant Samms, who also responded to the call, testified that he arrived at the scene after Russell had exited his car but before deployment of the taser. He was in his car on the phone while the tasing occurred.

"why don't you just tase me?" (Fredericks Dec. at 14.) The plaintiff's expert, Geoffrey Alpert,

Ph.D.,[2] testified that Russell may have been asking the officers "are you going to tase me?" but

that he could not tell what was actually said. (Alpert Dep. at 34.)

Dr. Alpert also testified that he did not think Russell was acting in an aggressive or

threatening manner, and that in his view Russell was simply trying to communicate to the

officers, a communication that likely failed due to the noise from Mattox's siren. (Id. at 34-35.)

Deputy Wright testified that immediately before he deployed the taser, Russell took a

step toward them and was getting ready to take another step. (Wright Dep. at 157-59.) Wright

then triggered his device using a single five second cycle, striking Russell directly in the chest.

Wright testified that he was roughly fifteen feet from Russell when he tased him. (Id. at 102-03.)

Approximately 17 seconds elapsed from the time Russell exited his truck until Wright deployed

the taser.

Upon being struck, Russell's body stiffened and he fell to the ground. The deputies

approached and handcuffed him and performed a pat down. Russell appears to struggle

somewhat while being handcuffed, and is heard making loud, guttural breathing sounds for at

least the next 48 seconds. The officers then noticed that Russell had become nonresponsive, and

they began yelling "hey buddy, hey buddy" at him in an attempt to revive him. Mattox requested

that the rescue squad that was en route to Russell's residence be diverted to the scene. The

officers administered a sternum rub and utilized an AED, which indicated that CPR was

necessary. They continued CPR until the rescue squad arrived. At some point, Russell went into

cardiac arrest. The rescue workers managed to restart his heart, but Russell had gone without

---

[2] Dr. Alpert is a professor at the University of South Carolina's Department of Criminology and Criminal Justice.
Wright has filed a motion to exclude Alpert as an expert witness, in which TASER joins. The motion argues that
Alpert is not qualified to offer opinions regarding, among other things, human movement, communications, and
audio/video matters.

oxygen for over eight minutes, causing severe brain damage.  He fell into a coma and died six

months later.  Prior to the incident, Russell had a history of heart trouble, as well as alcohol and

drug use.  (Hardison Dep. at 95.)  Russell had suffered two heart attacks, one in 2008, and

another in 2009, and was under doctors' orders to stop using drugs and alcohol, both of which

increased his risk of sudden cardiac arrest.  (Russell Dep. at 42-43.)  Toxicology reports taken in

the emergency room on the night of the incident indicated that Russell had a BAC of 0.17 and

had marijuana in his system.  (Hardison Dep. at 93.)

**B.      Wright's Background and Training**

From 2005 to early 2009, Wright worked at the Appomattox County Jail.  As part of his

training for that position, he learned defensive tactics, including holds and takedowns.  (Wright

Dep. at 16-19.)  When Wright went to work for the Appomattox County Sheriff's Office

("ACSO") as a deputy in 2009, he received an additional six months of training at the Central

Virginia Criminal Justice Academy.  (Id. at 29-30.)  Wright also received training on the Use of

Force Policy (the "Policy") adopted by the Sheriff's Office.  The Policy states that:

> Except for deadly force, the application of any degree of force is justified only
> when the officer believes it is reasonably necessary: . . . Officers may resort
> to more severe methods of force to overcome . . . increasing resistance.
>
> . . .
>
> The escalation in the use of force typically follows a pattern: verbal control,
> compliance techniques (control holds), chemical weapons, defensive tactics
> (including impact weapons such [batons]), and finally deadly force.  Officers
> must understand how to recognize increasing or decreasing levels of threat
> and respond appropriately.
>
> . . .
>
> When applying deadly force, the officer's objective shall be to stop or
> incapacitate the suspect. The objective use of any force is to overcome the
> suspect's resistance to an officer's lawful purpose: officers shall avoid
> unnecessary or excessive applications of force.

5

(Pl.'s Ex. M.)

The Policy has specific instructions on the use of tasers:

It is the policy of the Appomattox County Sheriff's Office to authorize the Taser as a use of force option. The Taser is considered a non-lethal use of force.

Definitions:

Passive Resistance: A person who exhibits no resistive movements in response to verbal or other directions by the officer.

Active Resistance: A person who exhibits resistive movements to avoid physical control or arrest.

. . .

1.      Authorization:

      a.      Only Officers who have completed the prescribed course of instruction on the use of the Taser are authorized to carry or utilize the Taser.

. . .

3.      Deployment of the Taser:

      a.      Taser is a force option listed at the same level as OC (Pepper Spray).

      b.      Handle the Taser like you would a loaded weapon.

      c.      The preferred target area when deploying a Taser should be center mass of the body. The face, neck, and groin area are to be avoided if at all possible. . . .

      d.      Whenever a Taser is to be deployed the officer should make other officers on the scene aware that the Taser is being deployed by announcing "TASER" several times.

4.      Usage Criteria

a. The Taser may be deployed when a person is exhibiting passive resistance only when a lesser means of force has been attempted and failed and the officer is attempting to make a custodial arrest.

b. The Taser may be deployed in cases where the subject is exhibiting active resistance, or aggressive behavior to an officer attempting to conduct legal law enforcement activities as a means of physical restraint or control.

5. Unauthorized use of the Taser

. . .

d. The Taser should not be used against a subject in custody unless physical resistance has to be overcome.

6. Post use Procedures

a. Assess the subject for injuries and provide appropriate medical treatment or summon medical aid if necessary.

. . .

IV. LIMITATIONS ON FORCE

The following acts associated with the use of force are prohibited.

. . .

E. Firing at a suspect when lesser force could be used and the officer believes that the suspect can be apprehended reasonably soon thereafter without the use of deadly force, or when there is any substantial danger to innocent bystanders. (*When in doubt, don't shoot.*)

Id.

Thus, in accordance with the Policy, the typical escalation of force procedure in subduing a suspect follows the pattern of: verbal control, compliance techniques, and then chemical

7

weapons, such as a taser or pepper spray.  The Policy lists the preferred target area for taser shots as "center mass," which refers to a target's chest.  This was in accordance with the training materials supplied by TASER that were used to train Wright.[3]

## II.    Discussion

### A.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, an award of summary judgment can be granted only when the moving party shows that there is no genuine issue of any material fact.  Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  To survive summary judgment, the non-moving party must present evidence enabling a reasonable jury to return a verdict for that party.  Id. at 252.

### B.    Excessive Force Claim

Wright argues that his use of a taser under these particular circumstances did not constitute excessive force.  Alternatively, he argues that, if the court were to find that he used excessive force, he is entitled to qualified immunity because the law on the matter was not clearly established at the time of the incident.

Claims of excessive force occurring during an arrest are to be evaluated under the Fourth Amendment to the United States Constitution.[4]  The Fourth Amendment guarantees that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The protection against

---

[3] As is discussed at length below, Wright was trained on an obsolete version of TASER's training materials.  This error has no import with respect to the claims against Wright, but is addressed in detail in the section of the court's opinion regarding the claims against TASER.
[4] The Fourteenth Amendment's Due Process Clause governs excessive force claims brought by individuals already in custody.  Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008).  Since Russell was not in custody at the time of the alleged violation, the Fourth Amendment applies.

unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'"

Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Schultz v. Braga, 455

F.3d 470, 476 (4th Cir. 2006)).  Courts are to balance "'the nature and quality of the intrusion on

the individual's Fourth Amendment interests' against the countervailing governmental interests

at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S.

1, 8 (1985)).  In evaluating excessive force claims, courts must utilize a standard of "objective

reasonableness." Id. at 395; see also Kentucky v. King, ___ U.S. ___, 131 S. Ct. 1849, 1859

(2011) ("Our [Fourth Amendment] cases have repeatedly rejected a subjective approach, asking

only whether the circumstances, viewed objectively, justify the action.") (internal quotation

marks and citations omitted).  In doing so, courts are to determine "whether the officers' actions

are 'objectively reasonable' in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see also Wilson v.

Flynn, 429 F.3d 465, 468 (4th Cir. 2005) ("The 'reasonableness' of a particular use of force must

be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight.").

Measuring reasonableness is "highly fact dependent," Wilson, 429 F.3d at 468, and

requires the court to "view the totality of the circumstances from the perspective of a reasonable

officer on the scene." Young v. Prince George's County, Md., 355 F.3d 751, 757 (4th Cir. 2004)

(quoting Graham, 490 U.S. at 396).  The specific characteristics of the incident are to be viewed

through the lens of three general factors: "the severity of the [underlying] crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.  This

interest-balancing must also take into account "the fact that police officers are often forced to

make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

If an officer is deemed to have employed excessive force in making an arrest, the plaintiff's claim must still be dismissed if the right violated was not clearly established at the time of the incident.  Police officers and other government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The court has the discretion to determine this second factor without reaching a decision on the first factor. Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Officials will not be held liable unless "[t]he contours of the right [in question were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).

It is with this general framework in mind that the court evaluates Russell's claim that Wright's use of a taser against him constituted excessive force.  The relative novelty of tasers and their sudden rise in use among police forces, and the benefits and potential harms they offer law enforcement agencies and the public, raise particularly difficult questions for courts tasked

with weighing claims of excessive force stemming from their use.[5]  This is especially true in light of the wide array of factual scenarios that are inherent in police work, and the requirement to evaluate excessive force claims through a totality of the circumstances approach.  The Supreme Court of the United States has not issued a decision substantively evaluating the use of tasers in an excessive force claim, nor does the law of this circuit offer many helpful examples.

