```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF VIRGINIA
 2                     Roanoke Division.

 3   ANITA RUSSELL,                Civil No. 3:11cv00075
     Personal Representative for
 4   The Estate of Daniel Russell,

 5                  Plaintiff,

 6           vs.                   Roanoke, Virginia

 7   DENNEY WRIGHT, et al,

 8                  Defendants.   December 11, 2012

 9              TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE GLEN E. CONRAD
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:
                              The Miller Law Firm LLC
13                            PETER A. MILLER
                              108 Railroad Avenue
14                            Orange, VA  22960
     For Deft. Wright:
15                            Guynn Memmer & Dillon
                              ELIZABETH K. DILLON
16                            415 S. College Ave.
                              Salem, VA  24153
17   For Deft. Taser:
                              Glenn Feldmann Darby &
18                             Goodlatte
                              JEREMY E. CARROLL
19                            P.O. Box 2887
                              Roanoke, VA 24001-2887
20
                              Taser International, Inc.
21                            ISAIAH FIELDS
                              17800 N. 85th St.
22                            Scottsdale, AZ 85255

23

24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

APPEARANCES (Cont'd):

Court Reporter:                    Sonia R. Ferris, RPR
                                   U.S. Court Reporter
                                   255 W. Main St. Room 304
                                   Charlottesville, VA 22902
                                   434-296-9284

1                    THE COURT: Good afternoon, everyone.

2                    Thank you for coming to Roanoke. I'm sorry

3    the Charlottesville courtroom is not available for

4    today's hearing.

5                    I'll ask Ms. Moody to announce the style of

6    the next case.

7                    THE CLERK:  Anita Russell versus Denney

8    Wright and others, Civil Action 3:11cv75, for a hearing

9    on motions.

10                   THE COURT:  I believe these are defendants'

11   motions.  Who wants to go first?

12                   MS. DILLON:  Your Honor, if I could go

13   first?

14                   THE COURT:  That would be fine, Ms. Dillon.

15                   MS. DILLON:  May it please the Court,

16   counsel. My name is Elizabeth Dillon. I'm here with an

17   associate from our office, Jennifer Royer.  It is our

18   pleasure today to represent Deputy Denney Wright of the

19   Appomattox County Sheriff's Office.

20                   Your Honor, this case arises out of an

21   incident that occurred on October 30, 2010, a little

22   before midnight.  Deputies Mattox and Wright -- and

23   Wright is the only law enforcement defendant in this

24   case -- were speaking in the parking lot at the high

25   school and Deputy Mattox was dispatched to a call.

1  Since Deputy Wright was with him, they both responded.

2  Sgt. Samms was also dispatched.

3          Dispatch informed them that they had just

4  received a call from 7724 Red House Road, in Appomattox,

5  and they were advised by dispatch that the teenager on

6  the line advised his dad just kicked his little brother

7  in the ribs, he's nine years old, we're going to be

8  toning out for rescue and we'd like a deputy to respond.

9  The father had been drinking and is still at the

10 residence. They were then advised that the child we have

11 on the phone advised his dad is getting in the vehicle

12 right now and leaving and it's a farm use Chevrolet.

13         The officers responded to the house.  As

14 they were going to the house, they received the

15 information that he was leaving the home in the farm use

16 Chevrolet and Andrew, the oldest son, reports to

17 dispatch that his dad did not stop for the officers.

18         Mr. Russell then proceeds at a high rate of

19 speed for about .6 miles, despite the lights and sirens

20 of the deputies' vehicles.  He passes numerous driveways

21 on the way.  Deputy Mattox calls it into dispatch as a

22 pursuit and says he's going about 60 miles per hour,

23 according to his own speed.  Finally, Mr. Russell

24 applies brakes, puts his signal on and pulls into a

25 parking area at the side of the road.  He exits the

vehicle so quickly that Deputy Mattox, who was the first
vehicle on the scene, pulls his service weapon and does
not have time to turn his siren off. Mr. Russell
approaches the officers. It's very unusual in the
experiences of these deputies, Deputy Wright and Deputy
Mattox, to have a citizen exit the vehicle and approach
them like this.

Deputy Wright exits his vehicle with his X26
electronic control device, also commonly known as a
Taser, although we understand that Taser is the name of
a company. Both officers are speaking in loud voices
and Deputy Mattox in particular repeats, shouting loudly
at Russell to "get down, get down on the ground, get
down." Mr. Russell makes no attempt to get down on the
ground. His hands are going up and down. He's also got
what looks like a button-up shirt or jacket loose over a
T-shirt so the deputies cannot see his waistband. They
cannot see the small of the back to see whether or not
he has any weapons with him.

Deputy Mattox, who teaches defense tactics,
after repeated commands have failed, says to Deputy
Wright, "tase him." Deputy Wright knows Mattox thinks
it's appropriate to do so. But he doesn't tase him
right away. There are more commands. "Get down, get
down on the ground." He does not get down. He makes no

attempt to get on the ground.  Deputy Mattox moves back,
retreats a little bit.  Russell takes a step forward and
approaches the officers again. That is when Deputy
Wright deploys the Taser for a single deployment of five
seconds.  Mr. Russell crosses his arms and falls
backwards.  They then get his arms out from under him,
handcuff him, pat him down and unfortunately, in this
situation and unbeknownst to the officers, Mr. Russell
had some health conditions, including heart conditions.
At some point in time, he suffers cardiac arrest.  He
suffers anoxic brain injury. CPR is given to him by Sgt.
Samms and Deputy Mattox.  Deputy Wright is instructed to
go back to the house and interview family members, the
son in particular.  Mr. Russell survives in the hospital
and nursing home for approximately seven months and then
passes away.

　　　　　Your Honor, this is an excessive force case
brought under the Fourth Amendment.  So what we have to
look at here is the perspective of the officers on the
scene, as you well know.  I would like to show a portion
of the aligned videos, aligned by Mr. Fredericks, who is
a video expert, to the Court.  I won't show the whole
thing, but I think a portion of the video is helpful to
see.

　　　　　Your Honor, you'll see, three videos will

1　come up. The first video is that of the Mattox vehicle.

2　The second vehicle is that of the Wright vehicle.　Then

3　the final video that comes up is from the camera that's

4　on the Taser itself.　The sound is delayed, so the sound

5　will start shortly.

6　　　　　　(Video played).

7　　　　　　This is Mattox proceeding towards the house

8　in response to the call.

9　　　　　　Now you see the right video comes up with

10　Mattox in front of him.

11　　　　　　There's the farm use vehicle driven by Mr.

12　Russell proceeding the other way down the road.

13　　　　　　Your Honor, before Mr. Russell is tased, the

14　officers hear him say, "go ahead and shoot me."　Later

15　examination of the video by the video expert seems

16　indicate that he actually says words to the effect of

17　"why don't you go ahead and tase me?"　But both officers

18　in their incident report, report they heard him say, "go

19　ahead and shoot me."　We would submit to the Court that

20　whether he said "go ahead and shoot me" or "why don't

21　you just tase me" is of no difference in this case

22　because it had the same effect on how the officers

23　viewed the situation.　They viewed it as very unusual.

24　They also viewed it as his clear intent not to comply

25　with their commands.　He was not going to do what they

1    told him to do, "get down on the ground."

2            Now, Your Honor, this is in Quik Time.  What

3    I'd like to do now is back up the video and we can go

4    frame by frame and show the steps that Mr. Russell makes

5    before he's tased.  It's hard to see when you're

6    watching that video just straight through, but going

7    frame by frame, it's much easier.

8            I don't know if the Court has Quik Time.  I

9    was not very technologically savvy, but apparently, if

10   you double click on this and then use your arrow keys,

11   you can proceed frame by frame through the video.  Your

12   Honor is probably better at this than I am.

13            (Video played frame by frame).

14            But you can see him exit the vehicle.

15   Mattox.  This is Deputy Mattox who first exits the

16   vehicle.  Mr. Russell is approaching them, walking

17   towards him.

18            Then you'll see Deputy Wright come into the

19   view of the camera.

20            Sgt. Samms arrives on the scene at some

21   point, but the officers were not aware that he had

22   arrived on the scene.

23            Here comes Deputy Wright.  Deputy Mattox is

24   now retreating.  He's backing up.  You can see the laser

25   from the Taser on Mr. Russell's chest.  You see the

hands going up again. They had been down. Then you can see the step, Your Honor. He's advancing towards the officers. He's not complied at all with their verbal commands. He takes that step with his right foot. He's bringing the left foot up and then the Taser is deployed.

Your Honor, as the Fourth Circuit said in Wilson vs. Flynn, application of the Graham vs. Connor standards in an excessive force case is a highly fact dependent analysis.

Plaintiffs in this case attempt to manufacture issues of fact where none exist. We have the video. We know what the officers perceived. We know that the officers believed that Mr. Russell could hear them and understand what they were saying and that he failed to comply. Plaintiffs attribute motives to Mr. Russell's actions, but none of us know what his motives were. That's pure speculation.

They note that his arms were down and up as if in surrender, but there's no evidence of that. That's a motive that's just speculated about.

They note he pulled over at the first safe place, but again, that is not indicated by any of the evidence. The video shows numerous driveways along Red House Road, which is also known as 727, where he could

1  have pulled over.

2  They note he was confused by the flashing

3  lights, the sirens and Mattox's aggressive actions.

4  Again, there's no evidence to that.  They did have an

5  expert that said it appeared there was confused

6  communication.

7  And they note that essentially, he believed

8  he was already detained and they cite to cases where you

9  can't use a Taser against someone who's detained.

10  Certainly he was not detained and there is no evidence

11  as to what he believed.  He was approaching the officers

12  and failing to abide by their verbal commands.

13  We have to look at this from the perspective

14  of that reasonable officer on the scene and not with

15  20/20 hindsight.  These circumstances were certainly

16  tense and uncertain and rapidly evolving.

17  Your Honor, when we look to the cases, the

18  Supreme Court has not issued any opinions with regard to

19  the use of a Taser or an ECV manufactured by someone

20  else.

21  We have in the Fourth Circuit the 2008 case,

22  Orem, which involved the Fourteenth Amendment and not

23  the Fourth Amendment.  In that case, a woman was being

24  transported to jail.  She was handcuffed and hobbled and

25  started banging her head and cursing and causing the

vehicle to rock. The officer stopped the vehicle. The officer that was behind that was following in another vehicle, while the officer driver was tightening the hobbling device, was having a loud confrontation with the suspect who was in the vehicle and used the Taser on her twice and commanded her to respect the officers. That is not similar to this case at all. Again, that was a Fourteenth Amendment case. The Court noted that the driver, a reasonable officer on the scene, did not find use of the Taser necessary.

In this case, we have two reasonable officers on the scene, one of whom was a defense tactics instructor, and he found it reasonable, obviously, to deploy the Taser as he instructed Deputy Wright. Deputy Wright made his own independent decision to do that. He evaluated the situation himself, but he also knew that Mattox, who taught defensive tactics, thought it appropriate and he did not do so until Mr. Russell made another step towards them.

In the Henry vs. Purnell case, Fourth Circuit, 2011, Your Honor, a suspect ran toward a house after he had gotten out of his truck. There was no command to stop and no verbal warning and in that case, the officer shot him in the elbow with his Glock service weapon, mistaking it for a Taser. The Court in that

1  case said we are specifically not saying whether or not

2  a Taser would have been appropriate in this case.  We

3  are looking at this under a deadly force situation.  You

4  can't shoot a fleeing non-threatening misdemeanant.

5           The concurring opinion, however, talks about

6  use of a Taser and compares the facts of the Henry case

7  with McKenney vs. Harrison.  In that case, the officers

8  were inside the home with a gentleman who had three

9  warrants against him for child support and he was warned

10 not to do anything stupid, told that he did not want to

11 be tased and he went towards the window.  He was tased

12 with a single shock.  He falls out the window and later

13 died of head injuries. The Court in that case said it

14 was a split second decision.  It was one shock and the

15 alternative to subdue him by tackling him posed a risk

16 of safety to the officers and did not ensure successful

17 arrest.  The McKenney Court also noted that the law was

18 still evolving with regard to Tasers and local law

19 enforcement policies reflect differing views of where

20 Tasers fit on force continuum.  The dissent noted the

21 similarity of the facts and said allowances need to be

22 made for honest mistakes by officers.

23          We then have a Western District case by

24 2011, decided by Judge Kiser, Thompson vs. City of

25 Danville, where an aunt arrived on the scene of her

