CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 11 2013

JULIA C. DUDLEY, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ANITA RUSSELL, Personal Representative for the Estate of Daniel Russell, | ) ) ) |
| Plaintiff, | ) Civil Action No. 3:11-cv-00075 ) ) |
| v. | ) **MEMORANDUM OPINION** ) |
| DENNEY WRIGHT, et al., | ) ) By: Hon. Glen E. Conrad |
| Defendants. | ) Chief United States District Judge |

Following the court's denial of TASER's motion for summary judgment, as well as the court's ruling limiting the scope of the testimony of the plaintiff's proposed warnings expert, TASER filed this renewed motion for summary judgment. TASER's position, in short, is that because the plaintiff's expert is not qualified to testify regarding the entirety of the information provided by TASER to the users of the product at issue in this case, the plaintiff cannot prevail under the theory of liability demanded in the court's initial opinion denying summary judgment. As indicated from the bench at oral argument, the court disagrees and will deny the defendant's motion. The court offers this brief opinion as further explanation for its ruling.

I.      **Factual Background**

The facts of the case have been stated at length in the court's initial summary judgment decision, and a concise recitation will suffice for purposes of resolving the current motion. Appomattox County Sherriff's Deputy Denney Wright was trained on a TASER manufactured X26 Electronic Control Device on April 26, 2010. Wright was trained using Version 14 of TASER's training materials, even though at the time it had been superseded by Versions 15 and

16. As part of Wright's training, and in accordance with the out-of-date materials he was instructed on, Wright was told to aim the device at an individual's upper center mass.

Beginning with Version 15, which became effective on August 24, 2009, and continuing in its subsequent warning materials, TASER lowered the preferred target area from upper center mass to lower center mass. To draw the attention of end users and trainers to the change, TASER released Training Bulletin 15.0 on October 12, 2009. This document advised users to avoid intentionally targeting the chest area with probe applications in order to "avoid the remote potential risk of cardiac effect." (Docket No. 60-21.) The document included a "blue-man" graphic depicting the new preferred target area, which no longer included the chest. Id.

On October 15, 2009, TASER released a "frequently asked questions" document regarding the target area changes made in Version 15. The first question asked, "Why was the preferred target zone changed?" TASER provided the following response:

> The answer has less to do with safety and more to do with effective risk management for law enforcement agencies. . . . Should Sudden Cardiac Arrest occur in an arrest situation involving a TASER electronic control device (ECD) discharge to the chest area[,] plaintiff attorneys will likely file an excessive use of force claim against the law enforcement agency and officer and try to allege that the TASER ECD played a role in the arrest related death by causing ventricular fibrillation (VF), an arrhythmia that can be fatal without intervention. The available research does not support this and demonstrates that while it may not be possible to say that an ECD could never affect the heart under any circumstances, the risk of VF is extremely rare and would be rounded to near zero. However, law enforcement is left defending a lawsuit and disproving a negative, which is difficult to do.

(Docket No. 66-16 at 2.)

On or about the same date, TASER posted to its website an article written by TASER Vice President of Training and Education Rick Guilbault. This article discussed lowering the preferred target area. The article stated:

2

> The intent of the new preferred target zones is risk mitigation, pure and simple. It is no secret that TASER International is involved in several lawsuits, and we often partner with law enforcement agencies in defending use of force litigation. We know the tactics being used by plaintiff's attorneys and we are trying to protect our law enforcement customers and ourselves from the lengthy and unpleasant process of civil litigation . . . . With the scientifically unsupported claims of the Braidwood Commission (Canada) that ECDs can cause cardiac arrest, TASER would have been negligent if we did nothing. Instead, we carefully crafted a message to lower your litigation risk without exposing you to any more liability than you currently face.

(Docket No. 66-15 at 1, 3-4.)

On November 6, 2009, TASER released Bulletin 15.0 Synopsis, stating that although TASER had lowered the preferred target area to avoid chest shots, "[t]he risk of an adverse cardiac event related to an ECD discharge is deemed to be extremely low. These guidelines further reduce this remote risk and improve risk management." (Docket No. 66-16 at 2.)

Each version of TASER's training materials includes extensive written and visual materials, as well as drills and a certification examination. Version 16 of TASER's training program became effective on December 7, 2009. Included in the Version 16 materials are numerous references to the new, lowered target area. A PowerPoint presentation includes the blue man graphic depicting the new target zone, stating that shots to this zone "reduce the risk of hitting sensitive body areas . . . ." (Docket No. 114-5.) Version 16 also included a number of drills utilizing the target area. For example, trainees were required to practice drawing the X26 from its holster and aiming the laser sight at the preferred target zone. Three separate drills required trainees to aim and deploy the device's probes at a preferred target zone. (Docket No. 114-3, at 10-12.) TASER provided life-size cardboard cut-outs that highlighted the lower center mass preferred target area for use during the drills.

All of the materials discussed thus far were released by TASER prior to Deputy Wright's training with the X26. However, other than the Version 14 materials, on which he was

3

incorrectly trained, the only personal exposure Wright had with any of the aforementioned materials was at a staff meeting he attended in February 2010 where the Bulletin 15.0 Synopsis was orally discussed. This meeting took place before Wright received his formal training on the X26. Wright testified that he left the staff meeting with the impression that shots to the upper chest remained safe and that the target area had been lowered merely to reduce litigation risk. The later training materials, which included the lower target area, as well as the rest of the Bulletin 15 communications issued to explain the change, were never read first-hand by Wright.