In Orem v. Rephann, 523 F.3d 442 (4th Cir. 2008), the United States Court of Appeals for the Fourth Circuit addressed whether the use of a taser against an arrestee who was being transported to jail in a police officer's car constituted excessive force.  Because the subject was already in custody, the Court analyzed the excessive force claim under the Fourteenth Amendment's standard of whether the officer "inflicted unnecessary and wanton pain and suffering." Id. at 446.  The arrestee in question was handcuffed in the back of a police car with a foot hobbling device fastened around her ankles.  Id. at 444.  The arrestee, a 100 pound woman, continually screamed, cursed, shifted around in the backseat, and banged her head against the wall, eventually loosening the hobbling device.  Id.  The officer driving the vehicle pulled the car over and tightened the ankle restraints.  Id.  Another officer who had been following the car pulled over and engaged in a verbal exchange with the arrestee.  Id.  The officer then placed a taser on her left breast and inner thigh, and told her she needed to respect the officers.  Id.  After

---

[5] The defendant points to language from cases and studies showing the benefits of ECDs in protecting police officers and arrestees.  "[T]aser[s] remain[] a relatively new technology, and courts and law enforcement agencies still grapple with the risks and benefits of the device.  Even as of a year ago, however, it could be said that tasers carry 'a significantly lower risk of injury than physical force' and that the vast majority of individuals subjected to a taser—99.7%—suffer no injury or only a mild injury.'" Hagans v. Franklin County Sheriff's Office, 695 F.3d 505, 510 (6th Cir. 2012) (citing John H. Laub, Director, Nat'l Inst. of Justice, Study of Deaths Following Electro Muscular Disruption 31 (2011)); see also Mattos v. Agarano, 661 F.3d 433, 454 (9th Cir. 2011) (Kozinski, J. concurring in part and dissenting in part) (noting the dangers posed by traditional tools, such as choke holds, arm locks, batons, and other hand-to-hand techniques, which are known to sometimes cause permanent injury, and even death, and comparing the use of tasers favorably, both for the safety of the arrestee and the arresting officer).  As illustrated by the facts of this case, however, it is unquestioned that the use of ECDs poses serious risks as well, beyond merely the immediate pain suffered as a result of the shock.  See e.g., Mahamed v. Anderson, 612 F.3d 1084, 1086 (8th Cir. 2010) (taser probes lodged in a man's testicle and hand, causing long term impotence, incontinence, and nerve damage).

the arrestee cursed and threatened to sue them, one officer tased the arrestee twice in stun mode on her breast and thigh. Id. at 445. Id. The Fourth Circuit denied the officer's motion for summary judgment, finding that there were questions of fact which, when viewed in the light most favorable to the nonmoving party, could support a finding that the officer's behavior was unjustified. Id. at 447. In doing so, the Court held that the use of a taser on a detainee who was already in handcuffs and restrained in the back of a police car was clearly unlawful. Id.; see also Wernert v. Green, 419 F. App'x. 337, 343 (4th Cir. 2011) (O'Connor, J.) (discussing Orem and holding that the officer's use of the taser was deemed "objectively unreasonable" in part because of the behavior of another officer at the scene who chose to merely secure the detainee's restraints instead of utilizing force).

The Fourth Circuit's 2011 decision in Henry v. Purnell, applying the Fourth Amendment, is also only somewhat helpful in evaluating the use of tasers in excessive force claims. Indeed, the case did not actually involve the use of a taser, but rather a Glock .40 caliber handgun that the officer mistook for his taser. Henry, 652 F.3d at 528. The plaintiff, Henry, had repeatedly failed to pay child support or report to jail and had an outstanding warrant for his arrest. Id. After Purnell, the officer, located Henry in his vehicle, Henry exited the vehicle and began to walk towards the back of the car with Purnell. Id. Henry then started to run away, and Purnell followed. Id. Purnell unholstered his gun thinking it was his taser, and without giving a command to stop or any other verbal warning, shot Henry in the elbow. Id. Applying the standard for use of deadly force, the Court held that an officer "who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others violates that suspect's Fourth Amendment rights.'" Id. at 531-35 (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)). The Court ultimately held that the

officer had made an objectively unreasonable mistake in reaching for and firing his gun instead of his taser, but before doing so evaluated a number of the Graham factors. First, the Court noted that because the only crimes Henry was suspected of were non-violent misdemeanors, the officer had little reason to think Henry posed much of a threat to anyone. Id. at 532. Additionally, Henry had exhibited no menacing conduct in his interaction with Purnell—he initially cooperated with the officer and walked towards the back of the car with him before fleeing. Id. The Court also noted that Purnell had no reason to believe that Henry was armed. Id. Although the Court's analysis of the Graham factors is helpful to the case at hand, ultimately, however, the Court's opinion does not address the question of whether use of a taser would have been lawful under the circumstances.

Looking to other circuits for persuasive authority, the clearest articulation of a rule for when the use of a taser is appropriate is found in Hagans v. Franklin County Sheriff's Office, 695 F. 3d 505 (6th Cir. 2012). In evaluating the issue under a qualified immunity analysis, the Court drew the line at: "[when] a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Id. at 509. The Court briefly explains numerous cases that illustrate the distinction between active resistance and compliance with officers' demands. Id. at 509-10. In each of these cases, use of a taser was

deemed appropriate when suspects refused to comply with officers commands, and inappropriate where the suspects were complying or were attempting to comply.[6]

The Court then noted two outlying cases, consolidated for en banc review, where the Ninth Circuit held that officers used excessive force when they tased individuals who refused to comply with their commands, but who did not take steps suggesting that they posed a real risk of danger to the officers. Mattos v. Agarano, 661 F.3d 433 (9th Cir. 2011). In the first, a pregnant woman whom officers pulled over for speeding refused to sign a citation or get out of her car after repeated requests she do so. In response, an officer tased the woman three times and handcuffed her. Id. at 436-38. In the second case, a woman was tased when she refused to get out of the way of officers who were attempting to arrest her husband. Id. at 438-39; see also

---

[6] It is worth quoting the opinion at length in order to better illustrate its distinction. "In Williams v. Sandel, 433 Fed.Appx. 353 (6th Cir. 2011), officers confronted a suspect who was high on ecstasy, nude and jogging along the interstate at midnight. Id. The suspect refused to be handcuffed, prompting officers to tase him thirty-seven times (and to use batons and pepper spray as well) until he stopped resisting. Id. at 362. We held the officers' use of force was reasonable. Id. at 363. Or consider Caie v. W. Bloomfield Twp., No. 11–1378, 2012 WL 2301648 (6th Cir. June 18, 2012). After two officers wrestled the suspect to the ground, he refused to move his arms from under his body, prompting a third officer to tase him. Id. at *2. The tasing was reasonable given the suspect's "active [ ] resist[ance] [to] the officers' attempts to secure his arms behind his back." Id. at *4; see also Williams v. Ingham, 373 Fed. App'x. 542, 548 (6th Cir. 2010) (officers acted reasonably by tasing suspect who would not move his hands from under his body).

"By contrast, when we have found excessive force, the suspects were compliant or had stopped resisting. In Kijowski v. City of Niles, 372 Fed. App'x. 595 (6th Cir. 2010), officers used excessive force by tasing a wedding guest who was sitting in his truck, not disobeying police commands. Id. at 600–01. And in Landis v. Baker, 297 Fed. App'x. 453 (6th Cir. 2008), officers used excessive force by repeatedly tasing a suspect who was pinned on the ground with his face submerged in muddy water. Id. at 464; see also Roberts v. Manigold, 240 Fed. App'x. 675, 676 (6th Cir. 2007) (officers used excessive force by repeatedly tasing suspect even though he was "completely pinned"); cf. Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004) (officers used excessive force by dousing suspect with pepper spray after he was immobilized with handcuffs and leg shackles and stopped resisting).

"A suspect's active resistance also marks the line between reasonable and unreasonable tasing in other circuits. Compare McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011) (tasing suspect who bolted toward second-story window in an attempt to escape was not excessive force); Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004) (tasing suspect who acted belligerently and refused to provide his license and registration after a traffic stop was not excessive force); and Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993) (tasing suspect three times who actively resisted officers' attempts to handcuff him was not excessive force); with Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010) (tasing non-resistant suspect was excessive force); Oliver v. Fiorino, 586 F.3d 898, 906–07 (11th Cir. 2009) (tasing suspect ten times was excessive force because he stopped resisting after the first shock); Brown v. City of Golden Valley, 574 F.3d 491, 498–99 (8th Cir. 2009) (tasing car passenger who was not attempting to flee or resist arrest was excessive force); and Casey v. City of Fed. Heights, 509 F.3d 1278, 1282 (10th Cir. 2007) (tasing a non-violent misdemeanant who was not offering any resistance was excessive force)." Id.

Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009) (denying summary judgment to officer who tased a woman suspected of an open bottle violation who was seated in the passenger seat of her car with her seat belt on but refused to obey an officer's command to terminate her 911 call). Although the Court found that the officers used excessive force in each of these cases, the officers were granted qualified immunity because the prohibition on taser use in these circumstances was not clearly established.