```
 1    nephew's arrest and interfered with the arrest and was

 2    handcuffed.  While handcuffed, she kicked back, hitting

 3    the officer's knee and struggled and the stun mode was

 4    used on her twice after she kicked the officer and

 5    struggled and then when failed to get in the car.  That

 6    case cited two Eleventh Circuit cases, Floyd and Draper,

 7    which are included in the brief.  Floyd, an Eleventh

 8    Circuit from 2011, the Court said it was clearly

 9    established in October, 2007, that a Taser could be

10    deployed on a non-compliant suspect where the crime was

11    minor and non violent.  In that case, the suspect was

12    thought to have struck his nephew at school.  He was

13    yelling at the boy.  He refused to cooperate with the

14    deputies.  He moved towards the nephew and the was tased

15    three times.  The Court granted -- said qualified

16    immunity was appropriate if the force had been

17    excessive.

18              In Draper, a tractor trailer driver was

19    pulled over for a faulty tail light, refused to submit

20    documents after several requests and he was tased once.

21              There's also an Eastern District Court, Your

22    Honor, cited by plaintiffs, where a husband called 911

23    because his wife was threatening herself with a knife.

24    He then calls back and says to disregard.  The officers

25    forced their way into the house. They say they struggled
```

1  with the husband. The husband says there was no
2  struggle and I have a witness on the phone and the Court
3  found there were factual issues that precluded summary
4  judgment in that case.

5          In this case, however, Your Honor, we have
6  someone the officers know is accused of committing a
7  violent crime; kicking his nine-year-old son in the
8  ribs. They know that. They know that he has left the
9  house and he failed to abide by their lights and sirens
10 and a pursuit was called in. He exited the vehicle very
11 quickly, which alarmed them and was unusual for the
12 circumstances. They couldn't tell if he was armed, if
13 he had any weapons and he kept advancing. He refused to
14 obey their commands and they deployed the Taser.

15         We would submit, Your Honor, there is no
16 Fourth Amendment violation; that the officers acted
17 reasonably and used reasonable force under the
18 circumstances.

19         When you analyze the Graham factors and you
20 consider it in light of the Wilson vs. Flynn case where
21 Mace was used, not a Taser, in that case there was a
22 domestic dispute. The husband showed up with an intent
23 to hurt his wife if she did not obey him. He had not
24 physically harmed her at the time. So here we have a
25 more severe case in the case at hand. The husband was

threatening to disable his wife's car and told her she
was not going anywhere with the kids. He had torn up the
house. They found that was threatening to everyone. The
husband disobeyed the officer's orders and the
daughter's pleas for him to cooperate.  He resisted when
they attempted to handcuff and there was no violation
found, even though they punched him in the face and
fractured his nose.

Even if, given these facts, the Court opined
the force was excessive, we assert that qualified
immunity protects Deputy Wright in this situation.  It
protects, as the Court said in <u>Malley</u>, all but the
plainly incompetent and those who knowingly violate the
law.  Given the state of the law, Deputy Wright
certainly acted as an officer who would not understand
that his actions violated the Fourth Amendment in this
case.

Plaintiff cites to internal policies which
are not applicable to a constitutional analysis and even
if they were, Deputy Wright complied with his policy,
the policy of his office, and the training he had
received.  The policy allowed for him to use a Taser
under these circumstances.  The policy also said that
center mass was the preferred target and Deputy Wright
complied with that.

         As the Sixth Circuit said in <u>Hagans vs.</u>
<u>Franklin County Sheriff's Office</u>, only months before, in
2012, "the Taser remains a relatively new technology and
courts and law enforcement agencies still grapple with
the risks and benefits of the device."

         Deputy Wright did not go hands on, did not
use defense tactics on Russell because he was unsure
whether Russell had any weapons.  There's also
statistics, Your Honor, that show that going hands on
causes additional injury and a higher percentage of
injuries to both officers and to suspects.

         It is easy to look back now, knowing Daniel
Russell was not armed, and say the officers should have,
could have, might have, but we are not the personnel out
in the middle of the night risking our lives dealing
with a person reportedly who has committed a violent
crime, indicates he will not comply and then advances on
the officers.

         Your Honor, we would ask this Court to grant
Deputy Wright's qualified immunity.  If not, find that
there was no Fourth Amendment violation involved and we
assert that the state claims of gross negligence of
assault and battery cannot survive a finding of
reasonableness. We have adopted the contributory
negligence argument of Taser and clearly, Your Honor,

punitives cannot survive as there was no conduct

motivated by evil motive or intent.  There was no

reckless or callous indifference and there was no

egregious conduct.

Thank you.

THE COURT:  I guess the most worrisome thing

from your perspective, Ms. Dillon, is as I understand

it, it is not clear to what extent the victim, the

decedent, heard what the officers were telling him in

terms of instructions when they first made contact.  I

still don't have a good feel.  Where were the

microphones? Where were the microphones that picked up

the sound that we heard, the audio from this tape that

we just viewed?

MS. DILLON:  Your Honor, each officer has a

mic, so -- and you can watch the videos separately, if

you'd like, and it's easier to hear when you're watching

them separately.  But each officer has a mic.  Then the

Taser camera is actually on the Taser itself.

THE COURT:  Did it have a mic as well?

MS. DILLON:  Yes, it has a mic as well.

Taser can confirm that -- yes.  But it has a mic as

well.  That automatically comes on.  You can't see

initially on the Taser camera because Deputy Wright had

his hand over the camera because he holds it with both

1  hands.

2         But Your Honor, the officers believed, and

3  you'll see this in their declarations, that he could

4  hear them and that was confirmed for them when they

5  heard him say back, and they heard what -- "just go

6  ahead and shoot me."

7         THE COURT:  So we know that or I guess we

8  could certainly assume for purposes of this exercise --

9  is it Mr. Russell?

10         MS. DILLON:  Yes.

11         THE COURT:  Mr. Russell did not hear quite

12  as well at least to the same extent the officers did

13  because they were there and the microphone was on their

14  chest and the microphone was on the Taser itself.  So

15  obviously, the microphone was a lot closer to the

16  speakers than was Mr. Russell. So we can assume he did

17  not hear as well as we are now able to hear in viewing

18  these audio and video tapes.

19         MS. DILLON:  But Your Honor, the officers

20  believed that he could hear them and they were purposely

21  speaking very loudly to him.

22         THE COURT:  That may be important for the

23  qualified immunity analysis, but what about for the

24  first part of the analysis? Would it have been the same

25  if Mr. Russell had not heard anything? Let's assume for

purposes of the legal review that Mr. Russell heard
nothing.

MS. DILLON:  Your Honor, if there were
indications that he couldn't hear at all, a hand to his
ear, perhaps, which most people would understand is "I
don't know what you're telling me" --

THE COURT:  He had his hands up in the air
at first.

MS. DILLON:  They go down and up.  But he
makes no indication that he can't hear them.  Then when
he makes the statement to them that they heard, whether
it was "go ahead and shoot me" or "why don't you just
tase me," he is telling them "I'm not going to do what
you want me to do" and they repeatedly give him the
instruction in a very loud voice.  So maybe he didn't
hear it once or twice.  But they say it over and over
and over again, Your Honor.

THE COURT:  That wasn't my question.

Let's assume for purposes of the exercise
that he didn't hear anything and he is just speculating
as to what they want him to do.  He doesn't know if they
want him to keep his hands up or to get down on the
ground or to go back to his vehicle, that he has no idea
as to what instructions he's received, then is the legal
analysis the same?

1        MS. DILLON:  Yes, it is, Your Honor, and it

2   is the same because specifically, both under Graham vs.

3   Connor and under the qualified immunity analysis, the

4   Court looks at the scene from the perspective of the

5   officer on the scene.  Here, we have two officers who

6   believed that they could be heard by Mr. Russell.

7        Mr. Russell could have -- we don't know. He

8   could have been deaf.  They could come across a suspect

9   that has no idea what they're saying.  But the Court

10  says, we can't look back with hindsight.  In both the

11  Graham analysis for the Fourth Amendment violation and

12  the qualified immunity analysis, we have to look at it

13  from the reasonable officer on the scene.

14       In this case, we have officers who believed

15  they could be heard, who believed he was willfully

16  failing to comply and who made no action to get down and

17  then says to them, "go ahead and shoot me" or "why don't

18  you just tase me," which tells them "I'm not going to do

19  what you want me to do."

20       Because of that, Your Honor, it doesn't

21  change the analysis.

22       THE COURT:  Thank you, Ms. Dillon.

23       MS. DILLON:  Thank you.

24       THE COURT:  Mr. Miller, do we want to

25  separate the two defendants and have you argue as

1   regards the officer first and then respond to Taser's

2   arguments later?

3           MR. MILLER:  Yes, Your Honor, if you don't

4   mind.  And if the Court would indulge me, I'd like just

5   a moment to set up the video.

6           THE COURT:  That's fine.

7           MR. MILLER:  Your Honor, I can start while

8   he's doing that.

9           May it please the Court, my name is Pete

10  Miller and I'm honored today to represent Mrs. Russell,

11  who's here in the courtroom.  I asked her to sit back in

12  the back due to the sensitive nature of the

13  conversation, and T.J. Shaw, a young attorney in the

14  firm who understands computers much better than I do,

15  and my son, Alex Miller, who wants to be an attorney

16  some day, he tells me, and he wanted to come and hope he

17  learns something.

18          Your Honor, I won't go through the complete

19  set of facts as Ms. Dillon has already gone through it,

20  just the points that I would dispute and I think that

21  might be the best way to handle it.

22          She started out with the phone call that

23  came from the teenage son indicating that the younger

24  son had been kicked.  Then she pointed out that Mr.

25  Russell left the house and the young son said "dad did

not stop for the police officers." It's easy to watch
the video and see as Mr. Russell is leaving the
driveway, that is the point in time when the police
officers arrive at the driveway. As the police officer
turns in pursuit, Officer Mattox, and calls in that he's
in pursuit, deposition testimony from both Wright and
Mattox cannot put Mr. Russell that he's speeding. It's
six-tenths of a mile before he goes to stop and pull
into a parking lot and from the video, it's clear he
goes over a hill and you lose sight of him. Clearly, as
the police officer loses sight of Mr. Russell, Mr.
Russell would have lost sight of them. Then as the
police officers come over the hill, it's within ten
seconds he puts on the brake, slows down, pulls into the
lot. I think that's an important point because when
looking at the severity of what the crimes he
potentially committed, they tried to use a high speed
pursuit and I don't believe there is a high speed
pursuit and I believe the video speaks to that clearly.
I think the video speaks to a number of issues.

The reason I cue this video up, what we saw
earlier was the video from Officer Wright's car, the
video from Officer Mattox's car and the video from the
Taser device, all displayed on one screen. I think what
that does is take attention away from Officer Wright's

vehicle camera that does such a good job of focussing on

exactly what happened and it's better to see Officer

Wright's camera to see an enlarged view.

Also, I'll point out when I deposed the

video expert who put those three videos together, the

audio was enhanced by someone other than someone in his

office and he didn't know the specifics of how it was

enhanced and I think it's better to hear the audio from

the original source.

THE COURT:  Okay.

MR. MILLER:  I was going to spend some time,

and the Court brought attention to it, and that is the

siren and the fact it is so loud.  That is such a

pivotal point to our case, the volume of the siren.

The Court brings up a very good point and

that is that the microphone is in the pocket of the

police officers.  As they're hollering "get down, get

down on the ground," it's clearly going to be picked up

by their microphones. That's a key point, but just as