## II. Discussion

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, an award of summary judgment can be granted only when the moving party shows that there is no genuine issue of any material fact. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To survive summary judgment, the non-moving party must present evidence enabling a reasonable jury to return a verdict for that party. Id. at 252.

### B. Analysis

As an initial matter, under Virginia law, plaintiffs are often required to provide expert testimony regarding a product's warnings in a failure to warn case. See, e.g., Alevromagiros v. Hechinger Co., 993 F.2d 417, 421 (4th Cir. 1993) ("'Absent an established norm in the industry,' a court is constrained to rely on the opinion testimony of experts to ascertain the applicable safety standard.") (quoting Ford Motor Co. v. Bartholomew, 224 Va. 421, 430 (1982)). Given the complexity of the warnings at issue in the case and the absence of a clear safety standard regarding devices such as the X26, it is clear that expert testimony is necessary to aid the jury's

understanding of the relevant warnings and their effect on product users. Indeed, the plaintiff concedes that expert testimony is necessary.

The parties disagree, however, on whether the plaintiff's expert, Dr. Kenneth Laughery, can satisfy this requirement in light of the court's earlier ruling limiting the scope of his testimony. As discussed in the court's previous opinion, Dr. Laughery admitted to being unfamiliar with Versions 16[1] and 17 of TASER's training programs, as well as the most up-to-date product warning issued before the incident. Instead, Dr. Laughery reviewed Versions 14, the out-of-date iteration of the program on which Wright was actually trained, and the series of communications issued by TASER explaining the change in the preferred target area. These communications include Bulletin 15.0, the article written by Mr. Guilbault, and the frequently asked questions document also attributed to Mr. Guilbault. Indeed, Dr. Laughery's opinions in his report focus almost exclusively on the effect of these communications. For example, the report states that TASER's warnings "place[] a great deal of emphasis on litigation as a factor. This emphasis on litigation, in conjunction with downplaying the hazard and its consequences, will result in the user not regarding the instruction to aim lower as an important, relevant safety consideration." (Docket No. 89-1 at 10.) Additionally, he opines that the manner in which TASER "viewed and communicated the hazard and consequences of tasing in the chest; namely, that the hazard and its potential consequence of cardiac arrest is virtually nonexistent (the risk could be "rounded to zero") . . . is the equivalent of telling the user "Don't worry about it." Id. As a result of Dr. Laughery's limited review of all the relevant materials, the court held that Dr. Laughery would not be permitted to testify regarding the overall effectiveness of the warnings.

---

[1] Version 16 is included in the list of materials reviewed by Dr. Laughery, but in his deposition he stated that he only "very quickly" scanned the Version 16 training program and could not identify what it included. (Laughery Dep. 82, 94.) The court anticipates allowing Dr. Laughery to discuss Version 16, but considering his deposition testimony, he will be subject to strong impeachment questioning from defense counsel.

5

Having considered the parties' arguments, the court finds that Dr. Laughery's inability to testify about the later materials is not fatal to the plaintiff's claim. The court begins by noting that this case presents a somewhat atypical set of circumstances in that it involves a highly technical product whose full understanding is continuously evolving. Ongoing studies of the physiological effects of the product, including studies by TASER itself, render it difficult if not impossible to state a single standard of care that should be employed in designing adequate product warnings. In that way it is unlike, for example, a typical medical malpractice case where an expert can testify regarding the accepted standard of care to be employed in a particular procedure and whether that standard has been met. Instead, the role of an expert in a case such as this is to aid the jury in determining whether the defendant behaved reasonably in doing everything it could to warn users of the dangers of which it had reason to know. See Torkie-Tork v. Wyeth, 757 F. Supp. 2d 567, 572 (E.D. Va. 2010) ("[A] manufacturer's duty to warn of a product's dangers imposes no underlying duty to conduct additional studies or tests because a failure to warn claim rests on a reason to know standard rather than the broader should have known standard.") (citing Owens-Corning Fiberglass Corp. v. Watson, 243 Va. 128, 135 (1992)) (emphasis in original). This is especially so in this case where there are multiple warnings, training materials, and other communications at issue, as well as an ongoing relationship between the manufacturer and the end user's employer. Under the particular circumstances of this case, the measure of liability is to be taken from the reasonableness of all of TASER's actions.

Given this, Dr. Laughery's unfamiliarity with some of the relevant documents does not defeat the plaintiff's case as a matter of law. Dr. Laughery will be able to testify regarding the materials with which he is sufficiently familiar, particularly the interim communications, and

6

offer his opinion as to what effect those documents would have had on a user who viewed them or was trained using them. That is, whether TASER's actions created a situation where users would never be concerned with the actual risks associated with the product regardless of any additional training they also received. The expert will be allowed to offer an opinion as to whether remediation could ever be successful. However, as per the court's earlier ruling, Dr. Laughery is not qualified to offer an opinion as to whether TASER's actual remediation efforts were ultimately reasonable or successful. While admittedly a close issue, the court maintains its position that the expected testimony is sufficient to create a genuine issue of fact as to the reasonableness of TASER's actions.

### III. Conclusion

For the foregoing reasons, the court believes that Dr. Laughery's expected testimony, while relatively limited, is sufficient to help create an issue of triable fact. Thus, the court will deny the defendant's renewed motion for summary judgment.

The Clerk is directed to send certified copies of this opinion to all counsel of record.

ENTER: This 11th day of April, 2013.

_____
Chief United States District Judge