The defendant cites heavily from two cases as examples of circumstances in which use of a taser was deemed reasonable. In McKenney v. Harrison, 635 F.3d 354 (8th Cir. 2011), the Court granted summary judgment in favor of an officer who deployed his taser against an arrestee attempting to escape. The suspect, who had successfully fled from the same officer three weeks prior to the incident, was arrested while naked in the second floor bathroom of his residence. Id. at 356-57. Two officers escorted the suspect to his bedroom and allowed him to dress before taking him into custody. Id. at 357. The officers observed that as the suspect was dressing, he looked suspiciously toward an open window which opened out to a porch roof. Id. One officer unholstered her taser and warned the suspect "not to do anything stupid," and admonished him "you don't want to be tased." Id. When the suspect made a move for the window, she deployed the taser. Id. As a result of the shock, he fell through the window, missed the roof, and landed on the ground. Id. He died as a result of the injuries suffered from the fall. Id. In holding that, as a matter of law, the use of a taser under these circumstances did not amount to excessive force, the Court reasoned that:

> When Barnes made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent Barnes' escape . . . . Despite the fatal consequences of the incident, the level of force employed also was not unreasonable. Pollreis used only a single Taser shock. She was required to react in a split second as Barnes sought to escape through a window only six to eight feet

15

> away. The alternative of attempting to subdue Barnes by tackling him posed a risk
> to the safety of the officer and did not ensure a successful arrest. The officers had
> warned Barnes. Just before he lunged, Harrison told Barnes not to do anything
> stupid, and Pollreis said "you don't want to be tased." And although the outcome
> was tragic, a reasonable officer, knowing that a Taser is designed to incapacitate
> instantly, could have believed that the force would incapacitate Barnes before he
> reached the window, while he was not in an "elevated position" and likely to fall.

Id. at 360 (citation and footnote omitted). A concurring opinion in the case noted that, given

"circumstances that [were] tense, uncertain, and rapidly evolving," it could not be said that the

officer's actions were objectively unreasonable. Id. at 364 (Murphy, J., concurring).

In Draper v. Reynolds, 369 F. 3d 1270 (11th Cir. 2004), a truck driver was pulled over

for driving with a faulty tail light. The officer requested that the driver exit the truck and walk

back to an area behind the vehicle. The driver initially complied, but then refused to retrieve

documents from the cab of his truck despite being asked repeatedly by the officer. Id. at 1278.

During the encounter, the driver "was belligerent, gestured animatedly, continuously paced,

appeared very excited, and spoke loudly." Id. at 1271. After the driver refused the officer's fifth

request to retrieve the documents, the officer tased him once in the chest. Id. at 1278. The Court

noted that given the driver's actions and demeanor, a "verbal arrest command accompanied by

attempted physical handcuffing, in these particular circumstances, may well have, or would

likely have, escalated a tense and difficult situation into a serious physical struggle in which

either [the officer or driver] would be seriously hurt." Id.

With this legal framework in mind, the defendant argues that he is entitled to judgment

as a matter of law that tasing Russell under these particular circumstances did not amount to

excessive force. Wright contends that an evaluation of the Graham factors warrants this result.

First, he notes that he was responding to a serious act of violence. Wright had been called to

Russell's residence because the decedent allegedly kicked his 9 year-old son badly enough that

he needed medical attention.  Wright also argues that he had just seen Russell lead police on a short pursuit, potentially a serious crime in itself.

Additionally, Wright argues that Russell posed a danger to himself and the officers. First, Wright was aware that Russell had been drinking that night, increasing his chances for unpredictable behavior.  Wright also saw Russell exit his vehicle immediately after pulling over and approach the officers.  He failed to obey the officers' repeated commands to stop and get on the ground.  He continued to do so despite facing officers with their weapons drawn, and having the laser target dot from Wright's taser pointed at his chest.  Wright argues that Russell began to advance towards him immediately before deploying his taser.

Wright also argues that the final <u>Graham</u> factor, whether Russell was actively resisting arrest, weighs in his favor.  Wright again points to Russell's failure to pull over immediately upon being followed, and his refusal to follow the officers' verbal commands.  Additionally, Wright contends that Russell's statement asking the officer to tase him indicated that he did not intend to surrender peacefully.

In response to these arguments, the plaintiff does not take issue with the legal framework to be applied, or the assertion that an officer's use of a taser is justified in situations where a suspect is actively resisting arrest.  Instead, she argues that there are disputed issues of material fact regarding the events that occurred between the time the officers arrived at the Russell home and Wright's use of the taser, and that these disputes preclude entry of summary judgment. Essentially, the plaintiff's position is that Russell was not resisting arrest, and was instead attempting to cooperate with the officers, but was unable to do so because he could not hear the officers' commands over the blare of Deputy Mattox's siren.  The plaintiff acknowledges that

Mattox's shouts are audible on the videotape, but contends that this is at least partly because the officers wear microphones in their chest pockets to help capture their voices.

Buttressing the plaintiff's argument on this point is the differing testimony regarding what Russell said to the officers. Wright and Mattox testified that Russell told them to "go ahead and shoot me." (Mattox Dep. 71; Wright Dep. 123.) TASER's expert, Grant Fredericks, testified that he believed Russell asked, "why don't you just tase me?" Dr. Geoffrey Alpert testified that he could not tell what Russell said. The plaintiff contends that these discrepancies raise triable questions of fact about whether the noise from the siren excused Russell's failure to comply with the officers' commands.

The plaintiff also contends that the video does not definitively prove that Russell was acting in an aggressive manner or that he was actively resisting arrest. Again, the plaintiff contends that Russell was merely trying to cooperate with the police, even if he was not going about it in the best manner. Wright acknowledged in his testimony that when Russell exited the car and put his hands up, he did not consider it to be a threatening gesture. Likewise, Dr. Alpert testified that he did not believe Russell was making the kind of sudden movements that indicate aggressive behavior. Alpert also testified that he did not agree with Wright's and Mattox's testimony that Russell made one final step toward the officers before being tased.

Finally, the plaintiff also asserts that there are factual disputes concerning the brief car pursuit. The plaintiff contends that the video shows that there were no safe places for Russell to pull over before reaching the parking area. Disagreeing, the deputies testified that Russell passed numerous driveways and other safe places where he could have pulled over, and that this fact would contribute to a reasonable officer's interpretation that Russell was attempting to evade arrest.

The court finds the plaintiff's arguments regarding the alleged factual disputes unavailing. While it is generally the case that at the summary judgment stage, the plaintiff's version of the facts must be accepted as true, "when a video clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Witt v. West Virginia State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (quoting Scott v. Harris, 550 U.S. 372, 378 (2007)); see also Blaylock v. City of Philadelphia, 504 F. 3d 405, 414 (3d Cir. 2007) (emphasizing that in Scott no disputed issues of fact existed because the "videotape . . . depict[ed] all of the defendant's conduct and all of the necessary context that would allow the Court to assess the reasonableness of that conduct"). Although the plaintiff has questioned the officers' interpretation of events at the scene through the introduction of her own expert witness, "[m]inor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when . . . the witness views the event from a worse vantage point than that of the officers." Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001). The court has the benefit of multiple video and audio recordings of the incident. The plaintiff's attempt to create factual disputes by pointing to such things as minor inconsistencies in what was said during the event, and a third person's opinion as to whether Russell was acting aggressively, simply overlooks the clear video evidence. It also ignores the requirement that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Wilson v. Flynn, 429 F.3d 465, 468 (4th Cir. 2005). The officers were responding to a fluid and potentially dangerous situation, and the minor factual disputes raised by the plaintiff do not affect the reasonableness of Wright's decision to deploy his taser at Russell.

Lacking any meaningful factual disputes, the court finds that Deputy Wright is entitled to qualified immunity on the excessive force claim. In doing so, the court exercises its judicial prerogative to employ either of the qualified immunity prongs first, and determines that regardless of whether Wright's actions constituted excessive force, an issue the court expressly does not decide, his actions were objectively reasonable because they did not violate clearly established law. Pearson, 555 U.S. at 236.

Given the dearth of caselaw on the use of tasers in excessive force cases, particularly within the Fourth Circuit, the court simply cannot say that Wright's use of his taser under these circumstances violated clearly established law. Tasers are still relatively novel devices, and courts across the country continue to grapple with determining their proper role in assisting law enforcement officers. Reviewing the relevant caselaw that does exist, the court believes that the line between active resistance and compliance is helpful in evaluating whether Wright's behavior was objectively reasonable. The officers in this case were responding to a report of violence, and were confronted with a suspect who refused to obey multiple commands. Unlike in Draper, a case where the officer was held not to have used excessive force, Wright and Mattox never had control of the scene before the taser was used. Russell's only acts of compliance with the officers' requests were to initially raise his hands (before later lowering them), and to cease approaching an officer who had his handgun drawn and trained on him. These acts alone do not demonstrate compliance, and are far outweighed by Russell's demonstrations of resistance discussed above.

Additionally, the situation confronted by the officers in this case was far more dangerous and fast moving than the facts presented in the Ninth Circuit's consolidated en banc cases mentioned above, in which the officers were granted qualified immunity. See Mattos v.

20

Agarano, 661 F.3d 433 (9th Cir. 2011). Furthermore, another officer on the scene, Deputy

Mattox, believed that Wright should deploy his taser—indeed he instructed Wright to do so.

Although an officer's actions must be viewed objectively, this fact certainly indicates that a

reasonable officer would not have understood that using a taser in these circumstances would

violate clearly established law. See Malley, 475 U.S. at 341 (granting qualified immunity even

where officers of reasonable competence could disagree on whether the action was reasonable).

If the purpose of qualified immunity is to protect "all but the plainly incompetent or those

who knowingly violate the law," Hunter, 502 U.S. at 229, Wright is certainly entitled to its

benefit. Even if Wright's actions were deemed excessive, in light of the existing caselaw, it

would be simply unfair to subject him to trial for using a taser on a potentially violent,

noncompliant arrestee. See Hagans, 695 F.3d at 511 ("The essence of qualified immunity . . . is

to give government officials cover when they resolve close calls in reasonable (even if ultimately

incorrect) ways."); see also Henry, 652, F.3d at 540 (Davis, J., concurring) ("That the law is still

evolving is illustrated in cases granting qualified immunity for that very reason. See, e.g., Bell v.