important is where the siren itself is and the siren

itself is mounted between the headlights pointing

forward.  If you notice from the video, if you can see

sound waves, then you would see Mr. Russell standing in

the zone where that speaker is shouting right at him.

We'll watch the video and see his actions.

1          I find it interesting that defense would

2    argue that they felt clear -- the officers felt clear

3    that Mr. Russell could hear everything that they were

4    saying.  However, they believe -- originally they said

5    he said "go ahead and shoot me."  Now they're saying he

6    says "go ahead and tase me."  This is a very material

7    issue.  I will state that I think a reasonable juror

8    could conclude that what he actually says when we watch

9    the video again is "are you going to tase me?"

10          When looking for cues on what senses, how

11   much the sense of hearing is lost, not only is it

12   putting a hand to the ear, but it would be such things

13   as coming to a stop and standing still because you don't

14   know what to do.  The officers are hollering "get down

15   on the ground." He stops. She wants to show it frame by

16   frame and I have no problem with that.  You do not see

17   him making aggressive steps toward a police officer. You

18   see a foot getting picked up.  You do not see any

19   aggressive steps.

20          What you do see, body posture wise, is "are

21   you going to tase me?"  When he immediately steps out of

22   the vehicle, and I invite the Court to watch it again,

23   it is not aggressive. He gets out of the vehicle quickly

24   after he stops, but I would not classify it as

25   aggressive.  He approaches the officers and his hands

1   are out.  He sees Officer Mattox with his firearm.  Then

2   as he sees Officer Wright with the Taser, his attention

3   goes to Officer Wright and then you see his hands come

4   out.  I would submit you can hear him say, "are you

5   going to tase me," just to show the confusion level is

6   there.  We believe that's what is driving this whole

7   thing.

8           THE COURT:  Is Ms. Dillon right? Isn't the

9   Graham vs. Connor an objective standard? Would you have

10   to be able to prove to a jury's satisfaction that the

11   officers lied when they said we thought Mr. Russell

12   could hear us?

13           MR. MILLER:  It is an objective standard,

14   but I think you could review this objectively and say a

15   reasonable person would not conclude he did not say

16   "shoot me," that there's enough audio there and enough

17   body posture wise --

18           THE COURT:  I'm backing up a few seconds

19   before that exchange when the officers are heard on the

20   video itself and clearly are telling Mr. Russell to get

21   down on the ground and he did not comply.  Your

22   assertion is he did not hear that instruction.

23           MR. MILLER:  Yes, Your Honor.

24           THE COURT:  The officers believe that he

25   did. So isn't it enough that they're able to say, well,

1 a reasonable -- we thought -- as reasonable officers, we

2 thought we were speaking loudly enough for him to hear

3 us and that he failed to comply with their instructions

4 and therefore, we upped the level of force that we

5 intended to apply?

6 　　　　　MR. MILLER:  I would dispute that theory

7 this way, and that is that if you're only looking at the

8 commands that are given and the lack of reaction to

9 those commands, I would agree with the Court.  But I

10 think the reasonableness standard is a totality of the

11 situation and clearly, it's the time line.  It's -- when

12 you watch the video, it is 15 or 16 seconds, not 17,

13 from the time that man gets out of the vehicle until the

14 time that man is tased.  And that is quite an escalation

15 of force to use in 16 seconds.  The standard there is

16 how serious of a crime did he commit, how much of a

17 threat is he to the public or the officers and is he

18 attempting to flee? Clearly he's not attempting to flee.

19 He's just standing there. How much of a threat is he to

20 officers? Again, he's standing there. You have Officer

21 Mattox with his service weapon pointed right at the

22 gentleman.  You have what we believe is confusion and

23 again, they're not sure what they hear. When I deposed

24 Officer Wright, he stated it was extremely hard to hear

25 and because of that, communication was extremely

difficult between him and Mattox and they were standing side by side. So to answer the Court's questions, the unreasonableness hinges on the time line, the fact it happens in 15 seconds. The constitutional right is if you're not resisting arrest, you're entitled to be free from excessive force while you're being arrested. Clearly, 15 seconds, and our expert will opine to that, it's the 15 seconds. Whether or not he hears, it's the -- unable to hear, but most importantly, the fact that it happens in such a short period of time.

THE COURT: That can cut both ways. Clearly this case is distinguishable from Draper where the officers engaged the truck driver for minutes, several minutes, trying to get him to get some relatively unimportant piece of paper before they tased him. Here, from all we see and all we know from the officers' depositions, they were trying to gain control of what they considered to be a volatile situation.

MR. MILLER: In Draper, I would argue that he's belligerent and it's clear there's communication and it's clear he is not going to work with the police officers and it's clear that he's done things in a violent nature.

THE COURT: It's also clear they're in control of him and the situation. They're just asking

1    to get some piece of paper.  When he fails to comply,

2    then they tase him.  I think it's pretty easy to include

3    that was unreasonable.  Is it quite as easy to make that

4    conclusion here?

5           MR. MILLER:  Your Honor, I would say to the

6    Court, the video shocks the conscience, the fact it

7    happens so quickly.  The police officers have left the

8    siren on.   There are so many other options.  With one

9    officer with a firearm pointed right at Mr. Russell,

10    clearly Officer Wright with a Taser could have turned

11    the siren off.  Mr. Russell is not displaying any

12    tendency to want to run, any threats. His hands are out

13    to the side and when you watch the video closely, you'll

14    see he gives a very confused, "are you going to tase

15    me," not "go ahead and tase me," which I think is

16    critical because what the defense is hoping for is that

17    "go ahead and shoot me, go ahead and tase me, I'm a

18    crazy man, I'm going to do whatever I feel like doing"

19    and that's not the case here. This is a man who wants to

20    comply.  I don't believe he can hear a thing to comply

21    and we have an expert to opine just to that and more

22    importantly, he's tased in 15 seconds.

23           THE COURT:  Okay.

24           MR. MILLER:  I think we'll also have to

25    consider the size. Mr. Russell was a small man.  I want

to say 5-10, 145 pounds, and if I'm off by a little bit
of size, I'm sure they'll point that out to me.  But
he's a smaller individual.  Both of the officers that
are there, healthy, quite capable, well trained in
defensive tactics and in fact, their protocol, their use
of force guidelines state that if someone is a passive
resister that the resistance has to escalate before he's
going to utilize the next level of force.  I would state
that there were lots of options to Officer Wright,
available to Officer Wright and Officer Mattox, without
tasing him in 15 seconds.

Mrs. Dillon states that it's reasonable
because a second officer, Officer Mattox, is on the
scene and he's saying "go ahead and tase him."  Officer
Wright elects to tase him on his own, he says in
deposition. However, you have a second officer saying
"go ahead and tase him."  What our expert is going to
opine to is the systemic nature of this and that is that
over-dependency on Taser.  Taser themselves use a slide
in their slide deck for training of over-dependency of
tasing. In their slide deck, they want their instructors
to state and discuss don't use a Taser when the next
level of force would be better.  Don't use it as "I
don't want to do other things that could be done" and I
have direct testimony on that from the vice president of

1   training at Taser. Overusing Tasers is an issue and it's

2   a problem and I think this case is the case that can

3   bring that to light.  I think it's unfair to say because

4   there's a second officer there, that makes it

5   reasonable.  I think both officers were in that frame of

6   mind of being over-dependent.

7           With regard to punitive damages, Your Honor,

8   we would argue that it is very egregious to use a Taser,

9   which is -- it certainly runs a risk of cardiac arrest,

10  the risk of losing an eye, the risk of getting hit in

11  the throat.  There are many sensitive areas in the front

12  of the human body. The decision tree for a police

13  officer to use a Taser is a serious one. To make that

14  decision in 15 seconds on a gentleman who is standing

15  there and can't hear, we believe is a very egregious

16  act.

17          I believe I've covered everything Ms. Dillon

18  has commented on. I don't need to take too much time

19  unless the Court has questions.

20          THE COURT:  I think the most significant

21  argument, I think, for the officer is the very point

22  that you made a moment ago and that's that there are no

23  cases that talk about use of Tasers, very few cases, and

24  they all have facts that differ significantly from our

25  case.  So how could someone have been on notice that

this was not a reasonable escalation of the use of

force? How could someone have understood that the

Constitution prohibits this?

MR. MILLER:  Well, Your Honor, there is case

law out there.  We rely on Brown vs. The City of Golden

Valley and that is the nature of the resistance of the

individual who's being tased.  If it's an active

resistance, then there's case law to support it's not

unconstitutional for the perpetrator to be tased.  If

the resistance is passive and there is no threat, no

danger to the officers, then tasing is unconstitutional

and excessive. There certainly is case law out there and

case law before this event.

It's a totality of the situation.  Mrs.

Dillon points out you can't solely rely on the training

manuals and the doctrine of Appomattox County Sheriff's

Office.  But you certainly can include that in the

totality of the situation. He had guidelines that were

clear that such a situation did not require a tasing and

he should have attempted some other means of force to

apprehend Mr. Russell.

THE COURT:  It seems to me the bright line,

the line of demarcation is when would a reasonable

officer feel that he was in control of the situation,

that he was in control of the site? It seems to me that

again, to go back to cases like Draper, to go back to
cases like Judge Kiser's case, it seems to me that the
use of Tasers when courts have found it necessary to
address the point, have generally been approved when the
situation is influx, when there's no control over the
defendant or the person who's ultimately tased except
that I think Draper was an exception to that. Clearly
they were in control of the situation and nevertheless,
the use of a Taser was found to be appropriate there
because the defendant was, the arrestee was being
belligerent and uncooperative. It seems to me she makes
a pretty good point about the control of this situation.
From the officers' perspective, they didn't have Mr.
Russell handcuffed. They didn't have him compliant.
They didn't have him down on the ground. They weren't
sure what he was going to do.

MR. MILLER: Your Honor, if the standard is
control of the situation, then I think there were many
other options available to the officers and many options
available to a reasonable officer.

THE COURT: So the first one you suggested
would be one of the two officers leaving the scene that
was still not under control and turning off the siren.

MR. MILLER: It all depends on control of
the scene. It's been 15 seconds since he exited the

vehicle. He's standing there making motions of "I'm
confused, I don't know what to do."  I don't think it's
always incumbent on the perpetrator to show he's the one
in control.  What could Mr. Russell have done to show
that, Mr. Officer, you're in control? How could Mr.
Russell show they're in control when he's standing there
and can't hear? I believe a reasonable officer could
realize Mr. Russell is not moving, Mr. Russell is not a
threat and we have one police officer with a firearm
pointed at him.  Who does it fall on to take control
from the perspective of the officers?  Do they not
have -- given the factors that are involved at the time,
I believe they do have control.  They have a gentleman
who has left his house.  He's hit the brakes, put on the
blinker, pulled into a driveway or a dirt lot.  He exits
his vehicle, faces the officers.  There's no attempt to
flee, there's no attempt to run. There's no threatening
gestures with his hands.

        THE COURT:  He initially raised his hands
and then he lowered his hands.

        MR. MILLER:  Your Honor, I agree. I don't
think our expert or theirs or anybody is going to say
this is a threatening gesture. He's standing there and
given the totality of the situation, he is certainly --
appears to be a man who is agreeing to their control. He