Kansas City Police Department, No. 08–456, at 4–5 (W.D. Mo. Mar. 22, 2010) (granting

qualified immunity to police officer in 'close case' because 'there is not enough law warning

defendant against tasering to justify this [excessive force] litigation'). Local law enforcement

policies also reflect differing views of where the taser fits on the 'force continuum.' Some allow

taser use only as an alternative to deadly force, while others call for taser use whenever any force

is justified. U.S. Gov't Accountability Office, GAO–05–464 Taser Weapons: Use of Tasers by

Selected Law Enforcement Agencies 9–10 (2005))." In light of the foregoing, Deputy Wright

did not violate clearly established law, and he is entitled to qualified immunity. Accordingly, his

motion for summary judgment will be granted as to Count I.

## C.     State Law Claims

In Counts II and III, the plaintiff alleges state law violations for gross negligence and assault and battery. Gross negligence in Virginia is defined as the "absence of slight diligence, or the want of even scant care." Frazier v. City of Norfolk, 234 Va. 388, 393 (1987). "[It] is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another." Id. Wright's conduct did not amount to a complete disregard of Russell's safety. Wright was charged with making a difficult decision in a rapidly evolving situation. ACSO's use of force policy authorizes taser use against subjects who are resisting arrest, and targeting Russell's chest was in accordance with the training Wright received on how to use the device. Additionally, Russell was given numerous chances to comply with the officer's commands before any force was employed. As a result, Wright's conduct simply cannot be said to lack the "slight diligence" required to defeat a claim of gross negligence. Id.

Likewise, the plaintiff's assault and battery claim is without merit. To support such a claim, the plaintiff is required to prove a "wrongful act" on the part of the defendant. Pike v. Eubank, 197 Va. 692, 700 (1956). Police officers are legally justified in using reasonable force to execute their lawful duties. Id. "When acting in good faith, the courts will afford [law enforcement officers] the utmost protection, and they will recognize the fact that emergencies arise when they are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." Wernert v. Washington, No. 3:09-cv-00031, 2010 WL 924281 *8 (W.D. Va. Mar. 11, 2010) (quoting Davidson v. Allam, 143 Va. 357, 373 (1925)). In a case such as this, in which the officer was clearly entitled to intervene and take Russell into custody, he was also therefore entitled to engage in a touching of some degree. Consistent with the court's earlier ruling, Wright could not have known that the use of a taser

22

under the circumstances was unreasonable, and he is thus entitled to a good faith defense to the assault and battery claim. See DeChene v. Smallwood, 226 Va. 475, 311 (Va. 1984) (concluding that where an officer acted in a good faith belief in the validity of an arrest, causes of action for battery [and] assault . . . claims cannot be based on such an arrest); Harrison v. Deane, No. 09-2202, 426 Fed. App'x. 175, 2011 WL 1630043, at *5 (4th Cir. Apr. 29, 2011) (holding that an officer cannot be subjected to civil liability for . . . assault and battery when the officer acted in good faith and with probable cause).

Moreover, a favorable ruling for the defendant on an excessive force claim brought under § 1983 requires dismissal of the state law claims as well. In Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), the Fourth Circuit held that a ruling that the officer's actions were objectively reasonable under a § 1983 analysis required dismissal of a state law wrongful death claim. The Court stated, "because we have concluded that [the officer's] actions were, as a matter of law, reasonable in the circumstances of this case, they cannot be negligent or wrongful . . . ." Sigman, 161 F.3d at 789. In Milstead v. Kibler, 243 F.3d 157 (4th Cir. 2001) (abrogated in part on other grounds), the Fourth Circuit affirmed a district court opinion stating that "[i]f [the plaintiff's] Fourth and Fourteenth Amendment claims are decided in favor of the defendants on their motion for summary judgment, the state law claims should also be dismissed." Milstead v. Kibler, 91 F. Supp. 2d 895, 901 (W.D. Va. 2000), aff'd, 243 F.3d 157; see also Thompson v. City of Danville, Va., No. 4:10cv00012, 2011 WL 2174536, *9 (W.D. Va. June 3, 2011) (dismissing state law claims for assault, battery, and negligence after dismissing plaintiff's § 1983 excessive force claim). Accordingly, Deputy Wright's motion for summary judgment will be granted as to Counts II and III. Additionally, because the court finds in favor of Wright on all

23

of the substantive counts, the plaintiff's claim for punitive damages against Wright in Count VIII will also be denied.

## CLAIMS AGAINST TASER

The plaintiff alleges that the TASER X26 used by Deputy Wright on the night of the incident was defective because TASER did not adequately warn that an electrical discharge from the device to a person's chest could induce ventricular fibrillation and result in cardiac arrest. The plaintiff's products liability claims are brought in negligence and for breach of implied contractual warranties. Specifically, she alleges negligent failure to warn in Counts VI and IX, and breaches of the implied warranties of fitness and merchantability in Counts IV and V, respectively. She also seeks punitive damages against TASER in Count VII for wantonly failing to provide adequate warnings.

## I.    Factual Background

The facts relevant to the plaintiff's claims against TASER, and which are not mentioned in the previous fact section addressing the claims against Wright, are summarized below.

TASER manufactures a number of different Electronic Control Devices ("ECDs"). The one at issue in this case is the X26. The X26 fires two darts, or probes, that transmit electrical charges into the body, blocking the nerve command center and causing the target to become temporarily incapacitated. (Smith Dec. ¶ 6.) When the trigger on the X26 is pressed, it releases a single five second cycle. (Id. ¶ 7.)

TASER offers instructor training courses in which the company certifies TASER ECD Master Instructors and Instructors. TASER generally trains the Master Instructors, who then train Instructors, who in turn train most ECD end users. (Id. ¶¶ 12-14.) TASER also issues product warnings, product manuals, training bulletins, and other training materials regarding the

24

ECDs.  When new versions of the training materials and product warnings are released, the

materials explicitly instruct that all prior editions have been superseded and rendered obsolete.

(Id. ¶¶ 17-20.)  The product manuals also include a similar warning that users should comply

with the current training materials.  Additionally, the training materials provided to Instructors

indicate in numerous places that they are to ensure training sessions are conducted using the

latest materials.  (Docket Nos. 60-24, 60-25.)  TASER posts training materials on its website, in

addition to distributing them via emails or mailings to all certified Instructors.  Instructors are

directed to visit TASER's website no more than 72 hours prior to conducting an ECD training

program to ensure they have and are utilizing the latest materials.  (Smith Dec. ¶ 18.)

The X26 used on Russell was shipped from TASER on May 18, 2007 to Southern Police

Equipment, a private distributor of law enforcement equipment in Virginia. (Id. ¶ 32.)  ACSO

purchased the ECD from Southern Police.  (Staples Dep. at 31.)  Included in the box were

TASER's Training DVD Version 13, a March 1, 2007 Product Warning, and an operating

manual.  (Smith Dec. ¶ 34.)  These were the current training materials at the time.  Also included

in the shipment were several sales documents, including the following warranties and limitation

of remedies:

> 7. Warranty Exclusions. THE WARRANTY STATED ABOVE IS THE
> EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. TASER
> DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER
> EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT
> LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY,
> DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM
> A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY
> WARRANTY AGAINST PATENT INFRINGEMENT.
>
> . . .
>
> 9. Limitation of Remedies. THE REMEDIES PROVIDED FOR IN THE ABOVE
> WARRANTY ARE EXPRESSLY IN LIEU OF ANY OTHER LIABILITY
> TASER MAY HAVE, INCLUDING INCIDENTAL AND CONSEQUENTIAL

25

DAMAGES . . . . IN NO EVENT WILL TASER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE . . . .

(Docket No. 60-13.)

Additionally, a warning affixed to the ECD itself, as well as included in the product manual, product warnings, and training program shipped with the device, stated that users should consult TASER's website to obtain current training materials and requirements. (Smith Dec. ¶ 34.)

TASER released Version 14 of its training materials on December 1, 2007; Version 15 was released on August 24, 2009; Version 16 on December 7, 2009; and Version 17 on May 1, 2010. (Smith Dec. ¶¶ 36-43.) New product warnings were released on April 28, 2008, September 30, 2009, and May 1, 2010. (Id.) Notice of these materials was delivered to ACSO's ECD Instructors, and the Instructors were either mailed a CD/DVD of the new materials or given a URL where they could be downloaded. (Id. ¶¶ 39-49.)

Although police departments and other users are independently responsible for decisions on certification and the use of ECDs in their employment, TASER maintains an official certification procedure. This requires Instructors to be retrained every two years, and end users to be retrained every year. (Id. ¶ 15.) Deputy Wright received his ECD training from Deputy Sean Burton on April 26, 2010. Wright was trained using Version 14 of TASER's training materials, even though at the time these had been superseded by Versions 15 and then 16. Version 14 included a warning that users "[c]omply with current training materials and requirements." (Docket No. 60-18.) Version 17 was released a few days after Wright's training. (Smith Dec. ¶ 42.)

On September 30, 2009, TASER released "Training Bulletin 15.0: Medical Research Update and Revised Warnings." (Docket No. 60-20.) The Bulletin announced a new "Targeting Guide" that lowered the preferred target for front shots from center mass to lower center mass. (Id.) A diagram accompanying the Bulletin shows that the upper half of the chest was now outside the recommended target area. (Id.) This was different from previous editions, which had explicitly instructed users to target the chest. (Id.) The Bulletin also discussed certain potential cardiac effects of darts to the chest, stating:

> Conclusion regarding the potential for cardiac effects: Researchers have been able to demonstrate changes in heart rate and rhythm consistent with cardiac pacing and, in some cases, ventricular fibrillation (VF) in small swine, an arrhythmia that can be fatal without intervention, and have concluded that the close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. The threshold for VF has been estimated to be 12.6 times that for cardiac pacing. This risk is judged to be extremely low in field use. In order to increase the safety margin and since field experience shows that ECD discharges are effective when deployed to the large muscles of the back, abdomen, legs and pelvic triangle, users should aim for the back or (when practical) toward the mid lower abdomen and avoid intentionally targeting the chest area with probe applications to increase effectiveness and avoid the remote potential risk of cardiac effect.