```
1   just doesn't know what their control is.  I think the
2   onus is on the officers to understand.  A reasonable
3   officer would say clearly it's only been 11 seconds,
4   12 seconds, 13 seconds, we have control of this
5   situation. They did have control of the situation. The
6   next step is -- what is the next step? What is the
7   officer going to do? He's got, like I say, a firearm and
8   a Taser and this gentleman is not moving, what is Mr.
9   Russell to do? Mr. Russell is standing there --
10              THE COURT:  They want him to go down and be
11   handcuffed.
12              MR. MILLER:  I certainly understand, but our
13   argument is he can't hear.  I played the video without
14   the enhanced audio to see -- it's amazing how loud it
15   is.  If you turn it up to try to hear what Mr. Russell
16   says, the siren gets to the point there's no way anyone
17   could hear and Mr. Russell is in that zone of noise.
18   That siren is designed, it's for the individual in front
19   of the police officer, the car, someone inside a car to
20   hear. This gentleman is standing in front of it with his
21   naked ears.
22              THE COURT:  So if the siren had not been on
23   and they instructed Mr. Russell repeatedly to get down
24   and he refused, then would it have been okay to Taser
25   him?
```

1      MR. MILLER:  I would argue because he's not
2  moving, I would believe 15 seconds is too short of a
3  time in that scenario.  But I don't believe those are
4  the facts in this case. But 15 seconds, if he's not
5  advancing toward the officers -- if he was advancing
6  toward the officers aggressively and the officers felt
7  he could hear, then Taser is a tool.  I'm not going to
8  stand here and say it's a tool police officers don't
9  use. This is not a case where it should have been used.
10      THE COURT:  You say it doesn't matter
11 whether they thought he heard them or not.
12      MR. MILLER:  Yes, Your Honor.  I fall back
13 on the Court's term, control.  I think there is control.
14 If you have a gentleman that can't hear, the best he can
15 do is stand and potentially ask a question.  He's
16 standing there saying, "are you going to tase me?" He's
17 lost.  He's standing there lost and 15 seconds is
18 unreasonable for a police officer to get out of his car
19 and tase someone standing there, in 15 seconds.  The
20 video shocks the conscience.
21      THE COURT:  Thank you, Mr. Miller.
22      Do you want to have rebuttal or do you want
23 Mr. Carroll to go next?
24      MS. DILLON:  Do you mind if I rebut now?
25 I'll make it very brief.

1          THE COURT:  No.  That would probably be the

2   best course.

3          MS. DILLON:  Your Honor, many other options

4   is second guessing, pure and simple.  Also, there's no

5   evidence, only pure speculation that he couldn't hear.

6   There's no evidence that he couldn't hear and indeed,

7   the expert, we filed a motion to exclude the expert in

8   certain areas because Dr. Alpert stated he's not a

9   communications expert, he's not a human factors expert,

10  he's not a body language expert, he's not an audio

11  expert.  Indeed, he has never opined it was more likely

12  or not that someone could or could not hear something.

13         THE COURT:  I kind of agree.  I don't want

14  to prejudge the Daubert motion of the expert, but it

15  seems to me to be something within the common knowledge

16  of everyone, but that, at the same time, suggests that

17  it's a jury question, doesn't it?

18         MS. DILLON:  Your Honor, in this case, we

19  talk about the placement of the sirens.  Well, the siren

20  in Wright's vehicle was closer to the officers.  So not

21  closer to Mr. Russell.  So that analysis doesn't work.

22         Also, Your Honor, there's no evidence --

23         THE COURT:  But again, one of your officers

24  testified it was awfully hard to hear.

25         MS. DILLON:  Correct, but what did Mr.

Miller say? He said if he couldn't hear, he would stand still.  He didn't stand still, Your Honor.  What did he do? He sees a service weapon and he sees a Taser.  What did he do? He started advancing on the officers again. If they're yelling at you and you can't hear and you should stand still, he doesn't do that.  He advances again.

What are the officers to do then? Just let him keep advancing or keep retreating? Then he has access to their vehicles, to the Mattox vehicle? They should keep moving back? He advances again.  He's not just standing still.

If they let him keep advancing, to what end? We don't know.  We don't know.

But the officers are entitled not to take that chance.  They are entitled to take control of the situation.  They are entitled to do that.

I would just briefly point out, Your Honor, that the declaration of Grant Fredericks, the video expert, paragraph five, makes it clear that this is not an enhanced version of the video or audio.  It's not enhanced.  That's part of the record.  That video is part of the record under seal, Your Honor.

Thank you.

THE COURT:  Thank you, Ms. Dillon.

1          MR. MILLER:  Your Honor, will the Court

2     entertain a few comments?

3          THE COURT:  Just regarding the matters she

4     brought up on rebuttal.

5          MR. MILLER:  Yes, Your Honor.  Thank you.

6          Although it looks like a lot, there's only a

7     couple things to reference.

8          THE COURT:  I think the most important thing

9     to rebut is whether or not the audio was enhanced.

10          MR. MILLER:  Fine, Your Honor.

11          One other point, if I could, Your Honor,

12     Ms. Dillon just made a good point. She said what should

13     he do? He should have stood still.  I think the video is

14     a question for the jury and I think a reasonable juror

15     is going to conclude he stood still.  Just what she said

16     he should have done, he did.

17          If I could, deposition of Grant Fredericks,

18     page 86.  Question by Mr. Miller, line two.

19          "And it's not based on any quality

20     enhancement that you did to the audio, correct?"

21          And he's speaking to the video.

22          He said, "well, my technician did enhance

23     the audio," in answer.

24          "Question:  We are hearing the enhanced

25     audio now?"

1          His answer:  "Yes."

2          And I asked him his technician's name and

3     all this line of questioning goes to the video.

4          One last point, Your Honor, responding to

5     what Ms. Dillon said.  It was Officer Wright's

6     deposition when he was asked, "do you think it was

7     extremely hard to hear?"

8          "Answer:  Yes."

9          It was extremely hard to hear.  All three of

10    them were in this cone of noise.  Just because the

11    officers were there with Mr. Russell doesn't make it any

12    easier to hear.

13         THE COURT: Mr. Carroll.

14         MR. CARROLL:  Your Honor, three lawyers and

15    three computers.  If I may have a moment.

16         May it please the Court, Your Honor, Jeremy

17    Carroll on behalf of Taser International.  With me this

18    afternoon is Isaiah Fields.  He is counsel for Taser

19    International as well and has been pro hac vice'd into

20    this matter.

21         The products liability aspect of this case,

22    Your Honor, relates to the Taser X26E electronic control

23    device that was manufactured by Taser International and

24    used by Deputy Wright to apprehend Mr. Russell on

25    October 30, 2010.

1    Plaintiff advances two primary theories of
2    recovery against Taser; a breach of implied warranties
3    and negligence.  The breach of implied warranties
4    claims, Your Honor, relate to both the implied warranty
5    of merchantability and the implied warranty of fitness
6    for a particular purpose. There are two separate
7    negligence counts as well and then there's also a fifth
8    count of punitive damages against Taser as well.

9    These product liability claims require a
10   plaintiff to prove a defect which renders a product
11   unreasonably dangerous.  Traditionally, there are three
12   methodologies for proving an unreasonably dangerous
13   defect; negligent design, negligent manufacture or
14   negligent failure to warn or inadequate warning.

15   The plaintiff has produced and presented no
16   evidence of a design defect or manufacturing defect and
17   proceeds exclusively under the theory that Taser has
18   inadequately provided warnings with regard to the X26E.

19   Specifically, Your Honor, plaintiff contends
20   that the warnings that were generated and produced and
21   delivered by Taser failed to provide adequate warning of
22   an alleged risk that deploying the Taser in the
23   direction of the chest would have the possibility of
24   inducing ventricular fibrillation and cardiac arrest,
25   Your Honor.

1          To prevail on these products liability

2     claims, the plaintiff would have to prove a defect and a

3     causation, Your Honor.  In the context of this case,

4     they would have to demonstrate as to the defect that the

5     warnings issued by Taser International prior to

6     October 30, 2010, were inadequate and with respect to

7     causation, they would have to prove that that alleged

8     inadequacy was the proximate cause of Mr. Russell's

9     injuries on October 30, 2010.  Plaintiff cannot prove

10    either defect or causation in this case, Your Honor.

11          The uncontroverted evidence is that Taser,

12    six months prior to this incident, on May 1, 2010,

13    issued its most recent cardiac and chest warnings and

14    that those warnings while being delivered to the

15    Appomattox County Sheriff's Office were never, in turn,

16    provided to Deputy Wright and Deputy Wright, therefore,

17    never read or reviewed those warnings.

18          Furthermore, Your Honor, the evidence in

19    this case is that plaintiff's warnings expert, Dr.

20    Laughery, never read or reviewed Version 17 of Taser's

21    training materials, which was the version that was

22    disseminated on May 1, 2010, or its May 1, 2010, product

23    warnings.  So they can neither prove causation because

24    Deputy Wright did not read these warnings, nor can they

25    prove the existence of a defect because their expert did

1    not even bother to read these warnings.

2             As to causation, Your Honor, the incident

3    obviously occurred on October 30th, 2010.  Plaintiff

4    concedes on brief and indeed argues the issue in this

5    case is whether as of that date, Taser had provided

6    adequate warnings with respect to the X26E and any risk

7    of cardiac risk for ventricular fibrillation.  Again, on

8    May 1, 2010, those very warnings had been issued by

9    Taser. Indeed, they had been issued previously.

10            On September 29th, there were warnings

11   issued on cardiac risk and December 4, 2009, there were

12   training materials issued that also warned against

13   shooting at the chest.  Those are not the relevant ones

14   for this case because on May 1, 2010, updated warnings

15   and training materials were issued.

16            THE COURT:  But as I understand it, the

17   theory is that the warnings that were given in late 2009

18   were deceptive and may have misled a user as to the

19   reason to be concerned about the shots from the Taser to

20   the chest area as opposed to the lower abdomen.

21            MR. CARROLL:  There's an argument, Your

22   Honor, that plaintiff relies on a number of documents in

23   the fall of 2009 which he alleges recanted or rescinded

24   previous warnings. To quote from his brief, he refers to

25   those documents as "subsequent statements" which

recanted earlier warnings.

At first blush, Your Honor, those could not have possibly recanted subsequent warnings. They could not have recanted the December 4, 2009, Version 16 training materials. And more importantly, they could not have recanted the May 1, 2010, training materials and product warnings, all of which were issued after those allegedly recanted documents.

Those documents also, Your Honor, there's no dispute Deputy Wright never saw any of those documents. So to the extent there's this allegation they recanted warnings, again, pre-existing warnings, Deputy Wright never saw them so they could have not have any impact on the causal link.