(Docket No. 60-21.)

The defendant notes that the September 30, 2009 product warnings also included language regarding possible cardiac risks that had not been included in its previous warnings or training materials. (Smith Dec. ¶ 47; Docket No. 60-10.) Deputy Burton and another Instructor, Sergeant Roger Irvin, each received Bulletin 15, but Burton testified that he did not read it in its entirety. (Burton Dep. 33, 54-55; Smith Dec. ¶ 43.) TASER issued a synopsis of Bulletin 15 on November 6, 2009. (Smith Dec. ¶ 48.) The synopsis noted that TASER had lowered the preferred point of aim for frontal shots to avoid the head, neck, and chest area when possible. (Docket No. 60-10.) It goes on to state that "[t]he risk of an adverse cardiac event related to an

ECD discharge is deemed to be extremely low.  These guidelines further reduce this remote risk

and improve risk management."  (Id.)  Shortly before Bulletin 15 was released, the company also

issued a set of frequently asked questions meant to clarify the new warnings.  The first question

asked, "Why was the preferred target zone changed?"  TASER provided the following response:

"The Answer to this has less to do with safety and more to do with effective risk management for

law enforcement agencies."  (Docket No. 66-16 at 2.)

Rick Guilbault, a vice president for training at TASER, also issued a four-page statement

around the time Bulletin 15 came out, addressing why the preferred target area had changed.  He

stated:

> [T]he ECD could have caused a cardiac event. The available research does not
> support the idea that a TASER ECD can cause ventricular Fibrillation (VF) and
> demonstrates that while it may not be possible to say that an ECD could never
> affect the heart under any circumstances, the risk of VF is extremely rare and
> would be rounded to near zero. An argument put forward by plaintiff's attorneys
> is that an ECD can cause a cardiac event and this puts law enforcement and
> TASER International in a position of having to prove that that is not the case.
>
> . . . .
>
> The intent of the new preferred target zones is risk mitigation, pure and simple. It
> is no secret that TASER International is involved in several lawsuits, and we often
> partner with law enforcement agencies in defending use of force litigation. We
> know the tactics being used by plaintiff's attorneys and we are trying to protect
> our law enforcement customers and ourselves from the lengthy and unpleasant
> process of civil litigation. . . . With the scientifically unsupported claims of the
> Braidwood Commission (Canada) that ECDs can cause cardiac arrest, TASER
> would have been negligent if we did nothing. Instead, we carefully crafted a
> message to lower your litigation risk without exposing you to any more liability
> than you currently face.

(Docket No. 66-15 at 1, 3-4.)

In a staff meeting in February 2010, which Deputy Wright attended, Deputy Burton

orally reviewed the Bulletin 15 synopsis.  (Burton Dep. at 84-85.)  At that time, Wright had not

yet undergone any ECD training.  Both Burton and Wright testified that after the staff meeting,

they understood that it was still proper to target the chest, and that the target area had been changed merely to avoid litigation. (Id. 43-45; Wright Dep. 91-92.)

The training materials in effect at the time of the incident were Version 17 and the May 1, 2010 product warnings. As with all prior versions, the warnings in those materials stated that ECDs can be dangerous, and that disregarding instructions can result in serious injury or death. (Docket No. 60-23 at 1.) The May 1, 2010 product warnings also included a warning that exposure to an ECD shock could affect a suspect's "heart rate and rhythm." (Id. at 4.) They warned of the chest/breast area as a "sensitive" spot that should be avoided when possible, and designated lower center mass (below chest) as the preferred target area for chest shots. (Id.) The training materials included in Version 17 contain similar instructions on avoiding chest shots, as well as some more explicit reasons for why chest shots should be avoided. (Docket No. 60-28.) A training slide included in the materials stated: "Risk of an ECD application having a negative effect on a person's heart rate and/or rhythm is not zero . . . . The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000." (Id.) The materials go on to state that "[e]xperts have identified heart to dart distance as being a key determining factor in whether an ECD can affect the heart. The VF [ventricular fibrillation] probability for a given dart location decreased with the dart-to-heart horizontal distance (radius) on the skin surface. The further an ECD dart is away from the heart, the lower the risk of affecting the heart." (Id.)

## II.     Discussion

### A.     Failure to Warn

In Counts VI and IX of the second amended complaint, Ms. Russell contends that TASER is liable for her husband's death due to a failure to adequately warn of the dangers associated with the X26.[7]  Under Virginia law, a product manufacturer is liable when it "(a) knows or has reason to know that the [product] is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the [product] is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."  Featherall v. Firestone Tire and Rubber Co., 219 Va. 949, 962 (1979) (quoting Restatement (Second) of Torts § 388 (1965)).  This duty to warn "stems from the view that the manufacturer should have superior knowledge of his product and it extends not only to the immediate purchaser but to other persons who might in the ordinary and natural course of events be subjected to danger."  Id.

In its initial brief in support of the motion for summary judgment, TASER asserted that it had no duty to warn of a danger of sudden cardiac events posed by chest shots from an ECD such as the X26.  (Docket No. 60, at 36-40.)  In its reply to the plaintiff's response to the motion for summary judgment, however, TASER clarified its position on the duty to warn, stating that

> the issue is NOT whether TASER had a duty to warn of cardiac risks from ECD chest shots on October 30, 2010, or whether the Virginia Supreme Court has yet to address a manufacturer's post-sale duty to warn of product dangers.  TASER in fact warned of cardiac risks and trained officers to avoid chest shots more than a year prior to Deputy Wright's October 30, 2010 encounter with Russell.  TASER also in fact regularly updated its warnings and training materials post sale to stay current with the medical and scientific literature on ECD risks as well as court decisions regarding such risks and made sure ACSO got them.  Accurately stated, the issue is whether TASER had a duty to warn of any cardiac risk not already contained in its comprehensive Version 17 training and May 2010 warnings.

(Docket No. 79, at 6) (citations omitted) (emphasis in original).

---

[7] Both failure to warn claims are based on negligence, rather than strict liability.

Regardless of whether TASER had a duty to do so or not, beginning with its Version 15 training materials and the product warnings issued on September 30, 2009, it undertook steps to warn users of the possibility of a danger posed by chest shots. It is uncontested that Wright, however, never saw these materials.

Properly determining the scope of TASER's duty to warn in this case requires answering the following questions: first, as a threshold matter, whether Virginia law recognizes a post-sale duty to warn;[8] second, whether such a duty would apply under the facts of this particular case; and third, if indeed such a duty existed, whether TASER sufficiently discharged that duty, both in terms of exercising reasonable care in disseminating the new warnings to users, as well as whether the substance of the warnings was adequate to properly inform users of the dangers. Finally, for TASER to be liable, the plaintiff must also show that the allegedly inadequate warnings were a proximate cause of Russell's injuries.

### i.   Post-sale duty to warn in Virginia

The Supreme Court of Virginia has never formally adopted the duty to make post-sale warnings regarding product dangers that come to light after the initial sale. See Royal Indem. Co. v. Tyco Fire Prods., LP, 281 Va. 157, 169 n.3 (Va. 2011) (declining to address appellant's argument that trial court improperly dismissed post-sale duty to warn claims); Harris v. T.I., Inc., 243 Va. 63, 72 (Va. 1992) (assuming without deciding that post-sale duty to warn exists). A number of federal courts interpreting Virginia law have assumed, however, that under the circumstances of their particular cases, the Virginia Supreme Court would have adopted the doctrine, and have therefore applied it. See, e.g., King v. Flinn & Dreffein Engineering Co., No. 7:09-cv-00410, 2012 WL 4459568, *6-8 (W.D. Va. May 16, 2012); Rash v. Stryker Corp., 589

---

[8] The parties do not directly address the post-sale duty to warn question, but given that the warnings in dispute were issued after the date of sale, it is relevant to determining the scope of any duty to warn.

F. Supp.2d 733 (W.D. Va. 2008); McAlpin v. Leeds & Northrup Co., 912 F. Supp. 207 (W.D. Va. 1996). But see Estate of Kimmel v. Clark Equip. Co. 773 F. Supp. 828 (W.D. Va. 1991) (declining to apply a post-sale duty to warn under Virginia law).

For the reasons set forth in the opinions cited above, including the undersigned's own decision in McAlpin, the court believes that, if confronted with the question, the Supreme Court of Virginia would apply a post-sale duty to warn in negligence failure to warn cases. Accordingly, the court will determine whether a post-sale duty to warn existed under the facts of this case.

### ii.   Duty to warn in this case

Assuming that Virginia would recognize a post-sale duty to warn, the court must determine whether such a duty would apply in this case. The question of whether a duty exists in negligence cases is generally a matter of law. Kellermann v. McDonough, 278 Va. 478, 487 (2009) ("The issue of whether a legal duty in tort exists is a pure question of law . . . ."). Determining the existence of a duty in this case can be answered by applying the post-sale duty to warn factors found in § 10 of the Restatement (Third) of Torts: Products Liability. Section 10 states that:

> (a) [w]hether a reasonable person would provide such a warning depends on proof that:
>
> (b)(1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and
>
> (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and
>
> (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and
>
> (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

32

Turning first to factors (2) and (3), the court finds that these weigh in favor of finding a duty to make post-sale warnings. TASER operates a certification program for law enforcement agencies to utilize in training their employees on safe ECD use, and regularly updates its training materials to stay current with any required changes. While TASER does not directly train end users, it has a built-in system for informing its purchasers of any new warnings or information that may become necessary. Indeed, TASER is in a much better position than most manufacturers to ensure that users of its product are kept up to date on new warnings and instructions. It is undeniable that TASER takes significant steps in attempting to do just that. Having such a system increases the likelihood that TASER would be able to identify users and effectively communicate any new warnings.