Third, Your Honor, those documents, the gist of those documents and the issues with those documents about which plaintiff complains is that they characterize the risk as remote and they seem to be or there's an allegation they were motivated by issues of risk management. The risk is remote, Your Honor. Plaintiff's expert described the issue as remote. Dr. Webster in his deposition described it as a low probability, very small, rare. Dr. Zipes, plaintiff submitted attached to his response brief Dr. Zipes' report. We objected to the report because it's not

1  sworn and doesn't meet the requirements for an

2  affidavit, but what is interesting about it is it relies

3  upon an article by a Dr. Lakkireddy.  In that article,

4  Dr. Lakkireddy described the risk as essentially zero.

5  .4 per million was the number he put on it in one of his

6  arguments.

7           So again, the risk is remote.  So to

8  accurately reflect the risk in those documents does not

9  recant or rescind prior warnings.  Plaintiff would have

10  us exaggerate the risk if you take plaintiff's argument

11  to its extreme -- really not even to its extreme, really

12  just as he states it.  But there's nothing in Virginia

13  law that would require us to exaggerate a risk with

14  respect to the Taser device.

15           Lastly, this recanting argument -- I'm

16  getting a little off here.  I was going to come to the

17  recanting argument later.  But it was specifically dealt

18  with by the District Court in Mississippi in a case

19  recently.  We cited it on brief.  Footnote five in that

20  case, Your Honor, specifically dealt with it and

21  rejected this very argument.

22           On brief, Your Honor, we cited a number of

23  cases for the proposition that where a manufacturer has

24  produced warnings and the user of the product has not

25  read those warnings, the causal link is broken.  There

1    cannot be proximate causation.

2            One of those cases, Your Honor, Fourth

3    Circuit case, Rule -- again these were all cited in the

4    brief -- but that was a medical device case. The doctor

5    had used the device before and observed it being used

6    before, but he did not read the warnings when he went to

7    use it on the time in question on a particular patient.

8    He used it in a negligent manner.  But the Fourth

9    Circuit held there was no causal connection, plaintiff

10   could not prove proximate cause between the manufacturer

11   and the injury because the product warnings had never

12   been read.

13           The same rationale led to Judge Kiser

14   reaching a similar conclusion in the Begley case, again

15   cited on brief. In that case, the individuals used the

16   forklift as a man lift, contrary to the warnings.  The

17   Court rejected the issue as to the adequacy of the

18   warnings because it did not matter.  The plaintiffs did

19   not read the warnings.  When they did not read the

20   warnings, there could not be any causal connection,

21   causal link.

22           Again, we cited a number of cases in the

23   briefs and the plaintiffs cited a case in their brief,

24   the Squid case from Alabama, which is a case where the

25   individual needed insulin and he complained about the

1   adequacy of the warnings about the use of the insulin.

2   The Court assumed that the warnings were inadequate, but

3   went on to conclude that because the plaintiff didn't

4   read the warnings, you could not prove that the warnings

5   or any alleged inadequacy in the warnings was a

6   proximate cause of the injury.

7          The warnings at issue, here, Your Honor --

8   and I'm probably going to have a problem with screens

9   here.  This is a little blurry, Your Honor.

10          These are the product warnings that were

11   issued in May 1, 2010, Your Honor.  These are in the

12   record at, I believe, Exhibit I-16, Your Honor. I just

13   wanted to highlight a couple for the Court's

14   edification.

15          First, right off the bat on this warning,

16   Your Honor, first sentence.  "These safety warnings are

17   for your protection as well as the safety of others.

18   Disregarding this information could result in death or

19   serious injury."

20          Plaintiff argues in their brief that Taser's

21   warnings didn't show -- didn't warn sufficiently on the

22   risk of death.  Again, I'm not trying to get into the

23   issue of the adequacy of the warnings, Your Honor, but I

24   think it is instructive to know that indeed, the issue

25   of death is addressed over 20 times in this product

warning and it is helpful to know these are the warnings
that were issued on May 1, 2010, but they were not
provided to Deputy Wright and not reviewed by Dr.
Laughery.

The third paragraph, "Read and Obey.
"Failure to comply with these instructions, warnings,
information and training bulletins and Taser training
materials could result in death or serious injury."
Again, expressing the warning about death or serious
injury from the use of a Taser.

Important, Your Honor, at the bottom of that
page, "these warnings are effective as of May 1, 2010,
and supercede all prior revisions and relevant training
bulletins. The most current warnings are on line at
www.Taser.com."

Back to that issue about whether 2009
warnings had been recanted. As of May 1, 2010, these
are the warnings. They stand on their own. Nothing
prior matters any longer.

This, Your Honor, I just carved it out
separately to show you. Taser is showing, "Warning."
This indicator, warning, means something to heed your
attention to and if you do not abide by it, again, this
could result in death or serious injury.

Here's one of the key elements of the

warnings, Your Honor.  "Warning.  Sensitive body part hazard."  And it goes on to tell the user not to target the chest or breast.  The preferred target areas are the lower center mass below the chest or front shots and below the neck area for back shots.

"Always follow and comply with all instructions, warnings, information and current Taser training materials to reasonably minimize the risk associated with possible use and side effects listed below."

This is in the record, Your Honor. It does go on to speak of cardiac arrest and impact on hearts and rhythm.

At the same time, Your Honor -- this is the product warnings. At the same time, we have the training materials.

The Version 17 training materials -- again, these are in the record, Your Honor.  These are the ones issued on May 1, 2010. I've tried to excerpt just a couple I think are particularly relevant for the Court's consideration.

"Taser does not establish, recommend or endorse any use of force procedures, policies or tactics."  Ms. Dillon earlier had a discussion briefly about use of force.  I believe Mr. Miller also addressed

the issue.  Taser doesn't establish where in the use of
force continuum the Taser falls.  Each department makes
that determination.

Again, the May 1st warnings.  "Taser ECD's
are not risk free. At this time, review all current
Taser warnings," referring back to the document we just
looked at a moment ago, "contained in the safety
manual."

Medical and safety slides in the training
materials.  "Risks of ECD application having a negative
effect on a person's heart rate and/or rhythm is not
zero. The risk of an ECD causing cardiac arrest is
remote," but goes on to say current estimates are one in
100,000 applications.

Interestingly, Your Honor, and this is in
Exhibit I-16 -- I didn't pull all these out for you, but
I believe Exhibit I-16, page 22 or 23 in the record, the
instructor notes, "highlight the source material for
this slide."  The source material for this slide is an
article by John Webster, the plaintiff's expert.  So
Taser utilized the plaintiff's expert's own information
to generate a slide, to provide the source information
for this slide.

Same for this slide as well, Your Honor.
Advising users to -- the dart is what comes out of the

1    Taser, Your Honor, and reference to dart to heart

2    distance is exactly what it sounds like.  The closer the

3    dart is to the heart, Taser is warning, six months

4    before this incident -- the further away the dart is

5    from the heart, the lower the risks are of any impact on

6    the heart.

7              Then we get into the preferred target areas,

8    Your Honor. A couple slides on this.  "When possible,

9    avoid the chest."  Reduces the risk of affecting the

10   heart.  It indicates the preferred target areas are in

11   blue, again, as the Court can see, avoiding the chest.

12             This is a slide which shows again, targeting

13   the lower torso.

14             "Warning.  Avoid intentionally targeting the

15   ECD on sensitive areas of the body, such as the head,

16   throat, chest, breast or known pre-existing injury

17   areas, without legal justification."

18             That phrase is important, "without legal

19   justification."  Again, the actual use of the Taser on

20   the continuum is up to the law enforcement agency and

21   the officer.  There could be times where an officer

22   would have no choice but to use it in one of these

23   sensitive areas. Our job at Taser is to warn not to do

24   it unless there is that justification.

25             Again, just a few more slides on the

preferred target zone, Your Honor.  Again, the blue is

the target area. Avoid the white.  Notice bullet point

three.  "Increase dart to heart safety margin distance."

This is the back, showing that the back is

safe or as safe as any location all together.  And then

again, the last slide, Your Honor, bullet point two,

"Aim at preferred target zones."  Bullet point three,

"Avoid sensitive areas of the body." One thing I would

point out on this one again, Your Honor, bullet point

two, again, refers you back to the warnings.

So you have two documents generated on

May 1, 2010, and made available.  There's no dispute in

the record they were e-mailed to and received by the

Appomattox County Sheriff's Office in May 1, 2010. Yet

there were never disseminated to any of the officers or

deputies at that time.

The cases we've cited, the Rule case, the

Begley case, a number of the other cases, Your Honor, we

respectfully submit stand for the proposition you cannot

prove causation in the absence of the officer reading

these warnings. The logic is this.  If these were

inadequate -- we think they're adequate and you don't

need to determine adequacy.  But if there was a better

warning, it wouldn't have mattered because the deputy

never read them.  So to prove causation, you have to

prove that it would have mattered. But because the
Appomattox County Sheriff's Office did not deliver the
warnings to the deputies, the warnings were -- the
causation has not been proven, Your Honor.

In addition to the failure to prove
causation, the plaintiff cannot prove defect. As I
mentioned previously, Your Honor, Dr. Laughery has not
reviewed the slides, has not reviewed the product
warnings that we just looked at. If the warnings expert
has not reviewed the slides that were generated six
months before the incident -- again, plaintiffs argued
on brief the issue is the warnings in place on October
30, 2010. Yet their expert hasn't reviewed them.

They say on page seven of their brief that
they will offer evidence about the inadequacy of the
warnings in their totality, but there's no citations to
the record, Your Honor. To the extent they have relied
at other locations of their brief on Dr. Laughery's
report, I would submit again the report is not sworn, it
is not an affidavit or declaration under the rules. But
more importantly, because Dr. Laughery did not review
the relevant warnings in place and in effect at the
time, he doesn't bother to even offer any opinions nor
could he about any inadequacies associated with those
warnings.

         The inability of the plaintiff to be able to
prove causation or the existence of a defect in the
warnings, Your Honor, is fatal to all of these claims.

         In addition, there are other justifications
for entering summary judgment with respect to the
individual claims.  For example, Your Honor, the
negligence claims fail on theories of contributory
negligence and assumption of the risk and the warranty
claims fail because of the disclaimer of warranties.
I'll talk briefly about those, Your Honor.

         Contributory negligence, I'm not going to
play the video yet again. I know the Court has seen it a
couple of times.  Simply put, Your Honor, we cited to
the Valladares case, which was a use of force case and
spoke for the proposition that an individual who, in
that case, he was interfering with the arrest of his
brother and essentially created a situation where the
officers felt it was reasonable to use force on him.  He
was responsible for setting the course of actions in
play that ultimately led to his injuries.

         That's exactly what has happened in this