Considering factors (1) and (4) next, the court believes that it is most appropriate to employ the traditional analysis used to determine when a manufacturer has a duty to warn under Virginia law. These principles of law hold that "[a] manufacturer is not an insurer of its product's safety, and a manufacturer has a duty to warn only if it knows or has reason to know that its product is dangerous." Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 135 (1992). "[A] manufacturer's duty to warn of a product's dangers imposes no underlying duty to conduct additional studies or tests because a failure to warn claim rests on a reason to know standard rather than the broader should have known standard." Torkie-Tork v. Wyeth, 757 F. Supp. 2d 567, 572 (E.D. Va. 2010) (citing Owens-Corning, 243 Va. at 135) (emphasis in original). "Reason to know" means that the actor "has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." Owens-Corning, 243 Va. at 135. Further, "[t]he duty to caution or warn of unusual

33

hazards or dangers must only arise where there is a reasonable anticipation that the use of a product as instructed or directed will produce injury." Smith v. United States, 135 F. Supp. 605, 609 (E.D. Va. 1957).

The plaintiff's evidence is largely based on two expert witnesses. The first, Dr. Douglas Zipes,[9] has offered into evidence a report outlining the available literature regarding the cardiac risks posed by ECDs. His report discusses a number of peer-reviewed papers in which ECDs were deployed on pigs in an attempt to study the cardiological effects of the charges. These papers have been published in the Journal of the American College of Cardiology, the Journal of Trauma, and the Journal of Cardiovascular Electrophysiology. Dr. Zipes describes the results of the papers in some detail in his Expert Report submitted to the court. (Docket No. 66-17.) The report analyzes a number of the pig studies and concludes and that they show that avoiding ECD shocks to the heart and surrounding region reduces the risk of cardiac capture[10] and ventricular arrhythmias in humans. (Id. 32-33.) Dr. Zipes also analyzes a study reporting to show capture and limited arrhythmia in a human subject who was shocked in the chest. (Id. 41-42.) Dr. Zipes' report notes the obvious dangers posed in conducting extensive studies on human subjects. (Id. 34.)

The plaintiff's second expert, Dr. John Webster, has submitted a similar report stating that published scientific journal papers have documented a correlation in animals between electric shocks from ECDs and cardiac events such as ventricular fibrillation ("VF"). (Docket No. 66-6.) The report refers to a number of the papers cited in Dr. Zipes' report as well as some others. As a result of these studies, he offers his opinion that "to a reasonable degree of

---

[9] Dr. Zipes has been qualified as an expert witness in numerous other cases involving product liability claims against TASER.

[10] Cardiac capture occurs to when the heart's natural rhythm is taken over ("captured") by an outside electrical impulse.

34

engineering certainty the Taser weapon can induce human ventricular fibrillation, which results in rapid loss of consciousness, and unless treated by cardiopulmonary resuscitation and defibrillation, leads to death in a few minutes." (Id. 7.) In deposition testimony, Dr. Webster also noted the ethical difficulties of performing these types of studies on humans. (Webster Dep. at 57.)

TASER's main point of contention with this evidence is that it does not prove a link between ECDs and cardiac events in human subjects. TASER argues that, at the time of the incident, "there was no published, peer-reviewed scientific study linking exposure to an electrical discharge from a TASER X26 to ventricular tachycardia, ventricular fibrillation, cardiac arrest, or lethal cardiac consequences in humans." Def.'s Br. in Supp., at 39. TASER points to numerous statements in Dr. Zipes' deposition, in this case and in others, acknowledging the lack of epidemiological studies showing a definitive link between ECD shocks and sudden cardiac death in humans. For example, in a May 22, 2010 paper written by Dr. Zipes and published in his Circulation litigation case series, he wrote "[t]o date, no peer-reviewed publication has definitely concluded that ECD shocks can precipitate ventricular fibrillation causing sudden cardiac arrest and death in humans." (Docket No. 60-46 at 110-11.) TASER also points to a paper authored by Dr. D.J. Lakkireddy, one of the co-authors of a pig-study paper relied on by Dr. Zipes, which states that when human body weight is factored into the equation, the probability of VF resulting from a chest application is essentially zero. Dr. Lakkireddy also authored a paper putting the VF risk in humans from ECD exposure at 1 in 2.5 million. (Docket No. 79-3.) Similarly, TASER points to Dr. Webster's deposition, in which he stated that as of April 30, 2012, there was no literature concluding that ECDs caused cardiac capture in humans, (Webster Dep. 57-59), and that TASER ECDs have a "very low probability of death." (Id. 106.)

A paper authored by Dr. Webster also states that the probability of human VF from ECD shocks is six in one million. (Docket No. 60-28.)

A number of courts have previously been called upon to evaluate substantially similar evidence to determine whether TASER had a duty to warn of the cardiac dangers resulting from upper chest shots. In Rich v. Taser International, Inc., No. 2:09-cv-02450, 2012 WL 1080281 (D. Nev. Mar. 30, 2012), the Court dealt with a case in which a man died shortly after being tased three times in the chest and twice in the thigh. The Court first determined that Dr. Zipes qualified as an expert witness to testify as to the alleged dangers posed by ECDs. Id. at *5-6. It then noted a number of the same papers concerning animal studies cited by Dr. Zipes in his report before this court, and determined that "on the basis of this evidence alone a jury could reasonably conclude that TASER knew of the cardiac risks of repeated ECD applications to the front chest." Id. at *10. The Court acknowledged the number of studies disputing Dr. Zipes' contentions, but found that weighing the evidence was simply a matter for the jury. Id. at *6. The Court also noted Dr. Zipes' reliance on animal studies, but found the argument that ethical limitations prevented rigorous studies in humans to be persuasive. Id.

In Fontenot v. Taser International, Inc., No. 3:10-cv-125-RJC-DCK, 2011 WL 2535016 (W.D. N.C. June 27, 2011), a 17 year-old male died from VF after being tased repeatedly by police officers. The Court considered the same pig studies in evidence in this case and determined that they presented an issue of fact as to whether TASER knew or had reason to know that "without including a warning or instructions about avoiding chest shots, the X26 ECD was in an unreasonably dangerous condition." Id. at 11. The Court noted that "TASER will have the opportunity to argue to a jury that its warnings were not defective, and the jury may agree, but the record does not permit this Court to so find as a matter of law." Id. at *10; see also

Piksura v. Taser International, Inc., No. 1:10-cv-248, 2012 WL 5378805, *14 (S.D. Ohio Oct. 29, 2012) (qualifying Dr. Zipes as an expert witness and then concluding that his testimony that ECD stimulation may cause cardiac capture and lead to VF in humans created a triable issue of fact precluding summary judgment).

Reviewing the expert testimony submitted in this case in the light most favorable to the plaintiff, as well as the other cases which have evaluated similar evidence, the court concludes that the plaintiff has adduced sufficient evidence to establish that TASER had a duty to warn of the occurrence of sudden cardiac events resulting from ECD applications to the chest.[11]

### iii. Adequacy of the warnings

Having determined the existence of a legal duty to warn of the dangers of chest shots, the court must now evaluate whether TASER's warnings on the matter were adequate. TASER contends that beginning with its Version 15 training materials and the September 30, 2009 product warnings, TASER provided users with warnings and instructions on the potential risk of sudden cardiac events arising from ECD chest shots. TASER contends that these warnings were adequate as a matter of law.

Under Virginia law, the adequacy of a product's warnings is typically a question for the jury. Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 86 (4th Cir. 1962); Abbot v. American Cyanamid Co., 844 F.2d 1108, 1115 (4th Cir. 1988). In a failure to warn suit founded on negligence, like this one, the relevant inquiry is one of reasonableness. Bly v. Otis Elevator Co., 713 F.2d 1040, 1042 (4th Cir. 1983) ("[A] manufacturer will be liable in negligence for a failure to warn if its conduct is unreasonable."). However, when reasonable minds could not disagree

---

[11] As mentioned above, in spite of its strenuous objections in its initial brief accompanying the motion for summary judgment, TASER appears to concede in its reply to the plaintiff's memorandum that it had a duty to warn of chest shots. Even if TASER does not formally concede the point, the evidence highlighted above suffices to create a duty to warn on TASER's part.

on the adequacy of a product's warning, the court may determine the issue as a matter of law.  Id.
In evaluating whether a warning is adequate under the circumstances, the relevant factors are
"(1) whether it could be expected to catch the attention of a reasonable person; (2) whether it
could be understood by a reasonable person; and (3) whether it gave a reasonable indication of
the nature and extent of the potential danger."  Franklin, 2007 WL 1725348, at *3 (quoting
Pfizer Inc. v. Jones, 221 Va. 681 (1980)).

TASER argues that the warnings provided in Versions 16 and 17 of its training guides,
along with the product warnings dating from September 30, 2009 and May 1, 2010, sufficed to
warn users that chest shots posed some risk of sudden cardiac events and should be avoided if
possible.  As a result, TASER contends it has met its burden of warning users how to avoid the
exact type of injury suffered by Russell in this case.

Complicating matters in this case is the fact that this is not an ordinary set of
circumstances where the reasonableness of the manufacturer's conduct can be evaluated by
looking at a single set of warnings and determining whether it was sufficient to adequately
caution users of the product's dangers.  In this case, the sale of the product was accompanied by
regularly updated instructions and warnings, as well as an ongoing relationship between the
manufacturer and user.  Between the sale of the particular X26 and its use on Russell, TASER
delivered or made available four different, superseding instruction guides.[12]  The company also
released new product warnings on April 28, 2008, September 30, 2009, and May 1, 2010, each of
which supplanted the prior editions.  Further, TASER released Training Bulletin 15, which
accompanied the September 30, 2009 product warnings, and lowered the preferred target area
from center mass to beneath the chest in order to "avoid the remote potential risk of cardiac
effect."  (Docket No. 60-21, at 8.)