case, Your Honor. From the decision to have the
sufficient consumption of alcohol to reach the .17 blood
alcohol level, from kicking his son, to fleeing his
home, to exiting his car instead of staying in his car,

1  to advancing quickly toward the deputies, not getting on

2  the ground, hands up, hands down, and ultimately, Your

3  Honor, the decision to say, why don't you go ahead and

4  Taser me and began, as Ms. Dillon's frame by frame

5  analysis showed, began the process of taking two steps

6  towards those deputies, was not acting reasonably.  It

7  unquestionably was foreseeable that it would result in

8  the application of force on him by the officers.

9  Therefore, we submit that contributory negligence

10  defeats plaintiff's negligence claims.

11         Plaintiff, Your Honor, on his brief, does

12  not contend that his client or that Mr. Russell was not

13  contributorily negligent.  Instead, he advances an

14  argument that the contributory negligence and primary

15  negligence must be concurrent.  However, he cites two

16  limited cases that deal specifically with medical

17  malpractice area. In those cases, Your Honor, the

18  situation was whether the patient who undertook some

19  action which brought about his need for medical care or

20  a patient after having received medical care undertook

21  some action which didn't mitigate his own injuries, the

22  Court said, no, in a medical malpractice case -- and

23  it's very specific.  All four cases we cited on briefs

24  for that concurrence rule were medical malpractice

25  cases.  They said no. In the medical malpractice

 1   context, there has to be a contemporaneous connection

 2   between the primary negligence and the contributory

 3   negligence.  Indeed, to try to apply that rule to a

 4   products liability case would eliminate the application

 5   of contributory negligence all together.  Whether it is

 6   a design or a manufacturing defect or a failure to warn,

 7   in almost all products liability cases, the alleged

 8   negligence of the manufacturer is going to predate the

 9   contributory negligence of the plaintiff.  However, you

10   know, the cases, Your Honor, are numerous which apply

11   contributory negligence in the context of product

12   liability claims.

13            The other allegation the plaintiff makes,

14   Your Honor, is contributory negligence does not bar a

15   claim where there is intentional tort or willful and

16   wanton tort.  The legal position is certainly

17   appropriate.  That is a correct statement of the law,

18   but there's no evidence of willful or wanton conduct by

19   Taser here. Willful and wanton conduct, the cases we

20   cited in the brief, Your Honor, if a party shows care

21   for the well-being of others, concern for the safety of

22   others, then by definition, it is being -- it is not

23   being willful and wanton, I should say.  Here, the

24   promulgation of the warnings shows care for the others.

25   We looked at the first product warning, Your Honor,

which specifically highlighted that it was about concern

for the officer's safety, as well as the safety of

others. Respectfully, Your Honor, there can be no

willful or wanton conduct where the manufacturer is

generating those warnings.

Furthermore, Your Honor, again, what they

would rely on, what plaintiff would rely on for this

willful and wanton conduct is these recanting articles,

these 3 or 4 documents which he alleges to recant

warnings. Again, those predated the Version 16 training

materials on December 4, 2009. Predated the May 1, 2010,

product warning and training materials.  So to the

extent they could have even showed willful and wanton

conduct, they cannot in the context of subsequent

warnings which came out after the fact.

THE COURT:  Again, though, and I think this

is the worst thing that can be said for your case on

causation, the plaintiff's point is that rightly or

wrongly, in training this particular defendant and all

the others, these guys came out of the training with the

notion that the real concern was to prevent lawsuits

such as this one, mismanagement concerns, and that

really trumped any subsequent effort to try to say,

well, we're really concerned about the well-being of

these people you may Taser. That is the argument and the

fact of the matter is, both of these officers testified that they came out of their training sessions with the understanding that risk management was the primary objective in the instructions that they received.

MR. CARROLL: I suspect, Your Honor, when most corporations generate warnings, risk management is an aspect to it. I'm not sure --

THE COURT: They just don't say so in so many words, but that was the claim here.

MR. CARROLL: That's exactly right. But it's not an improper motive to try to manage the risk or try to reduce risk and safety. What they also said in those documents is yes, the risk is remote. As I mentioned before, the plaintiff's own experts agree the risk is remote. But they did say in those documents that by reducing the target zone, you further reduce those risks. The risks are already remote, but by reducing the target zone, you further reduce those risks. Again, there's no obligation under Virginia law to exaggerate a risk when you're putting out that information, when you're putting out new warnings. You don't have to overstate what the actual risk is. They gave an accurate statement. Indeed, their expert testified there was nothing inaccurate about those documents. They accurately stated the risks.

1    THE COURT:  But you can understand the

2 plaintiff's argument that these subsequent notices,

3 these subsequent warnings, might, in a jury's eyes,

4 might not be sufficient to disabuse a user of the

5 potential risk, the real risk, the real reason that you

6 don't want to shoot someone above the waist.

7    MR. CARROLL:  I understand Your Honor's

8 point.  I would suggest in this case, Your Honor, the

9 core break in the causal connection is the Appomattox

10 County Sheriff's Office's failure on April of 2010 or I

11 believe that's when it was, that Deputy Wright was

12 trained.  They have conceded, and nobody takes issue

13 with it, they used a twice obsoleted set of materials.

14 They used Version 14. Version 16 was out at the time.

15 They used Version 14.  Deputy Wright was specifically

16 trained to target the torso because the Appomattox

17 County Sheriff's Office erred and did not use the most

18 recent, most current version of the training materials

19 they had been sent and been received because Taser had

20 already produced Version 16 which had the same -- the

21 text is a little bit different, but it has the same blue

22 man graphic as subsequently came out in Version 17.

23    If there's an issue as to whether Deputy

24 Wright was instructed or was under the impression to

25 target the upper chest, it's because Appomattox County

Sheriff's Office trained him improperly, using the wrong materials.

Again, those four documents that Mr. Miller will say recanted any previous warnings that had been issued by Taser, those came out before -- I won't say before -- while Deputy Wright was at Central Virginia Criminal Justice Academy. He had been elevated to a street deputy, but he had not reported to duty. I believe it was Christmas of '09 or early '10 when he actually reported for duty. So this alleged article that recanted warnings were before Deputy Wright was even a full time deputy. Again, he never saw any of them. He did, in February of 2010, sit in a staff meeting before he had ever been trained on how to use or anything about a Taser device where the issue of lowering the targeting zone was orally discussed. He had not been trained at that time. Again, there were subsequent warnings that came out. But most importantly, two months later -- he receives that training about lowering the target zone and two months later, he is specifically trained because of an error by the Appomattox County Sheriff's Office to target the upper torso. Again, this is not on Taser. Taser has already generated its warnings and generated its training materials which say lower the target zone below

1    the torso.  Yet that information doesn't get to Deputy

2    Wright.  He doesn't read them and that's why there can

3    be no causal connections because the warnings that were

4    in effect at the time, the training materials that were

5    in effect at the time never got to and were never read

6    by Deputy Wright, Your Honor.

7            THE COURT:  In those situations though, and

8    I know that most of these cases lie in other contexts,

9    but in those situations where a defendant cites some

10   failure to train or some inadequacy in the training,

11   doesn't it necessarily raise an issue as to whether or

12   not the training materials that are provided, the

13   instructions that the supervisors are given are adequate

14   for the purpose and doesn't that really stand as a jury

15   question?

16           MR. CARROLL:  Respectfully, Your Honor,

17   there's been no evidence of any defects.  Sounds like --

18           THE COURT:  He says they are. His experts

19   say they are. His experts say that really, it didn't

20   capture the ultimate concern here and that is that you

21   could cause cardiac arrest by shooting people in the

22   upper torso.

23           MR. CARROLL:  Your Honor, I believe his

24   argument was that the September, October, November, 2009

25   documents recanted the prior warnings. I think those

become irrelevant, utterly irrelevant, when you have the

May 1, 2010, warnings which we just went through.  Those

have then been established.  Taser has put those out,

yet they don't make it to Deputy Wright, through no

fault of Deputy Wright's. It becomes an issue of again

the inability to show proximate cause because plaintiff

says on brief, we look at October 30, 2010. He says

Taser had not warned at that time of the risks.

THE COURT:  He says these subsequent

remedial efforts were not enough to disabuse Officer

Wright of the notion that the real reason we recommend

not shooting people in the upper torso is there's some

possibility of litigation resulting therefrom.

MR. CARROLL:  I understand Deputy Wright

testifies to something to that extent in his deposition,

but that notion came from one oral review of a document

in February, 2010, before he is ever trained on how to

use any ECD or anything about an ECD. Then two months

later after he gets that oral discussion about a piece

of equipment he's never been trained on, two months

later, he is mistrained, if you will, and instructed to

target the torso, by the sheriff's office.  So I don't

see how there can be a causal connection that those

earlier documents, the late 2009 documents created this

inclination Deputy Wright's situation to continue to

1   target the torso when he was specifically and

2   erroneously trained to do so.  Again, when you juxtapose

3   that to these warnings, the current warnings, the ones

4   in effect, the first page I indicated showed these

5   May 1, 2010, warnings supercede everything that's come

6   before.  The effort is made to make it clear. These are

7   our warnings. Reduce your target zone unless legally

8   justified.

9           THE COURT:  So in your view, would we have a

10  triable issue if erroneous warnings had not been given?

11          MR. CARROLL:  If erroneous warnings had not

12  been given --

13          THE COURT: If they had not misinstructed the

14  deputy, would there be a triable issue, given what we

15  know about the case?

16          MR. CARROLL:  No, Your Honor, because the

17  warnings that would have been given at that time would

18  have been Version 16 and they do have this blue man

19  graphic and tell you to drop the target zone.  Then we

20  then, Taser subsequently issued the May 1, 2010,

21  warnings which were sent to and received by the

22  Appomattox County Sheriff's Office, and these warnings,

23  whether you were trained on the Version 14 or the

24  Version 16, these Version 17 and May 1, 2010, warnings

25  never made it to Deputy Wright.  So from Taser's

1  perspective, Taser has issued these warnings,

2  disseminated and put these warnings in the hand of their

3  customers and they did not make it to Deputy Wright in

4  this case.  That was through no fault of Taser.

5  Therefore, Your Honor, I don't believe you have a

6  triable issue because they can't prove any inadequacy in

7  these warnings because these warnings were not read.

8          Furthermore, Your Honor, you wouldn't have a