---

[12] A fifth, Version 14.2, was released to correct a software problem and did not displace Version 14.0.

Later, a synopsis of Bulletin 15, along with the above-mentioned letter from TASER vice-president Rick Guilbault, clarified these new warnings, emphasizing that they were issued primarily to reduce the risk of litigation, and not for medical reasons. The plaintiff contends that these remarks effectively negated the company's more explicit warnings on the danger of chest shots. The plaintiff suggests that the court should focus on these communications as proof that the company's warnings were inadequate; TASER, on the other hand, would have the court focus on the later warnings included in Versions 16 and 17 of its training materials that directly address the health risks of chest shots.

Given the ongoing nature of the relationship between TASER and the consumers of its products, the court concludes that the proper scope of the reasonableness analysis should include the whole of TASER's communications to its product users. In other words, the adequacy of TASER's most recent warnings should be viewed in light of the company's efforts to ensure that users actually received and reviewed those warnings, as well as what effect any prior warnings or communications from the company would have on a reasonable person's understanding of the reasons for issuing new warnings. It would be unfair to allow TASER to rely on a single set of warnings, issued after Deputy Wright was trained on the device, as conclusive proof that the company's actions were reasonable as a matter of law. This is especially true given how frequently TASER updates its warnings and instruction materials. Similarly, it would be unfair to TASER to hold that it could never escape the shadow of a single set of communications emphasizing the potential risk of lawsuits, no matter how effective any future warnings might be. In a unique case such as this, where an ongoing relationship exists between the buyer and seller, the reasonableness of the manufacturer's conduct should be measured by considering all of the

steps taken in assuring that users have and understand the most complete warnings reasonably required by law.[13]

In light of this conclusion concerning the scope of the proper inquiry, as well as Virginia's strong preference for having juries decide the question of a warning's adequacy, the court is unable to conclude that TASER's conduct was reasonable as a matter of law. To be sure, TASER took significant steps in attempting to ensure that users such as ACSO and Wright had access to the most up-to-date set of warnings. TASER explicitly noted in all of its materials that prior versions are supplanted when new warnings and instructional guides are released. The X26 has a label affixed to it that directs users to consult the company's website to ensure they have seen the most recent version of its warnings. It is also undisputed that ACSO received or had access to the newer training materials, and that Deputy Burton was simply mistaken in utilizing Version 14 when training Wright. However, whether TASER acted reasonably in disseminating the new materials remains a question of fact for the jury.

As for the adequacy of the materials themselves, this also remains a fact question under Virginia law. It is true that Versions 16 and 17 explicitly discuss the possibility of sudden cardiac events resulting from chest shots, and do not hedge such warnings by also discussing risk

---

[13] There is a scarcity of caselaw dealing with how a manufacturer can effectively discharge a post-sale duty to warn. A review of the existing cases indicates that most courts simply fold together their analyses of the means used to disseminate the new warnings with whether such warnings sufficiently address the dangers involved. See e.g., Brown v. Crown Equipment Corp., 460 F. Supp.2d 188, 191 (D. Me. 2006) (deciding whether a manufacturer discharged its post-sale duty to warn partly by reviewing the adequacy of the product's operating manual in light of the federal law requirement that operators read such manuals); Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 822 (11th Cir. 1984) (holding that a single form letter sent to users failed to adequately address the newly discovered dangers); Cover v. Cohen, 61 N.Y.2d 261, 276-77 (1984) (holding that the reasonableness of a manufacturer's steps in addressing users of a product's newly discovered dangers is a fact question for the jury). Considering both factors as part of a single reasonableness determination makes sense, especially in a failure to warn case based on principles of negligence law, since the effectiveness of a product's warnings must always be judged in light of their prominence and conspicuousness – in other words, how well the manufacturer enabled users to view and understand the warnings. See e.g., Franklin, 2007 WL 1725348, at *3 ("In determining whether a warning was adequate under the circumstances, the jury may consider . . . whether it could be expected to catch the attention of a reasonable person . . . .") (quoting Va. Civil Jury Instr. No. § 34-19). In any event, it always remains necessary to determine whether any new warnings, even if properly disseminated, were adequate to warn users of the product's dangers.

management issues. However, the plaintiff has raised a genuine issue of material fact as to the overall effectiveness of TASER's warnings, especially in light of the post-Version 15 communications emphasizing the risk management justification for lowering the preferred target area. It is clear that these communications had a significant impact on how Deputies Wright and Burton viewed the potential danger of chest shots. Both testified that if TASER had issued more explicit warnings on the health risks of chest shots, they would not have continued to think it safe to use the device in such a manner. (Wright Dep. 207; Burton Dep. 44-45.) It is possible for a reasonable jury to conclude that even if Wright had seen Versions 16 or 17 of the training materials, he still would not have recognized the risk of cardiac damage as the basis for the lowered target areas. In any event, the adequacy of a product's warnings is a question of fact best left for the jury to resolve. Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that the warnings included in the later versions, which, although they do address the possibility of sudden cardiac events, emphasize the unlikely nature of such a risk, and were simply inadequate in light of the dangers posed. TASER will have the opportunity at trial to present evidence and expert opinion on the dangers posed by its product and the alleged adequacy of its warnings. It will also be able to point to all the steps taken in disseminating its updated warnings to users, and a jury may agree that it behaved reasonably in warning users of its product's potential dangers. The court, however, is not able under the evidence presented to come to such a conclusion as a matter of law.[14]

---

[14] TASER also argues that the plaintiff has failed to carry her burden because she does not have a qualified expert witness to testify about the inadequacy of the warnings. See Alevromagiros v. Hechinger Co., 993 F.2d 417, 421 (4th Cir. 1993) ("'Absent an established norm in the industry,' a court is constrained to rely on the opinion testimony of experts to ascertain the applicable safety standard.") (quoting Ford Motor Co. v. Bartholomew, 224 Va. 421, 430 (1982)). TASER has filed a motion to exclude the testimony of Kenneth Laughery, Ph.D., the plaintiff's tendered warnings expert. TASER argues that if its motion to exclude Laughery is granted, the plaintiff will be unable to provide the expert testimony necessary to establish why TASER's warnings were inadequate. This argument was made in the defendant's initial brief accompanying its motion for summary judgment, before the

41

### iv. Causation

TASER argues that, regardless of the adequacy of its warnings, the plaintiff cannot show that the alleged deficiencies were a proximate cause of Russell's injuries. The court has considered TASER's arguments on the question of causation and finds them unavailing.

In a failure to warn case, the plaintiff must prove that a breach of the duty to warn was a proximate cause of the plaintiff's injuries. See Butler v. Navistar Int'l Transp. Corp., 809 F. Supp. 1202, 1207 (W.D. Va. 1991). A proximate cause is defined as "that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Atkinson v. Scheer, 256 Va. 448, 454 (1998). As with the issue of a warning's adequacy, proximate cause is ordinarily a question of fact for the jury. Phillips v. Southeast 4-H Education Center, 257 Va. 209, 213 (1999). It can be decided as a matter of law only when reasonable minds could not differ about the conclusion to be drawn. Id. (citing Poliquin v. Daniels, 254 Va. 51, 57 (1997)).

TASER argues that, because Wright never saw the most up-to-date warnings and instructions, any alleged inadequacy in them cannot have contributed to Wright's decision to shoot Russell in the chest with his X26. However, given the court's determination that the adequacy of TASER's warnings, when viewed collectively, remains in dispute, Wright's failure to view any one piece of those warnings cannot dispose of the causation issue as a matter of law. Even if Wright had viewed the later materials, a question remains whether they were sufficient to properly convey the dangers of chest shots and disabuse Wright of the notion that the warnings were changed simply to avoid litigation. Whether different warnings would have altered Wright's behavior is a question of fact common to the adequacy and causation elements. In a

---

motion to exclude was filed. Consequently, this argument is premature, and will be addressed, if necessary, as part of the court's ruling on the motion to exclude.

case such as this, where multiple warnings are at issue, and part of the manufacturer's duty includes a requirement to distribute new warnings in an effective manner, the manufacturer should not be able to avoid potential liability by failing to reach users. Holding so as a matter of law would establish a perverse set of incentives for manufacturers charged with issuing updated warnings.

Even when TASER's causation arguments are addressed on their face, the court believes that a grant of summary judgment would be inappropriate. Causation is typically a question of fact under Virginia law, and the plaintiff has presented enough evidence on the effect of TASER's earlier communications to survive summary judgment. Deputy Wright and Deputy Burton, a certified TASER instructor, both testified that after the February 2010 staff meeting, during which the Bulletin 15 synopsis was discussed, they were left with the impression that the preferred target zone had been lowered only to reduce litigation. (Wright Dep. 91-92; Burton Dep. 41-43.) Wright also testified that if TASER had produced a better, more explicit warning stating that chest shots could cause cardiac arrest or ventricular fibrillation, he would have avoided using the device in such a manner. (Wright Dep. 207-09.) Furthermore, another officer present during the incident, Deputy Mattox, instructed Wright to deploy his ECD against Russell. These instructions were given while Wright had the laser from his device clearly trained on Russell's chest. It can be inferred, then, that Mattox also felt it appropriate to deploy the X26 directly at Russell's chest, even though other targets were seemingly available. It is unclear from the record what instructional materials were used in Mattox's training, but the fact that both officers on the scene believed a chest shot to be safe raises a legitimate factual question as to whether better warnings would have prevented Russell's injuries.