9  triable issue here because their expert has never looked

10 at these warnings and has never offered an opinion these

11 warnings were inadequate.

12         THE COURT:  What else do you want to say

13 about your motion?

14         MR. CARROLL:  Your Honor, on the issue of

15 disclaimer, we did brief the issue of disclaimer.  I

16 will move along, but the plaintiff has not taken issue

17 with the fact they mention merchantability, are in

18 writing and are conspicuous, Your Honor. That has not

19 been argued.  The argument they advanced on brief we

20 dealt with in our reply.  I will rest on the briefs.

21         We do take the position, Your Honor, the

22 warranty claims fail because of the disclaimer of

23 warranties and the exclusion of inconsequential damages,

24 which would include an exclusion of personal injury

25 claims.

1          Obviously, Your Honor, with regard to

2    punitives, if indeed the claims do survive this motion,

3    punitives should not be one of those because we did

4    issue warnings, Your Honor, and we showed concern or the

5    safety of others. Indeed, Your Honor, the plaintiff's

6    own expert refers to the Taser as a good device, refers

7    to Taser's doing a good job training and refers to it as

8    an important device for law enforcement and under those

9    facts, Your Honor, we respectfully submit it could not

10   be proven Taser engaged in willful and wanton conduct.

11          I'll be glad to answer any questions.

12          THE COURT:  That's fine, Mr. Carroll.  Thank

13   you.

14          MR. MILLER:  Your Honor, Mr. Carroll did not

15   have the benefit of sitting in on the deposition of the

16   experts and the employees of Taser in this case. Mr.

17   Carroll, smart man, but there's a misunderstanding here

18   that I've got to explain to the Court.

19          First of all, my expert did read the

20   pertinent warnings.  He did review the pertinent

21   warnings and the warnings that were in place that

22   applied to Officer Wright were the ones that Officer

23   Wright was trained on.  It's very important that I get

24   this subtlety across.

25          There are training versions.  In this case,

1  training Version 14 is what the instructor for the

2  entire Appomattox County police department was trained

3  on.  That training version has warnings with it.  His

4  instructions were to take that with you and use that

5  when you teach the officers of Appomattox County how to

6  use a Taser. So he should have used that until training

7  Version 15 came out.  Then what he should have done is

8  gotten training Version 15 and had training Version 15

9  available until 16 came out and so on.

10          In this case, training Version 16 was the

11  current version when Officer Wright was trained on the

12  Taser. I walked through and had the opportunity to

13  depose their expert in training and he, too, walked

14  through all the slides between 14 and 16.  Nothing

15  significant changed and we have testimony on that.  The

16  warnings are identical in 14 and 16. Officer Wright was

17  trained on that.  Training bulletins that discussed

18  "don't Taser someone in the chest" were discussed to

19  Officer Wright.  Officer Wright was a full up, trained

20  user of a Taser. This all happened on April -- the end

21  of April -- I want to say April 30th of 2010.

22          May 1, two or three days after Officer

23  Wright's training, comes out training Version 17.

24  Training Version 17 has attached to it the new warnings

25  that are dated in May of 2010. I cleared this up with

the vice president of training with Taser, who is also

their expert on warnings. I cleared this issue up with

him and asked him, does training Version 17 apply in

this case? The way I did it with him was hypothetical.

If an instructor is trained on training Version 14 and

he subsequently trains someone on a training version, is

there any obligation on his part to retrain that

individual or rebrief that individual when a new

training version comes out, and no was his answer.

This is the vice president of training for

Taser, also their training expert. I asked him on page

71 of the deposition in which he was an expert.

"Question: All right. If an instructor

trains an end user, and for this hypothetical I'm going

to use Version 14."

His answer is: "Okay."

My question: "And now the end user is out

there on the street doing his job and a new training

Version 15 comes out, what requirement, if any, is there

to train that end user on 15?"

"There isn't any," is the answer.

Then I asked him: "He's a full up

(indecipherable), a trained individual out there using a

Taser despite the fact a new training version has come

out."

1            His answer:  "Correct."

2            Training Version 17 came out two or

3   three days after Officer Wright was trained.  They would

4   love to say that, oh, there are brand new warnings and

5   they did not train Officer Wright.  There was no

6   obligation, as per the vice president of Taser, as per

7   their training expert.  The fact he's bringing this up

8   clearly shows Mr. Carroll didn't have the opportunity to

9   be part of the deposition because that was clear.

10            More importantly, the warnings in training

11  Version 17 state "don't tase the chest."  They state the

12  preferred target zone has been dropped and the reason is

13  because they talk about safety.  They want to help

14  individuals out.  Well, that's great.

15            The way you get training Version 17, the way

16  Officer Burton, who's the training instructor for

17  Appomattox County Sheriff's Department, was instructed

18  to get his training version of Version 17 was to go to

19  the website.  It used to be they sent them a DVD, a DVD

20  arrived in the mail. That process terminated on training

21  Version 16 or 17.  What we have on 17 is an e-mail to

22  Officer Burton, go to the website and download training

23  Version 17.

24            They also have numerous places on their

25  documents, "always refer to the website, go to the

website." In fact, their expert says it's imperative that they go to the website.

Well, if Officer Burton would have gone to the website to get training Version 17 as they say was so important, which I clearly argue to you, was not and has no impact on this case, what you see on the website is a list of documents, training documents. This list of documents is the same as far as the first document goes today or at least was last month, as it was all the way back to 2009.

The first document someone would download is a memo or memorandum written by the vice president of training at Taser that goes on for three pages that says, yes, we've changed the preferred target zone and he says, "it's risk management, pure and simple" and spends an entire paragraph talking about lawsuits, not safety. There's nothing in here about safety.

When I deposed their electrical engineer, Dr. Panescu, Taser was well aware when this warning came out that it was safety and Panescu says it was safety. Panescu did a theoretical modeling on the human heart and how the Taser affects the heart. Panescu has a slide he developed prior to Taser's warning that shows a ten-fold increase in safety, not lawsuits -- safety -- if the targeting zone goes from directly over the heart

to 3 or 4 inches away from the heart.  A ten-fold
increase in safety.  I deposed Officer Wright.  Officer
Wright was briefed on that training bulletin, which is
the current attitude of Taser today, as per their vice
president of training.  He still has this document on
line.  Dr. Panescu, their expert, will state you've got
a ten-fold increase and that's exactly how far they're
asking to drop the targeting zone. So if you would
listen to their warning, you would be outside of this
area. It's a very accurate device.

The laser comes out of a Taser and there's
two probes. They claim their laser to be, I believe it's
3 inches to 13 feet.  So if you're 13 feet away and you
put that laser red dot on someone's chest, you're going
to be within three inches of that dot with the top probe
and the bottom probe is going to be on an eight-degree
flight path, which gives you about 7 inches to 14 feet
-- I may not have that right, but the top probe is going
to be a couple feet away from the top probe at the
distance that they were.

I deposed Officer Wright and I asked him if
he had a clear understanding of that memorandum and he
said he did. The training bulletin would come out in
between training versions and carry the message that
gets incorporated into the next training version and

that message was incorporated on down the line.  It was
a lengthy document, training bulletin 15, that said it
was risk management and safety, but it came out with a
synopsis of it, a one-page copy of it.  That one-page
copy in January of 2010 was held up in front of all the
officers of Appomattox County and explained that,
listen, guys, it's risk management.  I even had Officer
Wright read this memorandum.  When I said, Officer
Wright, is that the memorandum that was read to you?  He
said, yes. Later on, he was unsure and said maybe it was
the synopsis.  But I said, are you clear on the attitude
that they believe it's about lawsuits and not safety,
and he said yes.  I said, Officer Wright, if it would
have been a stronger warning for safety and not risk
management, would you have avoided putting that laser
dot on Mr. Russell's chest, and he said yes.

It's clear Taser went out of the way,
ignored Dr. Panescu and others who said it was a safety
issue and determined it was a risk management issue.
Behind the scenes, in deposing their CEO, it was a
revenue issue. They were going to lose the sale of
Tasers if it were be known to the forces out there, if
you tase someone in the chest, you're going to have a
cardiac arrest. It's much worse than just saying "let's
avoid lawsuits." It's "let's avoid a loss in sales."

Let's run the risk of having someone suffer cardiac

arrest, and this has happened numerous times, to let's

not lose sales. That's the issue here.  That's the

punitive damages and I can certainly back that up, Your

Honor.

What I think is very clear is so much of Mr.

Carroll's argument was training Version 17.  So much of

his argument hinged on that and training Version 17 does

not play in this case. Officer Wright was trained on

training Version 14 when he should have been trained on

training Version 16.  But we went through a painful

exercise of seeing what was different between the two.

Nothing significant.  Nothing that would have altered

the course or altered the cause of Mr. Russell's death

on the night of October 30, 2010.

Your Honor, the memo was also part and

parcel of other documents that have been entered as

exhibits and that is a frequently asked question.  The

CEO of Taser put out an e-mail saying, there's so many

questions about this new preferred targeting zone, I'm

going to answer questions on the phone.  And this is

information still true today, avoiding the risk versus

safety.  They sent out the frequently asked questions

and answers to an email to Officer Burton.  Can I still

target the chest? Yes, is the answer, and it goes on to

1    talk about avoiding risk.

2            Your Honor, I think this case is incredibly

3    clear and I think Taser went out of the way to make sure

4    that unsafe actions were happening when it came to the

5    use of Tasers.

6            Your Honor, contributory negligence does not

7    play a part in this case. The reason we reached out on

8    the case regarding the kidney issue, they're trying to

9    say that because Mr. Russell had a heart condition that

10    he's contributorily negligent in being tasered.  That is

11    so far afield, Your Honor, that we weren't sure what

12    case law to use to support that.  No one is responsible

13    for their actions being arrested and having a Taser used

14    on them based on their health condition.  No one carries

15    their medical record around.  The case law, Valladares,

16    that Mr. Carroll cited doesn't compare to this case

17    either.  Obviously, it was a brother who was standing by

18    watching his brother be arrested and decided to dive

19    into the scenario and help his brother.  Certainly

20    there's no evidence in this case that Mr. Russell did

21    anything so aggressive.  I don't need to go over that

22    again, but clearly, he's standing there and not doing

23    anything that compares to Valladares whatsoever.

24            Your Honor, I appreciate your time.

25            THE COURT:  Thank you, Mr. Miller.