Furthermore, there is good question whether, in the best of circumstances, Wright ever should have seen Version 17 of the training materials. Version 17 was not released until a few days after Wright was trained. TASER's certification process requires end users to be recertified once a year, and since the Russell incident took place less than one year after Wright's training, a reasonable inference can be drawn, especially construing the evidence in the light most favorable to the plaintiff, that the training protocol did not require that Wright be trained under Version 17 prior to the incident.

When the product warnings, training materials, and interim communications from TASER are considered in tandem, the court believes that a jury might conclude that a person in Wright's position, or even someone who had viewed the most up-to-date materials, would have misunderstood TASER's warnings and assumed chest shots posed no real danger. On the other hand, a jury might well conclude that ACSO's error in training Wright on the incorrect set of materials breaks the causal link necessary in a failure to warn case. Thus, the court concludes that the causation issue cannot be decided as a matter of law.

### B. Contributory Negligence

TASER asserts that Russell's actions on the night of the incident constitute contributory negligence, and as such the company cannot be held liable for his death. These actions include: committing a violent crime, leading police on a short pursuit, immediately approaching the officers after he pulled over, refusing to obey their commands, and asking "why don't you just taser me?"

As a preliminary matter, contributory negligence is available as a defense to product liability cases grounded in negligence, particularly failure to warn cases. Hottle v. Beech Aircraft Corp., 47 F.3d 106, 111 (4th Cir. 1995) (citing Featherall v. Firestone Tire and Rubber Co., 219,

Va. 949, 967 (1979)); see also King v. Flinn & Dreffein Engineering Co., No. 7:09-cv-00410, 2012 WL 3133677, *7 (W.D. Va. July 30, 2012).[15]  In Virginia, "a plaintiff's negligence claim is barred by his contributory negligence if he failed to act as a reasonable person would have acted for his own safety under the circumstances." Rascher v. Friend, 279 Va. 370, 375 (2010).  The issue of contributory negligence is generally a jury question, and can be answered by the court as a matter of law only when reasonable minds could not disagree. Kimble v. Carey, 279 Va. 652, 663 (2010); Rascher v. Friend, 279 Va. 370, 374 (2010); Griffin v. Shively, 227 Va. 317, 320 (1984).  "When a defendant relies upon contributory negligence as a defense, he has the burden of proving by the greater weight of the evidence not only that the plaintiff was negligent, but also that his negligence was a proximate cause, a direct, efficient contributing cause of the accident." Karim v. Grover, 235 Va. 550, 552 (1988).

In Valladares v. Cordero, No. 1:06-cv-1378, 2007 WL 2471067 (E.D. Va. Aug, 27, 2007), the Court granted summary judgment against a plaintiff's state law claims for gross negligence stemming from injuries suffered at the hands of a police officer who was attempting to effect an arrest. Id. at *6.  The Court held that the plaintiff's act of "shoving Officer Cordero and interfering with [the] arrest was negligent.  That negligent act was the cause of the police officer's attempt to subdue [the plaintiff], and the ensuing struggle and injury would not have occurred absent James' initial negligence.  Furthermore, it was foreseeable that the negligent act of shoving a police officer could result in physical harm to the assaulter." Id.

In the case at hand, the evidence does not establish as a matter of law that Russell was negligent, or that his actions were a foreseeable, proximate cause of being tased directly in the chest.  Russell's conduct may have contributed to the officers using some degree of force in

---

[15] Contributory negligence is not a defense, however, to breach of warranty claims, as they derive from contract law. Riebold v. Simon Aerials, Inc., 859 F. Supp. 193, 198 (E.D. Va. 1994).

getting him to cooperate in his arrest, but it could not have been foreseeable to Russell, or a reasonable person in his position, that his actions would cause an ECD to be deployed directly at his chest. The issue in this case with respect to TASER is whether the company was negligent in failing to properly warn of the dangers of ECD chest shots. An arrestee who does not immediately comply with police officers does not as a matter of law absolve a manufacturer of law enforcement products of any potential liability stemming from the use of its products. The defendant will have the opportunity to present its contributory negligence defense to a jury, but the court cannot decide this question based on the evidence currently before it. [16]

In light of the court's conclusions on the plaintiff's failure to warn claims and TASER's asserted affirmative defenses, the court will deny TASER's motion for summary judgment as to Counts VI and IX of the complaint.

### C. Breach of Warranty

Regarding the plaintiff's contractual claims, TASER argues that it is entitled to summary judgment on Counts IV and V because it effectively disclaimed all implied warranties and properly excluded consequential damages arising from any breach of warranty claim.[17]

The plaintiff's warranty claims must fail even without addressing the validity of TASER's disclaimer and exclusion. "The duty to warn under a theory of implied warranty . . . is obviously similar, in many respects, to the manufacturer's duty to warn under a negligence theory. But it differs in [certain] critical aspects . . . ." Bly, 713 F.2d at 1045. "[T]he duty to warn under an implied warranty theory focuses upon whether the lack of warning renders the

---

[16] TASER also puts forth an assumption of risk defense, based primarily on Wright and Mattox's recollection that Russell asked the officers to tase him. As addressed above, this evidence is disputed by the plaintiff, and, like the contributory negligence argument, presents a fact question for the jury's resolution.

[17] Although both of the plaintiff's breach of implied warranty claims mention negligent design and manufacture in addition to failure to warn, the defendant is correct in noting that the plaintiff has put forth no evidence with respect to design or manufacturing flaws.

46

product unreasonably dangerous; in contrast, a manufacturer will be liable in negligence for a failure to warn if its conduct is unreasonable." Id. While liability under the two theories will generally be coextensive, there are situations where "a manufacturer has 'reason to know' that its product is 'likely to be dangerous' – triggering liability under [a negligence theory], – but its failure to provide a product warning does not render the product 'unreasonably dangerous' under a theory of implied warranty . . . ." Id. at n. 8.

In the court's view, the instant case is one in which potential liability under theories of negligence and warranty is not coextensive. The plaintiff alleges that TASER was negligent in issuing statements explaining that the preferred target area had been lowered merely to reduce the risk of litigation, and not to address health risks. The plaintiff's only claim on which it has produced evidence is that TASER was negligent in crafting and disseminating its warnings after the product left the manufacturer's hands. In other words, it was TASER's allegedly negligent conduct that subjected the company to potential liability, and not simply the nature of the product itself. All of the plaintiff's evidence focuses on the effect TASER's interim statements had on the officers' beliefs regarding the danger of chest shots. If TASER is to be found liable, it must be for negligence in instructing users on the nature of the actual risk of its product, and then failing to correct that error by ensuring that future warnings could be properly understood in light of the company's prior statements. These negligence arguments do not apply to the plaintiff's

breach of contract claims.  Accordingly, the defendant's motion for summary judgment will be granted with respect to Counts IV and V.[18]

### D.    Punitive Damages

Finally, the defendant asks the court to rule that punitive damages are not available under the facts of this case as a matter of law.  In Virginia, punitive damages are available only when the defendant has acted with actual malice or with wanton and willful disregard for his actions. Wallen v. Allen, 231 Va. 289, 297 (1986).  "Willful or wanton conduct imports knowledge and consciousness that injury will result from the act done." Id.  Simple and even gross negligence is not enough.  See Ford Motor Co. v. Bartholomew, 224 Va. 421, 436-37 (1982) (striking punitive damages arising out of an automobile manufacturer's negligent design of a parking gear and negligent failure to correct or warn of the defect).  Conduct that evinces some concern for the safety of others, such as attempts to neutralize dangers once they are known, will weigh against an award of punitive damages.  See Philip Morris, Inc. v. Emerson, 235 Va. 380, 409 (1988).

TASER argues that it cannot be held liable for punitive damages given that it attempted to warn users of the possible danger of ECD chest shots.  It argues that it took remedial steps to update its warnings even though the risk of such dangers remained scant.  The plaintiff argues that TASER's statements that it lowered the preferred target area solely to avoid litigation reflect a wanton disregard for the known dangers of its product.

---

[18] The court also notes that TASER's disclaimer of implied warranties and exclusion of consequential damages are valid.  With respect to the disclaimer, Virginia Code § 8.2-316 allows sellers to disclaim the implied warranties of merchantability and fitness for a particular purpose.  Such disclaimers are valid even when personal injury results from use of the product.  Buettner v. R.W. Martin & Sons, 47 F.3d 116, 120 n.2 (4th Cir. 1995).  Additionally, as third-parties can have no greater contractual rights than the parties to the contract, such disclaimers are validly applied to injured third-parties.  Id. at 118-19; Riebold, 859 F. Supp. at 197-98.  Regarding the exclusion, under Virginia Code § 8.2-719, manufacturers can expressly limit their exposure to consequential damages resulting from a breach of warranty with regard to non-consumer goods.  Consequential damages include damages for personal injuries.  Blevins v. New Holland of America, Inc., 97 F. Supp. 2d 747, 749-50 (W.D. Va. 2000).  Finally, the court notes that it has considered the plaintiff's various arguments as to why TASER's disclaimer and exclusion are invalid, and decides that the arguments lack merit.

The conflicting evidence produced from each side prevents a decision on the punitive damages claim at this point in the litigation. Viewing the evidence in the light most favorable to the plaintiff, there remains a genuine issue of material fact regarding the nature of TASER's actions. Given such a conflict, and given the fact that certain of TASER's statements could be construed as in wanton disregard of the potential risks involved in use of the product, the motion for summary judgment on the punitive damages claim must be dismissed.

## CONCLUSION

Based on the foregoing, Deputy Wright's motion for summary judgment is granted in its entirety. TASER's motion for summary judgment is granted as to Counts IV and V, and is denied as to Counts VI, VII, and IX.

The Clerk is directed to send certified copies of this opinion to all counsel of record.

**ENTER**: This ____4th____ day of January, 2013.

_____
Chief United States District Judge

49