1          Mr. Carroll, anything else you would say

2   about it?

3          MR. CARROLL:  If I may, Your Honor.

4          THE COURT:  Sure.

5          MR. CARROLL:  Mr. Miller says Version 17 is

6   not in play in this case, but, Your Honor, those are the

7   warnings that Taser distributed to its law enforcement

8   customers six months before this incident.  Plaintiffs

9   on brief, Your Honor, says the issue is what warnings

10  were disseminated and in effect as of October 30, 2010.

11  He says that several times in his brief, Your Honor.

12         We respectfully submit that is the key

13  issue, what had Taser done, because that's who he wants

14  to hold liable.  It's not Appomattox County Sheriff's

15  Office.  He made the decision not to sue them over their

16  failure to train.  He made the decision to sue Taser.

17  Taser, on May 1, 2010, issued Version 17, issued new

18  product warnings and those, we respectfully submit, Your

19  Honor, any inadequacy in those cannot be a causal

20  connection to the injury because they were never seen by

21  Deputy Wright.  Your Honor, we have put the pages, I

22  believe page 93 and 94, of Dr. Laughery's deposition, he

23  says specifically he never looked at Version 17 and

24  hasn't looked at the May 1, 2010 warnings.  That's their

25  warnings expert. He had not reviewed them.

1          Mr. Miller says there was no difference

2    between the Version 14 warnings and Version 16 warnings.

3    He now thinks Version 16 is important.  He didn't put

4    Version 16 into evidence.  In fact, a lot of what he

5    said when he was up here was not evidence before this

6    Court.  I don't think there's any excerpts from Dr.

7    Panescu's deposition in evidence.

8               Version 16, I feel comfortable telling the

9    Court, have the blue man graphic on it with the chest

10   white, saying do not -- avoid targeting the sensitive

11   areas, in that case, the chest, breast.

12               He also said the warnings between Version 14

13   and Version 16 were not different, yet his whole case is

14   about a failure to warn about chest shots.

15   September 30, 2009, the warnings that were connected to

16   the December, that were appended to the December 2009

17   issuance of Version 17 says, Your Honor, "when possible,

18   avoid intentionally targeting the ECD on sensitive areas

19   of the body, such as the head, throat, chest, breast or

20   known pre-existing injury areas without legal

21   justification."  That's Exhibit I9 that we submitted.

22   The warnings with Version 16 were almost identical to

23   the warnings with Version 17 because they did warn about

24   the chest, breast.  So for Mr. Miller now to come here

25   and say it's really about Version 16, but I didn't put

Version 16 in the record, even though he has to come
here today and put on his evidence of how he's going to
prove his case, I think is a little bit of a stretch,
Your Honor, respectfully.

Your Honor, the speculation of motivations
behind Taser. Again, to my recollection, I don't recall
any evidence about a motivation behind Taser's decision
to issue any of those memos. They accurately reported
the risk as remote. They accurately reported we're
trying to manage risk. There's nothing erroneous about
it. Their expert said there was nothing inaccurate
about those documents.

Mr. Miller comes in and speaks about this
frequently asked questions e-mails. That was a late
2009 e-mail, completely rescinded and overridden by the
December 2009 issuance of Version 16, which recommended,
did recommend lowering the target zone and of course,
subsequently overridden by the May 1st warnings and
Version 17.

Your Honor, lastly, the one slide I showed
Your Honor was we do not, Taser does not establish use
of force practices. That's up to the law enforcement
agency. They can take our information and train as they
see fit. They can use the Taser if they want to without
Taser training at all. But what we recommend is that

they use our most recent warnings. That's why the
May 1, 2010, warnings and the May 1 training materials
were made available and they, at that time, rescinded
all pre-existing materials. That's all that can be
asked of Taser. That's what Taser did. Taser gave
warnings. You don't have to reach a decision as to the
adequacy of those warnings I showed Your Honor. They
are adequate as a matter of law, we would respectfully
submit. I understand courts of Virginia are loathe to
go down that path. But you don't have to reach the
adequacy because Deputy Wright never saw them. Dr.
Laughery never saw them. They cannot prove defect or
causation.

    We ask for entry of summary judgment, Your
Honor.

    THE COURT: Anything else, Mr. Miller?

    MR. MILLER: Your Honor, very shortly.

    I believe I heard Mr. Carroll just say the
warning and training in Version 16 were almost identical
to that of Version 17. That pretty much removes his
entire argument because that's what we're talking about,
the fact they're warning about not aiming at the chest
and having a document on the website their CEO said he
would not be surprised if it was on there today when I
deposed him a couple months ago. It's not about the fact

there's a warning there or not. It's about the fact

they came out with such a warning that would have saved

the life of Mr. Russell on October 30 and then not to

say it's inadequate. It's that it was totally removed.

It was diminished to the point that Officer Wright,

based on the information, the paperwork that came from

Taser that is still in effect today, that I elected to

put that laser dot on Mr. Russell's chest and I was sure

cardiac arrest was not going to happen because that's

what I learned from Taser and that's been the testimony.

Again, Your Honor, training Version 17, the

reason my expert didn't read it is because it does not

apply. The only reason training Version 17 was current

on October 30, 2010, is if a new recruit would have

shown up and said "teach me on the Taser," then they

would expect the instructor to get that training Version

with the new warnings and train him. As Mr. Carroll just

said, would have been the same warnings on 16 as it

would have been on 17. Had they gone to the website to

get it, they would have gotten the same memo. Pure and

simple, it's about risk management and it goes on to

explain risk management is avoiding lawsuits because

they don't want to be in court as they were today.

THE COURT: Mr. Miller, let me ask you to

state in one sentence, perhaps two, what you believe to

be your viable claim against Taser.  How would you

characterize your claim against Taser?

MR. MILLER:  Your Honor, my claim against

Taser would be making an adequate warning null and void

based on training bulletins and internal memos.

THE COURT:  And what legal issue do you

think is necessary for the Court to resolve that perhaps

is not very clear under Virginia law at this time in

deciding that issue?

MR. MILLER:  Your Honor, I see it as a

factual issue.  What legal issue, I think it's very

clear that the adequacy of the warnings jumps out at you

when you read the memo.  If that's a legal issue the

Court needs to look at, I think would be a clear and

easy one to resolve.

THE COURT:  What cases do you think are

dispositive in determining the adequacy of post sale

duties to warn?

MR. MILLER:  If the Court would entertain

one second, I've got that marked.

THE COURT:  Mr. Carroll, what do you think?

What case do you think is most helpful along these

lines?

MR. CARROLL:  I'm sorry, Your Honor?

THE COURT:  What case do you think is most

helpful for the Court to use in deciding the extent the

adequacy of a post sale duty to warn?

MR. CARROLL:  Judge Turk's recent <u>King</u> case

addresses and does a very thorough job --

THE COURT:  It addresses whether or not

there's such a duty.

MR. CARROLL:  Correct.

THE COURT:  Which case helps us understand

how that duty is discharged, assuming it exists?

MR. CARROLL:  In this case, Your Honor, I

would commend the <u>Rule</u> case, which I mentioned in oral

argument and brief, Your Honor.  That case, the warnings

were given, the doctor didn't read the warnings, the

doctor proceeded to use the medical device, Your Honor,

in a manner contrary to the warnings and no causation

could be proven because he did not read the warnings.

Your Honor, we had a discussion here about Version 16

and Version 17 warnings.  It's uncontroverted and

unrefuted that Deputy Wright never saw any of them.

THE COURT:  Surely if that duty exists,

there has to be some shades of gray. There has to be

some standard that determines when the duty is properly

discharged, if there's a post sale duty to warn, which I

don't think is a closed question.

MR. CARROLL:  It is not a closed question.

1    Certainly the Virginia Supreme Court has never ruled on

2    it.

3              I did not find a case specifically on that

4    particular issue, other than I suppose the general

5    adequacy cases, Your Honor.

6              THE COURT:  Would it be different than any

7    other duty to warn case?

8              MR. CARROLL:  I think you would probably

9    take the six factors and comment in, Section 383 of the

10   Second Restatement of Torts, Your Honor, as to whether

11   those six factors were met.  Again, I think that is --

12             THE COURT:  So it is the same.

13             MR. CARROLL:  To the Court's point, I think

14   that's the same analysis. I think the issue, there might

15   be other issues because of the fact it's after the sale,

16   delivery or things such as that.  There's obviously been

17   no evidence or opinion in that regard in this case.  I

18   guess that's the best answer to that question I came up

19   with as I was preparing.

20             THE COURT:  That's a fair answer.

21             MR. CARROLL:  Again, Your Honor, I think

22   that all goes down the path of adequacy, which is not

23   necessary when it's uncontroverted all the warnings

24   we're talking about were never read by Deputy Wright.

25             THE COURT:  Mr. Miller, what do you have to

1  say?

2          MR. MILLER:  Your Honor, two points.  One

3  is, I think I've covered the ground, he keeps continuing

4  to say Officer Wright did not read the warnings. That's

5  not a factor in this case and I stand by that.

6          When it goes to post market warnings, I

7  would bring in Spruill vs. Boyle Midway, Inc., and

8  that's from the U.S. Supreme Court of Appeals Fourth

9  Circuit and they speak to the adequacy of a warning and

10  that is an inadequate warning is not a warning and that

11  is clearly what my expert is prepared to say.

12          THE COURT:  Thank you.

13          Thank all three of you for challenging

14  arguments.  Again, I appreciate you appearing here in

15  Roanoke today, even though this case is pending

16  elsewhere.

17          When is the matter set to be tried?

18          MR. MILLER:  January 14th, Your Honor.

19          THE COURT:  The issues are a little more

20  difficult than I would have thought coming in to today's

21  hearing.  We're going to try to get a ruling out to you

22  in time for you to know how to prepare.  It may be that

23  it won't be released before the end of the year, but I

24  suspect that if you haven't heard from us by the week

25  after Christmas, you may call Ms. Moody or call in and

1 we can give you some hints about preparation, who needs

2 to prepare, who doesn't and what issues may still be in

3 play.  But we'll try to have something out before that.

4          Any other questions? Any other problems that

5 we need to deal with in terms of preparation of the case

6 for trial?

7          MR. MILLER:  Your Honor, no.

8          MR. CARROLL:  We do have all the Daubert

9 motions pending.

10          THE COURT:  When do you want to set those to

11 be heard? Would that be best done after the first of the

12 year? I would think so.

13          MR. CARROLL:  That's fine.

14          THE COURT:  I'll let you contact Ms. Moody

15 about that and hopefully we'll know the direction in

16 which the case is headed by the time to conduct those

17 hearings has rolled around.

18          Anything else?

19          MR. MILLER:  No, Your Honor.

20          MS. DILLON:  Thank you, Your Honor.

21          THE COURT:  Ask the Marshal to declare the

22 court adjourned for the day.

23

24

25

1   "I certify that the foregoing is a correct transcript

2   from the record of proceedings in the above-entitled

3   matter.

4

5

6   /s/ Sonia Ferris                    March 13, 2013"

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25